UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CONN CREDIT I, LP, | ) | |
| | ) | |
| Plaintiff-Counter-Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15-cv-03713 |
| | ) | |
| SHERMAN ORIGINATOR III LLC, | ) | |
| | ) | |
| Defendant-Counterclaimant, | ) | |
| | ) | |

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S ORIGINAL COMPLAINT, AND ORIGINAL COUNTERCLAIMS

Sherman Originator III, LLC ("Sherman") files this Original Answer, these Affirmative Defenses, and these Original Counterclaims against Plaintiff Conn Credit I, LP ("Conn"), as follows:

## INTRODUCTION

This case was originally filed by Plaintiff Conn in the United States District Court for the Eastern District of Texas, and has been transferred to this Court pursuant to an order granting Defendant Sherman's motion for transfer to this Court pursuant to 28 U.S.C. § 1406. Conn had filed the Complaint in the Eastern District in January 2015 without telling Sherman, even while Conn and Sherman were negotiating resolution of *Conn's* breaches of certain provisions of the parties' September 15, 2014 Purchase and Sale Agreement (the "PSA"), and apparent related fraud by Conn. Only when those talks broke down in mid-April 2015 and Sherman sent Conn a demand letter threatening suit did Conn attempt to serve its Complaint on Sherman.

After extensive briefing, Judge Marcia A. Crone found that in describing supposedly relevant contacts with the Eastern District, "Conn appears to confuse Sherman's conduct with its

own" and that the language of the venue statute, 28 U.S.C. § 1391, "favors the defendant and prevents Sherman from being 'haled into a remote district having no real relationship to the dispute.'" (E.D. Tex. Case No. 1:15-cv-7, Doc. #33, Order at 11, 13 (quoting citation omitted).) Now that this case is before the proper Court – indeed, the Court in which Sherman would have filed its own suit if Conn had not preemptively filed in the Eastern District a year ago – Sherman now answers the Complaint, outlines its affirmative defenses, and brings its claims against Conn for breach of contract and fraud in the inducement relating to the PSA.

The loan accounts that Conn sold, or was to sell, to Sherman under the PSA (the "Accounts") had already been agreed to be purchased and had been subsequently rejected by a previous buyer, TF LoanCo III, LLC ("TF LoanCo"), who had entered into its own purchase and sale agreement with Conn months before the Conn-Sherman deal.  Conn knew of the fundamental problems with the loans when they induced Sherman to buy them in September 2014, and knew Conn's representations in the PSA were false at that time.  They lied to Sherman about the reasons the prior (then-unidentified) buyer had backed out.  When Sherman began attempting to service and collect on the loans it had purchased, it quickly learned that Conn's representations were false, account balances were not what Conn said they were, and Conn had engaged in unseemly practices in slamming its consumers with insurance products.  Sherman determined that, because of the problems with many of the loans it was being sold by Conn, it could no longer service them in accordance with applicable law.  It refused to accept for purchase subsequent pools of loans from Conn under the PSA, and demanded that Conn refund Sherman for those it had already purchased, in accordance with Sherman's rights under the PSA.

## ANSWER

Sherman answers Conn's Complaint below with the paragraph numbers in this document corresponding to the paragraphs in the Complaint. The section headers are likewise taken from Conn's Complaint.

### Parties

1.      Admitted.

2.      Sherman admits that it is a Delaware limited liability company with its principal place of business in South Carolina. Sherman admits that it has, at various times, had business contacts with the State of Texas. It denies any implication that it is subject to general personal jurisdiction in the State of Texas, but admits that it is subject to specific personal jurisdiction in the State of Texas because this dispute arises out of the PSA. Sherman admits the identity of its registered agent, but notes that service was not effected by this method. As to any agreement to accept service by certified mail, the PSA speaks for itself.

### Jurisdiction

3.      Admitted.

4.      Sherman admits that it has, at various times, had business contacts with the State of Texas. It denies any implication that it is subject to general personal jurisdiction in the State of Texas, but admits that it is subject to specific personal jurisdiction in the State of Texas because this dispute arises out of the PSA.

### Venue

5.      Denied, to the extent it purports to allege that venue for this case was proper in the United States District Court of the Eastern District of Texas. Admitted to the extent it is now

deemed to state that venue for this case is proper in the United States District Court for the

Southern District of Texas.

### Background Facts

6.      Sherman states that it lacks sufficient information to form a belief as to whether or

not Conn's "marketing agent engaged in substantial marketing efforts to facilitate the sale of the

Portfolio" or as to what Conn's reasons were for engaging the "marketing agent" (Garnet Capital

Advisors LLC ("Garnet")).  Sherman admits that Conn offered for sale certain consumer loans

that had been or were to be charged off, and an interest in certain as-yet unidentified loans that

would henceforth be charged off to and through July 2015.  Sherman denies each and every

allegation not specifically admitted.

7.      Sherman admits that it entered into negotiations with Garnet on or about

September 1, 2014, but denies that it had any direct negotiations with Conn at that time.

Sherman admits that between the dates September 5, 2014 and September 15, 2014, negotiations

took place between representatives of Conn and Sherman, and that Conn and Sherman entered

into a Purchase and Sale Agreement that was dated September 15, 2014.  Sherman denies each

and every allegation not specifically admitted.

8.      Sherman admits that it reviewed, but denies that it was fully satisfied with, the

drafts of the PSA, and specifically states that the negotiations dealt with, among other things,

proposed changes and edits to the various drafts of that agreement.  Sherman admits that the final

version of the PSA was eventually agreed to by both Conn and Sherman, and that it contained

various terms.  Sherman denies that it "reviewed and evaluated the Accounts sold pursuant to the

PSA."  Sherman states that the last sentence of Paragraph 8 of the Complaint, as written, is

unintelligible, and that no response thereto is required.  To the extent that a response to that

sentence is required, it is denied.  Sherman further denies each and every allegation not specifically admitted.

9.     The PSA speaks for itself.  Sherman admits that the design of the PSA was for Sherman to make payments upon monthly account deliveries by Conn of computer files of loan accounts, and further admits that Conn sent Sherman a computer file to Sherman on November 13, 2014.  Sherman affirmatively states that it informed Conn in late October or early November, and in no event later than on November 5 and 7, 2014 that it was not accepting any further accounts under the PSA because of serious issues with Conn's accounts, and in fact requested a full put-back of accounts already purchased.  Sherman denies that it was required to fund under the PSA on November 18, 2014, and further denies each and every allegation not specifically admitted.

10.    Denied.  Section 10.1 of the PSA speaks for itself.

11.    Sherman admits that it communicated to both Conn and Garnet that it would not fund the "October Delivery" (scheduled for delivery during November 2014) and would not fund any other loan deliveries under the PSA.  Sherman denies that it was obligated to pay Conn for any accounts Conn sought to deliver in November 2014, and further denies each and every allegation not specifically admitted.

12.    Sherman states that Paragraph 12 is unintelligible, and vague and ambiguous, in its lack of specificity as to whose payment obligations are alleged to be a breach of the PSA.  To the extent that Paragraph 12 is intended to make allegations with respect to payment obligations of Sherman, Sherman denies that it has failed to comply with any payment obligations under the PSA or that any of its actions constituted a breach of the PSA.

13.    Denied.

**DEFENDANT'S ANSWER AND AFFIRMATIVE**
**DEFENSES TO PLAINTIFF'S ORIGINAL COMPLAINT,**
**AND ORIGINAL COUNTERCLAIMS**

### Cause of Action – Breach of Contract

14.     Sherman incorporates its above responses to Paragraphs 1 through 13 of the Complaint into this paragraph as if set forth fully herein.  As to each and every allegation contained in Paragraph 14, denied.

15.     Denied.

### Cause of Action – Attorneys' Fees

16.     Sherman incorporates its above responses to Paragraphs 1 through 15 of the Complaint into this paragraph as if set forth fully herein.  Sherman states that it lacks sufficient information to form a belief as to whether Conn "has found it necessary to retain the undersigned counsel to prosecute this case" or as to the terms of any engagement between Conn and its counsel, including any agreement by Conn to pay its law firm all reasonable and necessary attorneys' fees and costs.  Sherman therefore denies the allegations in Paragraph 16.

17.     Denied.

18.     Denied.

19.     To the extent that a response to Conn's prayer for relief is required, Sherman, for the foregoing reasons and those set forth in its affirmative defenses and counterclaim(s) below, denies that Conn is entitled to any of the relief it seeks in the Complaint.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

20.     Sherman was not obligated to close on or fund the October Delivery or any subsequent loan deliveries under the PSA, and was excused from performance, by Conn's prior material breaches of the PSA as outlined below in Sherman's counterclaims.

DEFENDANT'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S ORIGINAL COMPLAINT,
AND ORIGINAL COUNTERCLAIMS

## Second Affirmative Defense

21.      Sherman was not obligated to close on or fund the October Delivery or any subsequent loan deliveries under the PSA, and was excused from performance, by Conn's fraudulent actions as outlined below in Sherman's counterclaims.

## Third Affirmative Defense

22.      Conn's claims are barred, in whole or in part, by the doctrine of recoupment.

## Fourth Affirmative Defense

23.      Conn's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## Fifth Affirmative Defense

24.      Conn's claims are barred, in whole or in part, by the doctrine of unclean hands.

## Sixth Affirmative Defense

25.      Conn's claims are barred, in whole or in part, because the PSA is rendered unenforceable by the doctrine of illegality.

## Seventh Affirmative Defense

26.      Conn's claims are barred, in whole or in part, because of Conn's failure to satisfy all conditions precedent to enforcement of its rights, if any, under the PSA.

## Eighth Affirmative Defense

27.      Conn has failed to take reasonable steps to mitigate its alleged damages.

## Ninth Affirmative Defense

28.      To the extent that Conn is awarded any damages, liability for which is denied by Sherman, Sherman is entitled to claim a set-off for the amounts Sherman has paid to Conn.

29.     Sherman reserves the right to assert additional defenses in light of facts and information discovered in the course of the litigation, or otherwise as appropriate and permissible by applicable rules.

**WHEREFORE,** Defendant-Counterclaimant Sherman requests judgment dismissing Conn's Complaint and each of the claims thereunder on their merits and with prejudice, awarding Sherman its costs, disbursements, and attorneys' fees incurred herein, and granting Sherman such other relief to which, in this Court's judgment, it may be entitled.

## ORIGINAL COUNTERCLAIMS

Defendant and Counterclaimant Sherman Originator III LLC ("Sherman"), by its undersigned attorneys, for its counterclaims against Plaintiff-Counter-defendant Conn Credit I, LP, alleges and shows as follows:

1.     Sherman restates and realleges as if set forth fully herein Sherman's Answer and Affirmative Defenses to the Complaint.

### Parties

2.     Defendant-Counterclaimant Sherman is a Delaware limited liability company with its principal place of business in South Carolina.

3.     Plaintiff-Counter-defendant Conn Credit I, LP (with its affiliates, "Conn") is a Texas limited partnership with its principal place of business in The Woodlands, Montgomery County, Texas.  Conn Credit I, LP has a number of affiliate entities, including Conn Appliances, Inc., and Conn Credit Corp., Inc., both Texas corporations with their principal places of business in Texas, and Conn's, Inc., a Delaware corporation headquartered in The Woodlands, Montgomery County, Texas, which is the ultimate parent company of Conn Credit I, LP and its

other affiliates.  Conn's, Inc. is a publicly-traded holding company with no independent assets or operations aside from those of its subsidiaries.

## Jurisdiction and Venue

4.      Sherman agrees that personal jurisdiction is proper in the State of Texas because Conn, and its affiliates, have their headquarters and principal places of business in Texas, and Sherman has consented to personal jurisdiction in the State of Texas.  Sherman also agrees that this Court has subject matter jurisdiction over this dispute because diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a) in that this is a civil action in which the amount in controversy exceeds $75,000 and is between citizens of different States.

5.      Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391 because a substantial part of the actions that led to Sherman's counterclaims occurred within this District.

## Conn and Its Affiliates' Retail and Financing Businesses

6.      Conn and its affiliates produce revenue from at least two sources: (i) retail sales and delivery of products such as consumer electronics and home appliances, among others, and (ii) an in-house consumer credit program, including sales of related financing and credit insurance products.

7.      As of August 2015, Conn and its affiliates operated approximately ninety-five (95) retail stores in twelve (12) different states:  Arizona, Colorado, Georgia, Louisiana, Mississippi, Nevada, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.

8.      Conn Credit I, LP (i.e., the Plaintiff-Counter-defendant here) is primarily responsible for the Conn corporate family's credit business.

9.      Conn requires its retail customers to provide proof of property insurance coverage on all installment credit purchases to offset potential losses relating to theft or damage of the product financed.  For any consumer that does not have or acquire such insurance from a third party, Conn requires that he or she purchase property insurance from Conn or one of its affiliates. For all sales through its credit program, Conn and its affiliates act as agents for third-party insurance companies to offer property, life, disability and involuntary unemployment credit insurance.  As a result of each such sale, Conn receives sales commissions from the third-party insurance company at the time it sells the coverage, and it then receives retrospective commissions in the event that insurance claims end up being less than the earned premiums. Conn also sells repair service agreements to consumers on behalf of third-party insurance at the time products are purchased and thereby receives additional commissions in a similar fashion.

10.     Conn's financing operation targets a specific socio-economic group of consumers, namely those consumers not typically eligible for other credit options.  That is, Conn's primary customers are consumers with a FICO score described as "bad" to "fair" – between 550 and 650. In recent litigation, it has been alleged that Conn – as part of an aggressive expansion scheme – targeted those with even worse credit scores, at least as low as those with scores of 400, and that in many circumstances it provided financing to consumers without any regard to their credit standing or ability to pay the full amount due.

11.     Upon information and belief, many Conn consumers do not understand that they are buying insurance products, or, if they do, are uninformed about crucial aspects of the insurance products for which Conn is charging them due to aggressive and deceptive sales techniques by Conn personnel.

12.     Conn's sales practices, including with respect to the sale of warranty and insurance products, have a history of leading to litigation filed against Conn and its affiliates. For example, in 2009, Texas's then-Attorney General Greg Abbott filed suit against Conn's Inc. and Conn Appliances in the District Court of Harris County, Texas, alleging violations of the Texas Deceptive Trade Practices – Consumer Protection Act. *See State of Texas v. Conn's Inc. and Conn Appliances, Inc.*, Harris County District Court, No. 2009-33349.  This lawsuit resulted from more than 3,000 consumer complaints about Conn to the state and the Better Business Bureau over a three-year period.  The deceptive sales practices alleged included delayed repair appointments and refusals to provide refunds or replacements for defective products, as well as use of high-pressure sales tactics to sell extended warranties, followed by refusal to honor those warranties.  Conn later settled the case by paying $4.5 million to a consumer restitution fund and promising to change its sales practices, including refraining from adding extended warranty or credit insurance to invoices without written consent.  Upon information and belief, Conn has continued some or all of these deceptive practices.

13.     In addition, Conn's business practices regarding its loan financing have resulted in multiple shareholder derivative lawsuits that have been consolidated and are currently pending before Judge Keith Ellison of this District.  *See In re Conn's Inc. Securities Litigation*, No. 4:14-cv-548 (S.D. Tex.).  These suits allege that (a) Conn sought to profit by lowering its underwriting standards and offering lines of credit to unqualified consumers and pushing large items onto consumers with little or no ability to pay, even while telling the investing public that it was raising its underwriting standards; (b) Conn forced consumers to purchase credit insurance through a requirement buried in paperwork, then added this payment obligation amount so as to artificially inflate its sales revenue levels; (c) Conn violated federal securities laws by failing to

disclose that it was increasing sales revenues through methods that weakened the quality of its loan portfolio, leading to rising rates of delinquency on loan accounts and threatening the company's financial performance; and (d) Conn's executives sold millions of dollars' worth of Conn stock based upon non-public information while the stock was artificially inflated due to temporary financial success stemming from lowered underwriting standards.  That complaint further alleges that Conn, in early 2014, publicly and falsely blamed an "unexpected delinquency increase" on Conn's internal staff's failings with respect to collections.

### Conn and Garnet's First 2014 Sale of Charged-Off Loan Accounts

14.     In many instances, Conn's consumer borrowers fail to timely repay their loans.  In those cases, the loans become delinquent and, if not paid within a certain period of time, are charged-off by Conn as less likely to be ultimately collected.

15.     During 2014, in packaging, marketing and selling its consumer loans, Conn worked with a marketing agent to broker its loan portfolio deals, namely Garnet.

16.     In Spring 2014, Conn and Garnet offered for sale tens of millions of dollars in Conn consumer loans that were then or would become overdue and charged-off.  The loan pools for sale in Spring 2014 included consumer accounts that already had been charged off between October 2013 and January 2014 (four months), as well as "fresh forward flow" of anticipated pools of loans that would be subject to charge-off between February 2014 and January 2015 (twelve additional months).

17.     Garnet and Conn marketed these pools of charged-off loans through an offering memorandum, containing information about the portfolio, that was circulated by Garnet to prospective purchasers (the "Offering Memorandum").  The Offering Memorandum required bids to be received no later than April 22, 2014.

DEFENDANT'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S ORIGINAL COMPLAINT,
AND ORIGINAL COUNTERCLAIMS

18.     The Offering Memorandum was sent to Sherman in South Carolina and, upon information and belief, to a number of other prospective debt purchasers, including, but not limited to, TF LoanCo in Florida.

## Conn and TF LoanCo Enter Sale Agreement, and TF LoanCo Informs Conn and Garnet of Fraud and Breaches Relating to Loan Accounts

19.     Unbeknownst to Sherman at the time, on or about April 30, 2014, Conn entered into a purchase and sale agreement with TF LoanCo (the "TF PSA").[1]  Under the TF PSA, Conn was to sell, and TF Loan Co was to purchase, consumer accounts pursuant to a certain delivery schedule, contemplating a total of thirteen (13) deliveries of accounts from the date of the TF PSA through approximately January 2015 (each described as a "Closing Date").  Upon information and belief, TF LoanCo had been the selected bidder for the portfolio offered in the Offering Memorandum that Sherman had received, and the portfolio conveyed in the TF PSA was the same one offered to Sherman (and others) in the Offering Memorandum in Spring 2014.

20.     Unbeknownst to Sherman at the time, the TF PSA included a provision (Section 10.2) that provided that Conn and TF LoanCo would be obligated to complete a particular delivery under the TF PSA "on a Closing Date only if (i) the representations and warranties of [TF LoanCo] and [Conn], respectively, in this [TF PSA] are true and correct as of such Closing Date; and (ii) [TF LoanCo] or [Conn], respectively, has complied in all material respects with any obligations to be performed by it on or prior to such Closing Date."

---

[1] Various facts in this section are drawn from TF LoanCo III, LLC's Second Amended Answer and Affirmative Defenses, and Original Counterclaims, filed on January 4, 2016, and Conn's Answer to TF LoanCo's Counterclaims, dated June 22, 2015, in the matter styled *Conn Credit I, LP v. TF LoanCo III, LLC*, C.A. No. 1:14-cv-429, pending before District Judge Ron Clark of the Eastern District of Texas.

21.     Unbeknownst to Sherman at the time, the TF PSA included a number of other representations and warranties by Conn to TF LoanCo, including, but not limited to, those found in Article 8 of the TF PSA.  In many instances, versions of these representations and warranties were also included in the PSA drafted by Conn and entered into by and between Conn and Sherman.

22.     Unbeknownst to Sherman at the time, by May 9, 2014, TF LoanCo and Conn had closed on the four-month bulk delivery contemplated by the TF PSA and the "fresh forward flow" deliveries #1 and #2 scheduled under the TF PSA (the February 2014 and March 2014 charge-offs listed above).  For these deliveries, TF LoanCo paid Conn a total of $6,426,666.73, between approximately April 30, 2014 and May 2014.

23.     Unbeknownst to Sherman at the time, the closing date for the next deliveries under the TF PSA was to be August 28, 2014 (for the April 2014, May 2014, June 2014, and July 2014 charge-offs).  Between July 2014 and August 26, 2014, however, TF LoanCo informed Conn that it refused to close on those deliveries because, TF LoanCo explained, Conn had materially breached the TF PSA and engaged in fraudulent conduct with regard to the TF PSA and the subject loan accounts.

24.     Upon information and belief, TF LoanCo's refusal to close on August 28, 2014 was due to a material breach of the TF PSA and/or Conn's fraudulent actions, and had nothing to do with any failure of TF LoanCo's financing sources nor with any inability of TF LoanCo to fund amounts due to be paid under the TF PSA, as Garnet (on Conn's behalf) would later fraudulently assert to Sherman.

25.     According to TF LoanCo, it refused to close in August 2014 based upon:

- Conn's breach of several representations and warranties in the TF PSA, including Sections 8.1-8.3, 8.5-8.7, and 8.9 thereof, including because Conn "engaged in a systematic practice whereby it does not refund/rebate any unearned portion of a [Repair Service Agreement] to consumers at the time of charge off," and "[t]his practice violates Conn's contracts with its consumers and all applicable laws, including the [Texas Service Contract Regulatory Act] and similar state laws." (*Conn Credit I, LP v. TF LoanCo III, LLC*, C.A. No. 1:14-cv-429, Doc. #35, at 9-11, ¶¶ 12-18);

- TF LoanCo's belief, based on the above conduct, that it had overpaid Conn for the accounts that it purchased as of that date (*id.* ¶ 20);

- TF LoanCo's belief that Conn had sold it accounts "that do not accurately and legally reflect the true and correct balances due and owing by consumers," meaning "any attempts by TF LoanCo to collect such amounts could potentially run afoul of the Federal Fair Debt Collection Practices Act…" (*id.* ¶ 21).

26.     Unbeknownst to Sherman at the time, Conn filed a complaint against TF LoanCo for breach of contract in the U.S. District Court for the Eastern District of Texas on August 23, 2014, serving an amended version of it on or about August 28, 2014.  (Doc. #1, *Conn Credit I, LP v. TF LoanCo III, LLC*, Civ. A. No. 1:14-cv-00429; *id.*, Doc. #4.)  TF LoanCo has since filed counterclaims against Conn, including for fraud and breach of contract.

## Conn and Garnet Seek to Sell 2014 Charged-Off Loan Accounts Again – This Time, to Sherman

27.     Despite TF LoanCo specifically raising with Conn and Garnet a number of Conn's illegal practices, contractual breaches, and fraudulent representations and conduct, Conn

quickly decided to sell the loan pools again (to a different buyer) in order to paper over the many

problems with the loan accounts, even while attempting to collect damages from TF LoanCo for

the deliveries it had refused to accept or purchase.  Specifically, Conn (with Garnet) sought to

sell charge-offs starting with the very same April 2014, May 2014, June 2014, and July 2014

pools of charge-offs that TF LoanCo had rejected.

28.     In late August 2014, Garnet (on behalf of Conn) contacted candidates, including

Sherman, to stoke renewed interest in purchasing the troublesome loan accounts from Conn.

29.     Conn and Garnet decided not to tell Sherman about the problems and disputes

with TF LoanCo regarding the loan accounts, nor about TF LoanCo's allegations regarding

breaches and fraudulent actions by Conn, for the common purpose of misleading Sherman and

encouraging it to enter into an agreement with Conn and purchase the Accounts.

30.     On or about September 1, 2014, Garnet (on behalf of Conn) contacted Sherman

regarding the renewed possibility of Sherman purchasing Conn's charged-off consumer debt in a

transaction substantially similar to that previously described and proposed in the Offering

Memorandum.  Garnet and Conn, in approaching Sherman in September 2014, left Sherman to

rely upon the very same Offering Memorandum that had been sent out months before, in Spring

2014.

31.     On or about September 1, 2014, Garnet (on behalf of Conn) contacted Sherman

and told Sherman that the accounts were coming to market again because the prior purchaser had

been "unable to fund." This statement was false when made, as were related statements.  Upon

information and belief, Garnet made this false statement, and other related statements, to

Sherman because it been instructed to say this by Conn.

32.     Garnet (on behalf of Conn) drafted and sent to Sherman the first version of what was to become the PSA.

33.     On or about September 10, 2014, Garnet (on behalf of Conn) sent Sherman a draft of what was to become the PSA, after which time negotiations continued between Garnet (on behalf of Conn) and Sherman.

34.     The September 10, 2014 draft of the PSA sent to Sherman did not include any provision akin in form to what had been Section 10.2 of the TF PSA.  Upon information and belief, Conn, Garnet and/or their respective attorneys intentionally did not include this Section 10.2 in this draft because they knew, or had reason to believe, that Conn's representations and warranties elsewhere in the draft PSA would not be accurate and would, in fact, be false.

35.     During September 2014, a Section 10.1 was added to the PSA, providing that either party can terminate the PSA, including, but not limited to, "if there has been a material violation or breach by the other Party of any covenant, representation or warranty contained in the Agreement."

36.     During the course of negotiations, neither Conn nor Garnet ever informed Sherman of (a) the real reasons that the prior purchaser (TF LoanCo) had refused to fund further purchases, (b) the TF LoanCo letter of default that had been sent to Conn, (c) the known problems and disputes regarding Conn's commercial practices including with regard to the sale of insurance and warranty products to consumers, (d) the known problems and disputes regarding the balances of loan accounts the sale of which was being negotiated, nor (e) the litigation then pending between Conn and TF LoanCo.  If Sherman had known any of these facts as of or before September 15, 2014, it would not have entered into the PSA with Conn.

### Conn and Sherman Enter the PSA

37.      Sherman and Conn entered into their PSA on or about September 15, 2014.  A true and correct copy of the PSA is attached hereto as **Exhibit "A"**[2].

38.      The PSA contemplated that Conn would sell, and Sherman would purchase, certain consumer "Accounts" pursuant to a delivery schedule.  That delivery schedule contemplated a total of thirteen (13) deliveries of accounts – starting with the April 2014 through July 2014 charge-offs that TF LoanCo had already rejected, and such subsequent sets of charge-offs that TF LoanCo had told Conn it would not purchase – such deliveries contemplated to occur from September 2014 through approximately August 2015.

39.      If Conn breached any of its representations or warranties in the PSA, Sherman had, among other rights:  (i) the right to terminate the PSA; and (ii) the right to file an action seeking damages demanding that Conn repurchase Accounts from Sherman.

40.      In entering into the PSA and in purchasing Accounts thereunder, Sherman was taking on certain risks with respect to whether all amounts would actually be collected from the respective obligors; however, it did not take on any risk as to whether the various Accounts actually existed, were valid, and were being conveyed to Sherman, nor with respect to Conn's other representations and warranties.

41.      As further detailed elsewhere herein, at the time the PSA was executed, Conn knew, or had reason to know, that certain of Conn's representations and warranties in the PSA were and would be false.

---

[2] Exhibit "A" is provided to the Court under seal pursuant to Defendant Sherman Originator III, LLC's Motion to Seal filed of even date.

42.     Sherman and Conn closed on the "Bulk Delivery" and "Delivery 1" in September 2014, with Sherman paying Conn $3,542,995.62 and accepting delivery.

43.     Sherman and Conn closed on "Delivery 2" on October 2014, with Sherman paying Conn $862,287.70 and accepting delivery.

### Conn's Actionable Conduct

44.     Soon after Sherman began attempting to service loan accounts in the first sets of loans it had purchased in September 2014 and October 2014, it became clear that the Accounts that Conn had originated and sold to Sherman suffered from serious issues, including with respect to the accuracy and reliability of the balance (amount) of the Accounts.  The debtors Sherman or its agents contacted asserted claims and complaints regarding the Accounts at a very high rate – some 13 times the rate that would otherwise be expected in this market with similar debtors.   The complaints included, but were not limited to, consumers stating that they had already disputed or made a claim regarding their Account (before sale to Sherman), that merchandise had been returned to Conn but had not been credited to their Accounts, that the Account balances reflected insurance amounts that they had not purchased or had not received promised benefits from, that Conn had told the consumer that she would receive her purchase for free, that Conn had deceptively marketed insurance, that Conn had provided deceptive descriptions of the goods, that Conn had not honored its warranties, and that Conn's products were defective.  Sherman quickly realized that Conn was in breach of Sections 8.5, 8.6 and 8.7 of the PSA, among other provisions, and along with other potential claims Sherman would have available to it.

45.     In communications with Sherman in early November 2014, Garnet recognized that the nature and volume of complaints and claims Sherman was hearing from consumers were

above and beyond what would normally be experienced for this type of customer base, which it felt was an "important" point for discussion with Conn.

46.     The issues Sherman uncovered led it to conclude that it could no longer service many of the loan accounts consistent with its legal obligations, including those under the federal Fair Debt Collection Practices Act, that it would cease its funding of Account deliveries and not accept any further deliveries, and that it would assert its rights under the PSA to demand a full putback to Conn of the uncollectible accounts that it had purchased to date.

47.     Sherman promptly informed Conn (through Garnet) of its awareness of the problems with the Accounts, the apparent widespread data problems, and the breaches by Conn of the PSA by October 29, 2014 and at various times in early November, 2014.  Sherman also informed Conn that it would not fund any more purchases under the PSA, and requested a full putback of the uncollectible accounts that it had previously purchased.

**Failure to Provide Notice of TF LoanCo Litigation and Dispute**

48.     In Section 4.4 of the PSA, Conn was obligated to "provide the other party [Sherman] with prompt reasonable notice of any demand letters threatening to sue . . . Seller [Conn], any filed lawsuits and/or any threatened regulatory proceedings regarding the Accounts . . . ."

49.     Upon information and belief, during or before August 2014, TF LoanCo had sent one or more letters constituting a "demand letter" relating to the Accounts it had purchased and was refusing to purchase under the TF PSA, including those that were then included in the scope of those Accounts later to be sold under Conn's PSA with Sherman.

50.     On August 23, 2014, Conn "filed" its lawsuit against TF LoanCo regarding the Accounts in the United States District Court for the Eastern District of Texas.

51.     On August 27, 2014, Conn "filed" a First Amended Complaint against TF LoanCo regarding the Accounts in the United States District Court for the Eastern District of Texas.

52.     Contrary to its representations in the PSA and its obligations under Section 4.4 thereof, Conn failed to provide prompt reasonable notice of the demand letter(s) and filed lawsuits involving Conn and TF LoanCo.  Thereafter, Conn accepted payments from Sherman for the Bulk Delivery, Delivery 1, and Delivery 2, in September 2014 and October 2014.

53.     On January 7, 2015, Conn "filed" a lawsuit against Sherman regarding the Accounts in the United States District Court for the Eastern District of Texas.

54.     Contrary to its representations in the PSA and its obligations under Section 4.4 thereof, Conn failed to provide prompt reasonable notice to Sherman of the lawsuit Conn filed against Sherman.  Conn did not attempt to serve, or otherwise notify Sherman of, this lawsuit until sometime in April 2015.

### Breaches of Account Representations

55.     Conn ran afoul of various representations and obligations under the PSA it entered with Sherman.

56.     Among others, Conn represented and warranted therein, as follows:

a.  "[Conn] . . . has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject . . . ."  (§ 8.1);

b.  "The Accounts have been originated, serviced and collected in accordance with all applicable laws" (§ 8.5);

c.  "Except for Accounts eligible for repurchase under Article VI, *each Account*

*represents the valid, enforceable, legal and binding obligation of each Obligor . . . .*"

(emphasis added) (§ 8.6 ("Accounts Valid and Enforceable")),

d.  "The information included in the applicable Computer file as of the date the

Computer Files are transferred to [Sherman] are materially accurate . . . ." (§ 8.7);

e.  "Account Documents provided pursuant to Section 3.2 are accurate in all material

respects." (§ 8.9).

57.      Each of these representations proved to be false, and based on Conn's knowledge

of its own practices and of the issues raised by TF Loan Co, Conn knew or had reason to believe

they would be false as of the time the PSA was executed.

58.      The pools of loans that Sherman purchased or was to purchase pursuant to the

PSA were all "charged-off" loans.  Upon information and belief, when Conn charged off

consumer loans, it failed to credit back to the consumer's debt balance the amount of

unearned/unused repair service/extended warranty agreements that the consumer had previously

financed.[3]

59.      Upon information and belief, when a consumer makes a purchase at a Conn store,

Conn often sells to the consumer a repair service/extended warranty agreement (an "RSA").  The

cost of these RSAs are then added to the total amount financed by the consumer through the

loans Conn originates for them.  A massive percentage of the consumers whose Conn accounts

---

[3] Certain allegations in paragraphs 58 through 63 are based, in part, on the counterclaims and the answer thereto in the matter of *Conn Credit I, LP v. TF LoanCo III, LLC*, C.A. No. 1:14-cv-429, pending before District Judge Ron Clark of the Eastern District of Texas (Docs. #35, 39, at ¶¶ 12-21), and are also consistent with the types and frequency of insurance-related complaints Sherman received from consumers after it began attempting to service the Accounts it purchased under the PSA.

Sherman purchased under the PSA were among those consumers who, wittingly or unwittingly, had financed these RSA amounts.

60.     Upon information and belief, these RSAs are cancelled at the time a delinquent account is charged off.

61.     Upon information and belief, in its contracts with these consumers, Conn agreed that upon cancellation of the RSAs, Conn would rebate or refund any unearned/unused portions thereof by crediting those amounts back to the account in question.  Likewise, pursuant to applicable laws in the various relevant jurisdictions, including the Texas Service Contract Regulatory Act, Texas Occupations Code § 1304.001 et seq., consumers who purchase RSAs are entitled to have prorated amounts thereof refunded (and credited) back to their accounts upon cancellation.

62.     Upon information and belief, contrary to its consumer contracts and these applicable laws, however, Conn does not rebate or refund to consumers the unearned/unused portion of the RSA at the time of charge-off, resulting in material breaches by Conn of its PSA with Sherman.

63.     Upon information and belief, when Conn reported the alleged account balances to Sherman in documents such as the Bill of Sale relating to the Bulk Delivery, Delivery 1, and Delivery 2, the account balances were overstated and had been "padded" with these unearned RSA amounts.  As a result, Conn requested and received payment from Sherman in excess of that which it otherwise would have received for each delivery and in excess of that which it, even arguably, could claim to be entitled.

64.     As of November 2014, consumer disputes regarding the Accounts were being received at a rate that was approximately thirteen (13) times what an experienced market

participant like Sherman would expect from a transaction with the types of loans and consumers at issue.

65.     This issue goes to the core of what the Accounts are, and it precludes Sherman even from collecting on almost all of those it purchased by October 2014, or on any of those Accounts that Conn sought to have Sherman purchase in November 2014 and thereafter.  Under the applicable federal Fair Debt Collection Practices Act (the "FDCPA"), and similar applicable state laws, debt collectors (including Sherman) "may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," including a stringent bar on any "false representation of . . . the *character, amount, or legal status* of any debt." (Emphasis added.)   15 U.S.C. § 1692e(2)(A).  Thus, Conn has sold to Sherman accounts that it cannot even attempt to collect without potentially running afoul of federal and state debt collection laws in that it is unable to make true and correct representations to consumers as to the amount due and owing on their accounts.  This precludes Sherman from realizing the basic benefit of its bargain with Conn, and means that the amounts it paid for the deliveries it accepted cannot be recouped.  Unsurprisingly, these revelations constitute breaches of various representations and warranties that Conn made in the PSA.

66.     These practices, and other origination, servicing and collection practices by Conn run afoul of other relevant federal and state laws, including, but not limited to, Unfair and Deceptive Acts or Practices ("UDAP") violations.

67.     In fact, contrary to Section 8.1, Conn had *not* complied with all laws, rules, and regulations to which it is subject.

68.     In fact, contrary to Section 8.5, Conn had *not* originated, serviced and collected the Accounts in compliance with applicable law.

69.     In fact, contrary to Section 8.6, many, if not all, of the Accounts *did not* represent the valid, enforceable, legal and binding obligation of the obligor in question.

70.     In fact, contrary to Sections 8.7 and 8.9, the Computer Files and other data related to the account balances of various Accounts was *not* materially accurate.

71.     Sherman relied upon the above representations and warranties by Conn in the PSA in entering into the transaction with Conn, and such reliance was made explicit by the terms of the PSA (*see, e.g.*, Section 7.1).

72.     After Sherman raised with Garnet and Conn the problems with the loans, Conn nevertheless encouraged Sherman to continue to service and attempt to collect on all of the Accounts anyway.

73.     Not only did Conn refuse to provide adequate recompense to Sherman for the deliveries which it had accepted and paid for in September and October 2014, Conn has filed suit seeking remedies for Sherman's (contractually-permitted and rational) refusal to accept *additional* pools of loans under the PSA that would be essentially worthless and for which it would be unlawful to attempt collection.

### Failure to Provide Account Documents

74.     Under Sections 3.2 and 8.9 of the PSA, Conn was further obligated to provide certain "Account Documents, including, (i) for credit card accounts, applications, invoices, and payment histories, and (ii) for consumer loan accounts, instruments evidencing an obligation to repay the Account, invoices, payment histories, and where requested, affidavits of debt and affidavits of sale at the individual Account level," and it represented that these Account Documents were accurate in all material respects.

75.     Despite requests from Sherman, Conn failed to provide Sherman with the necessary documents regarding the Accounts as it had contractually agreed to provide, breaching Section 3.2 of the PSA.

### Failure to Accept Putback

76.     Under Article VI of the PSA, and specifically Section 6.1, Conn had an obligation to repurchase any Account if any of eight listed conditions applied.  If any of those conditions was met, Sherman was obligated to immediately cease collecting the affected Accounts and provide notice to Conn.  Conn was then obligated to repurchase the affected Accounts, unless (a) Conn made a request to Sherman for "reasonably detailed information and documentation" (under Section 6.2); (b) Conn provided Sherman with an "Account-level response" as to any Accounts Conn disagreed as to satisfaction of any of the above conditions (under Section 6.3); and (c) after further discussion, the evidence or proof provided by Sherman in response to Conn's request was not reasonably satisfactory to Conn (under Section 6.4(d)).

77.     As noted above, Conn further represented and warranted, under Section 8.6 ("Accounts Valid and Enforceable"), that, "Except for Accounts eligible for repurchase under Article VI, *each Account represents the valid, enforceable, legal and binding obligation of each Obligor . . . .*" (Emphasis added.)

78.     In the event of "any breach by Seller [Conn] of any of its representations or warranties in respect to any Account, [Sherman]'s sole and exclusive remedy for damages other than third party claims arising out of such breach shall be the Seller's [Conn's] repurchase of such Account." (Section 9.4.)

79.     Sherman also had putback rights with respect to any Accounts in the event of breach of a representation or warranty by Conn relating thereto.

80.     Sherman informed Conn and provided notice that it was exercising its right to a full putback the balance of the uncollected Accounts it had purchased.

81.     Conn has not acted in accordance with its putback obligations, has not accepted the putback tendered by Sherman, and has not repaid Sherman for the Accounts included therein. Therefore, Conn is in breach of the PSA.

### Conn Preemptively Sues Sherman

82.     Between the time of the PSA's signing in September 2014, and December 2014, the SEC requested information regarding Conn's underwriting policies and bad debt provisions, and Conn's CFO resigned.

83.     In good faith, from October 2014 until mid-April 2015, Sherman worked with Conn to resolve the issues arising from Conn's breaches and the problems with the loan accounts it had purchased in September and October 2014.  Without telling Sherman, Conn had filed the Complaint in this action on January 7, 2015, in the Eastern District of Texas.  Only after Sherman sent Conn a demand letter to Conn on April 6, 2015, threatening to initiate litigation to enforce Sherman's rights, did Conn attempt to serve Sherman or notify it of the Complaint. Likewise, only after Sherman received a copy of the Complaint in this action did it become aware of the disputes between Conn and TF LoanCo.

### COUNT I – BREACH OF CONTRACT

84.     Sherman incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

85.     In the event of any material violation or breach by Conn of any of Conn's covenants, representations, or warranties in the PSA, Sherman had the right to terminate the PSA

without any notice requirements, pursuant to Section 10.1(a), and the right to damages from Conn in the form of its repurchase of all Accounts relating to the breach.

86.     In early November, Sherman informed Conn that it would not accept any further deliveries under the PSA and would not pay for any further deliveries of pools of loans thereunder.

87.     Conn's actions, inactions, omissions, and conduct identified herein constitute material breaches of the PSA.  In particular, and among other things, Conn breached the PSA by failing to provide prompt notice to Sherman of letters and lawsuits regarding the Accounts; by failing to repurchase loan accounts upon written notice from Sherman and Garnet, and failing to adequately respond to Sherman's repurchase request; and by breaching the representations and warranties it made in the PSA.

88.     Conn's breaches have caused Sherman to suffer actual damages.

89.     Based thereon, Sherman is entitled under the PSA to have Conn repurchase Accounts for which Sherman has paid, totaling $4,283,347.00, and is entitled to damages in like amount.

## COUNT II – FRAUDULENT INDUCEMENT

90.     Sherman incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

91.     Upon information and belief, as of August 23, 2014, September 1, 2014, and on all dates thereafter, Conn knew about a number of problems with the Accounts that Conn then sold to Sherman, including, without limitation, that the account balances associated with many of those loan accounts were incorrect and that attempting to collect on loans in these pools would likely run afoul of applicable laws, including, but not limited to, the FDCPA.

92.     In connection with the PSA, Conn made representations and warranties that, at the time, Conn knew to be false or that it made recklessly without any knowledge of their truth and as positive assertions, including but not limited to representations and warranties located in Sections 8.3-8.7 and 8.9 of the PSA.

93.     Conn made these representations with the intention that Sherman act on them in entering into a contractual relationship with Conn as embodied by the PSA, and Sherman did rely on these representations in doing so.  That is, not only did these representations turn out to be false, Conn made them with no intention that they ever be true and with no intention of ever performing under the contract, in order to induce Sherman to enter into the contract.

94.     Sherman has been damaged as a result of relying on Conn's representations and warranties found in the PSA.

95.     At the time the PSA was executed, and at all relevant times thereafter, Conn knew, or had reason to believe, that many of the Accounts *did not* represent the valid, enforceable, legal and binding obligation of the obligor in question.

96.     At the time the PSA was executed, and at all relevant times thereafter, Conn knew, or had reason to believe, that it had *not* originated, serviced and collected the Accounts in compliance with applicable law.  Specifically, they knew or had reason to believe that, since many of the stated account balances were likely incorrect, any past (or future) servicing or collection activity thereon would likely be violation of federal and state law.

97.     In its role in negotiating and pushing for the transaction, Garnet (on behalf of Conn) likewise made representations to Sherman.  For example, and not by way of limitation, Garnet represented to Sherman, during a phone call with Bryan Faliero of Sherman on or about September 1, 2014, that Accounts were again available for purchase because the prior purchaser

(which, unbeknownst to Sherman at the time, had been TF LoanCo) had been "unable to fund." When Mr. Faliero sought further explanation during this call, Garnet insisted to Mr. Faliero that the prior purchaser simply had not been able to pull together sufficient funds to purchase the remaining Accounts.  Upon information and belief, Garnet made these false statements to Sherman because it been instructed to say this by Conn, which desired to induce the counter-party to enter into an agreement to purchase the Accounts.   The statements were false, and Conn knew these assertions to be false at the time.  Garnet (on Conn's behalf) made these representations, among others, to Sherman in order to cause Sherman to rely on the representations in entering, and induce it to enter, into a contractual relationship with Conn for the purchase of the Accounts, which contractual relationship was eventually embodied by the PSA.

98.     Sherman has been and will be damaged as a result of relying on Conn's representations and warranties, including, but not limited to, those made through its agent Garnet.

99.     During the time of negotiations, Conn (and Garnet, working on Conn's behalf) omitted material information that it was obligated to share with Sherman, including, but not limited to, the dispute and litigation between Conn and TF LoanCo, the real reasons that TF LoanCo refused to fund further deliveries of the Accounts under the TF PSA, and the known issues and problems with the Accounts being sold pursuant to the PSA with Sherman.

100.     Sherman has suffered and will continue to suffer monetary damages due to Conn's material omissions and failures to provide material information to Sherman during negotiations.

101.     If Sherman had known the truth about the dispute and litigation between Conn and TF LoanCo, the real reasons that TF LoanCo refused to fund further deliveries of the Accounts under the TF PSA, and/or the issues and problems known to Conn with regard to the Accounts being sold pursuant to the PSA, Sherman never would have entered into the PSA.

102.     Because of Conn's conduct described herein, Sherman has been denied the benefit of its bargain under the PSA, and is entitled to all attendant damages.

103.     Conn's fraudulent conduct was motivated by willfulness, wantonness, malice and/or fraud, for which the law allows the recovery of exemplary damages.  Accordingly, Sherman seeks an award of exemplary damages in an amount to be determined at trial.

### COUNT III – ATTORNEYS' FEES

104.     Sherman incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

105.     In Section 13.12 of the PSA, the parties agreed that "[i]n the event of litigation under this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs."  Sherman has employed the undersigned law firms and attorneys to represent it in this litigation and has agreed to pay them for their services.  Accordingly, Sherman seeks to recover all of its reasonable and necessary attorneys' fees and costs from Conn in this lawsuit, both for successfully defending against Conn's claims, and for prevailing in its prosecution of its counterclaims.

**WHEREFORE,** Defendant-Counterclaimant Sherman respectfully requests judgment in its favor, dismissing Conn's claims and causes of action in their entirety, with prejudice, and judgment in Sherman's favor with respect to each of its above counterclaims, along with an order for all proper relief, including requiring Conn to pay Sherman:

DEFENDANT'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFF'S ORIGINAL COMPLAINT,
AND ORIGINAL COUNTERCLAIMS

a.  actual damages in an amount to be proven at trial;

b.  liquidated damages;

c.  the remedies provided for in Article VI and Section 9.4 of the PSA;

d.  pre-judgment interest on all of the foregoing at the maximum rate allowed by law;

e.  Sherman's attorneys' fees and costs as provided for in Section 13.12 of the PSA;

f.  exemplary damages in an amount to be determined at trial;

g.  post-judgment interest on all of the foregoing at the maximum rate allowed by law; and

h.  such other relief, in law or equity, to which Sherman may entitled.

Dated:  January 22, 2016

Respectfully submitted,

William A. Gage, Jr.
Attorney-in-Charge
Texas Bar No.  07566580
BUCK KEENAN, LLP
700 Louisiana, Suite 5100
Houston, Texas 77002
713.225.4500 Telephone
713.225.3719 Facsimile
gage@buckkeenan.com

*Counsel for Defendant-Counterclaimant*
*Sherman Originator III LLC*

OF COUNSEL:

Andrew J. Wronski (admitted pro hac vice)
Kellen C. Kasper (admitted pro hac vice)
Gregory N. Heinen (admitted pro hac vice)
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.271-2400 Telephone
414.297.4900 Facsimile
awronski@foley.com
kkasper@foley.com
gheinen@foley.com

*Counsel for Defendant-Counterclaimant*
*Sherman Originator III, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant Sherman Originator III, LLC's Answer to Plaintiff's Original Complaint was served on all counsel of record in this cause by the Clerk's ECF system on January 22, 2016.

**By ECF System**

**COUNSEL OF RECORD**

J. Thad Heartfield
M. Dru Montgomery
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, TX 77706
(409) 866-3318
thad@heartfieldlawfirm.com
dru@heartfieldlawfirm.com


*/s/ William A. Gage, Jr.*
William A. Gage, Jr.