UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CONN CREDIT I, LP, | ) | |
| | ) | |
| Plaintiff-Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-cv-3713 |
| | ) | |
| SHERMAN ORIGINATOR III LLC, | ) | |
| | ) | |
| Defendant-Counter-Plaintiff. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant Sherman Originator III, LLC moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment in its favor, dismissing all of Conn's claims against it as a matter of law, granting judgment to Sherman on its claims against Conn for fraudulent inducement and breach of contract, and awarding Sherman damages and attorneys' fees. Defendant's motion is supported by the facts and arguments set forth in the memorandum of law in support of this motion, hereinafter, and the accompanying Declaration of Bryan Faliero, Declaration of Thomas B. Pahl, and Declaration of Gregory N. Heinen, each with accompanying exhibits, filed separately.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

SUMMARY OF THE ARGUMENT ............................................................................... 1

STATEMENT OF UNDISPUTED FACTS ..................................................................... 3

I.     Conn's Credit Business and Charged-off Loan Portfolio ................................... 3

II.    Conn's Sale and Post-Charge-Off Treatment of Repair Service Agreements ................... 4

III.   The Quality of Conn's Loan Portfolio Declines From 2012-2014. ................... 5

IV.   Conn's Sale of its Charged-Off Loan Portfolio. ............................................ 6

V.    Sherman Experiences Unprecedented Dispute Rates on the Conn Portfolio. ................... 9

STATEMENT OF ISSUES .......................................................................................... 11

ARGUMENT .............................................................................................................. 11

I.     CONN FRAUDULENTLY INDUCED SHERMAN TO ENTER INTO THE PSA
THROUGH MATERIAL MISREPRESENTATIONS AND OMISSIONS. ................... 11

      A.   Conn Willfully Concealed TF LoanCo's Issues with the Accounts, and
When Sherman Directly Inquired About TF LoanCo, Conn Lied....................... 12

      B.   The PSA Does Not Immunize Conn's Fraud....................................................... 14

II.    THE UNDISPUTED FACTS AND PLAIN LANGUAGE OF THE PSA
DEMONSTRATE CONN'S MATERIAL BREACH OF ITS CONTRACTUAL
REPRESENTATIONS AND ENTITLE SHERMAN TO TERMINATION OF
THE PSA AND REPURCHASE OF THE ACCOUNTS BY CONN. ........................... 17

      A.   Conn's Admitted Failure to Credit the Accounts for Unearned RSA
Charges Indisputably Breached Sections 8.5, 8.6, and 8.7 of the PSA. ............... 19

      B.   As a Result of the Remarkably High Dispute Rate Precipitated by Conn's
Origination, Servicing and Collection Practices, the Accounts Were Not
Valid, Binding and Enforceable Obligations and the Account Balances
Provided to Sherman Were Materially Inaccurate, Breaching Conn's
Representations. ..................................................................................................... 21

      C.   As a Result of Conn's Undisputed Material Breaches, Sherman Was
Entitled to Terminate the PSA and Refuse to Accept Further Deliveries of
Accounts. ............................................................................................................... 24

i

D.    Conn Breached the PSA by Refusing to Repurchase the Accounts in Accordance with Section 9.4 of the PSA, Entitling Sherman to Summary Judgment on its Counterclaim for Breach of Contract. ....................................... 24

CONCLUSION.................................................................................................................. 25

SHERMAN'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*DIMON Inc. v. Folium, Inc.*,
    48 F. Supp. 2d 359 (S.D.N.Y. 1999)................................................................. 15

*Forest Oil Corp. v. McAllen*,
    268 S.W.3d 51 (Tex. 2008)........................................................................... 17

*Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*,
    449 S.W.3d 474 (Tex. 2014)......................................................................... 24

*Hoggett v. Brown*,
    971 S.W.2d 472 (Tex. App. 1997)................................................................. 16

*In re Arnette*,
    454 B.R. 663 (Bankr. N.D. Tex. 2011)........................................................... 12

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
    341 S.W.3d 323 (Tex. 2011)................................................................... 11, 14

*Meltzer/Austin Rest. Corp. v. Benihana Nat. Corp.*,
    No. A-11-CV-542-AWA, 2014 WL 7157110 (W.D. Tex. Dec. 15, 2014) ..................... 23

*Paull v. Capital Res. Mgmt., Inc.*,
    987 S.W.2d 214 (Tex. App. 1999)................................................................. 13

*Prudential Ins. Co. of Am. v. Jefferson Assocs.*,
    896 S.W.2d 156 (Tex. 1995)......................................................................... 16

*Smith v. Nat'l Resort Cmtys., Inc.*,
    585 S.W.2d 655 (Tex. 1979)......................................................................... 15

*Stone v. Unocal Termination Allowance Plan*,
    542 F. Supp. 2d 605 (S.D. Tex. 2008) ........................................................... 11

### Statutes

12 U.S.C. §§ 1301, 1306.................................................................................. 22

12 U.S.C. §§ 5481 and 5536(a).......................................................................... 21

15 U.S.C. § 1692e(2)(A).............................................................................. 21, 22

15 U.S.C. § 45.............................................................................................. 22

Tex. Occ. Code §§ 1304.003(a)(2) ................................................................. 19

Tex. Occ. Code § 1304.159(a), (c) ................................................................. 19

Tex. Occ. Code §§ 1304.101-105 ................................................................... 19

## Rules

Fed. R. Civ. P. 56(c) ...................................................................................... 11

## SUMMARY OF THE ARGUMENT

In 2014, Sherman agreed to purchase a portfolio of delinquent and charged-off retail installment loans originated and serviced by Conn.  Sherman has long been in the business of purchasing and collecting portfolios of distressed consumer debt and has acquired more than 7,000 portfolios.  The industry is heavily regulated, subject to the Fair Debt Collection Practices Act ("FDCPA"), rules promulgated by the Federal Trade Commission and the Consumer Financial Protection Bureau, and state laws and regulations.  Regulators insist that debt buyers take reasonable steps to ensure that the obligations they purchase are valid, binding and enforceable and that the information that will be used to collect that debt (which the seller provides) is reliable and accurate.  To that end, Sherman insists that sellers make contractual representations and warranties that the debts are valid, binding and enforceable obligations, and that the seller has provided complete, accurate and reliable information.

Conn is a retailer of consumer electronics, furniture and appliances that has carved out a market niche by targeting "unbanked," sub-prime consumers for whom conventional financing is not an option.  Most Conn customers finance their purchase of merchandise (and the extended warranties and insurance products that Conn pushes relentlessly) with Conn's in-house credit product.  In 2012, Conn embarked on a strategy of opening new stores, focusing on more expensive products and loosening underwriting standards in order to grow sales.  Conn's loan portfolio grew rapidly but the portfolio's credit quality deteriorated terribly.  Customers defaulted at an unprecedented rate, and Conn's portfolio of charged-off loans ballooned.  (This ultimately led to shareholder litigation and an SEC investigation.)  Facing severe pressure from the poor performance of its credit portfolio, Conn decided to sell its charged-off loans.

With the help of an advisor, Conn auctioned the accounts.  Sherman had the second-best bid.  Conn sold the accounts to the high bidder, TF LoanCo.  Shortly after closing, TF LoanCo

1

experienced severe issues with the accounts, including numerous customer disputes and inaccurate balances.  After months of back-and-forth with Conn, TF LoanCo refused to accept further accounts, concluding that much of the portfolio was unenforceable.  Conn sued TF LoanCo.  Within days of filing suit, Conn asked Sherman if it was still interested in the accounts.  When Sherman inevitably asked why the prior purchaser (whose identity was unknown to Sherman) backed out, Conn lied, telling Sherman that TF LoanCo had been "unable to fund" additional purchases and concealing the issues that TF LoanCo had experienced and the pending litigation.

Had Sherman known the truth, it would not have purchased the accounts.  But Sherman did not know, and moved forward.  Like TF LoanCo, Sherman was immediately deluged with disputes from Conn's customers.  The dispute rate was unprecedented and was at least *13 times* what Sherman has experienced historically with other sub-prime consumer loans.  The extraordinary volume of disputes required Sherman to stop all collections and demonstrated that the account balances that Conn provided were inaccurate and unreliable.  Sherman refused to accept further accounts, terminated its agreement with Conn, and demanded that Conn repurchase those accounts it had delivered.  What Sherman did not know then was that more than 60% of the account balances were inflated for another reason – Conn failed to credit customer accounts when it cancelled warranty agreements at charge-off, contrary to clear Texas law.

These undisputed facts demonstrate that Conn breached its contractual representations and warranties as a matter of law, entitling Sherman to summary judgment on Conn's breach of contract claim.  These same facts demonstrate that Conn committed fraud through its material misrepresentations and omissions about TF LoanCo, and that Conn further breached its

contractual repurchase obligation.  As a result, Sherman is also entitled to summary judgment on its counterclaims.

## <u>STATEMENT OF UNDISPUTED FACTS</u>[1]

1.      Defendant-Counterclaimant Sherman is a Delaware limited liability company with its principal place of business in South Carolina.  Sherman is in the business, among other things, of acquiring and collecting distressed and charged-off debt.  (FD ¶¶ 2, 7.)[2]

2.      Sherman has purchased more than 7,000 portfolios of debt.  This transaction with Conn is the first time that Sherman demanded repurchase of a portfolio by the seller, and the first time Sherman has ever been involved in a lawsuit related to the repurchase of a portfolio.  (FD ¶ 11.)

3.      Plaintiff-Counter-defendant Conn Credit I, LP (with its affiliates, "Conn") is a Texas limited partnership with its principal place of business in The Woodlands, Montgomery County, Texas.  (Dkt. #1, ¶ 1.)  Conn is in the business of selling consumer electronics, furniture and home appliances, and extending credit to finance purchases of merchandise by its customers.

### I.      Conn's Credit Business and Charged-off Loan Portfolio

4.      Approximately 70% of Conn's annual sales are financed through its in-house consumer credit program.  (HD, Ex. A, Walton Dep., 42:7-19.)

5.      Conn's in-house credit is available to all customers, but its target demographic and market "niche" is a specific socio-economic group, namely consumers that are not able to obtain financing through traditional means, like a bank.  (*Id*. at 48:19-24, 50:4-7.)  Conn's core

---

[1] Sherman refers to its statement of the nature and stage of the proceeding as its "Statement of Undisputed Facts."

[2] Sherman references the Declaration of Gregory N. Heinen ("HD"), Declaration of Bryan Faliero ("FD"), and Declaration of Thomas B. Pahl ("PD") filed separately, with accompanying exhibits.

customers have a FICO credit score described as "bad" to "fair" – between 550 and 650 – and are generally described as "sub-prime." (*Id.*, Ex. C, Poppe Dep., 62:17-25.)

6.    In many instances, Conn's borrowers fail to timely repay their loans, which become delinquent. After a defined period of delinquency, Conn charges-off those loans. (*Id.* at 81:23-82:24.) The accounts at issue in this litigation are all "charge-offs."

## II.    Conn's Sale and Post-Charge-Off Treatment of Repair Service Agreements

7.    Conn sells extended warranty products, including Repair Service Agreements ("RSAs"). When purchased, the customer pays for the RSA in full at the time of purchase. Conn offers financing for the purchase of RSAs and, in such case, the customer makes payment in full with funds borrowed from Conn. (*Id.*, Ex. A, Walton Dep. 125:1-8.)

8.    When Conn charges-off a delinquent account, it also cancels any RSA associated with the account which has a term that has not expired. (*Id.* at 199:23-200:1.)

9.    Although Conn administers its RSAs, the product is underwritten and issued by a third-party insurer. Cancellation of an unexpired RSA results in a refund to Conn from the insurer that issues the RSA. (*Id.* at 200:2-201:9.)

10.    Before August 2015, Conn retained any refund obtained from the insurer and did not credit (reduce the balance of) the customer's account in the amount of the refund. In or about August 2015, Conn changed its policy and began crediting the refund to the customer's account. (*Id.* at 199:12-201:1, 201:5-203:12; *id.*, Ex. C, Poppe Dep. 235:23-241:3.) Conn's new policy was applied prospectively – *i.e.*, only to accounts charged-off in and after August 2015.

11.    All of the Accounts that Sherman acquired or was to acquire from Conn in the transaction at issue were charged-off accounts that were (or would be) charged-off before August 2015. Conn did not credit any of these Accounts for the refund of unexpired RSAs. More than 60% of the Accounts that Sherman purchased had inaccurate and inflated account balances,

because Conn failed to credit the Accounts for refunds of unexpired RSAs. (HD, Ex. T, Nov. 9, 2016 Supp. Decl. of Bruce Blacker, pp.7-8; *id.*, Ex. C, Poppe Dep. 244:1-8.)

### III. The Quality of Conn's Loan Portfolio Declines From 2012-2014.

12.     Beginning in December 2011, Conn implemented a new product strategy. Conn stopped selling many low-price products in favor of more expensive products typically purchased on credit. As a result, Conn's percentage of sales financed significantly increased in Fiscal Years 2013-2014 (calendar years 2012-2013). (Ex. C, Poppe Dep. 34:8-25, 49:22-51:6.)

13.     Conn's new strategy included opening a significant number of new stores. To ramp up sales in these new stores, Conn lowered the minimum credit score required to apply for credit, typically between 500 and 550, to below 500 in order to build a new customer base. In other stores, Conn relaxed all underwriting guidelines, not just credit scores, for new customers toward the end of 2012 into early 2013. (*Id.* at 24:4-26:1, 27:12-22; 29:2-22.)

14.     At the same time, average FICO score at origination of Conn's customers dropped from 619 in October 2011 to 599 by October 2013. Beginning in the first quarter of FY 2014, Conn's charge-offs increased significantly, as did the rate of first pay defaults (meaning customers who never made a timely payment). (*Id.*, Ex. G, CONNS_SHE0052564; Ex. C, Poppe Dep. 51:21-52:19, 54:14-55:19, 150:18-21.)

15.     All of these factors contributed to rising rates of delinquency across Conn's loan portfolio in 2013 and 2014. Accounts more than 60 days delinquent increased from $36.7 million in July 2011 to $94.4 million in January 2014. (*Id.*, Ex. A, Walton Dep. 232:14-233:4, *id.*, Ex. H, CONNS_SHE0052551.)

16.     On December 9, 2014, Conn issued a press release announcing that its provision for bad debts had increased $49.4 million from the same prior-year period, conceded that the company's "credit operations forecasting has not been acceptably accurate," withdrew Conn's

earnings guidance for FY 2015, and announced the resignation of its CFO.  (*Id.*, Ex. I, Conn Dec. 9, 2014 Press Release.)[3]

**IV.     Conn's Sale of its Charged-Off Loan Portfolio.**

17.     In Spring 2014, Conn worked with Garnet Capital Advisors, LLC ("Garnet") as the "Loan Sale Advisor," to offer for sale a portfolio of charged-off accounts.  The portfolio included accounts charged-off between October 2013 and January 2014 (referred to as the "bulk"), and a "fresh forward flow" of accounts that would be charged-off each month between February 2014 and January 2015.  Garnet actively marketed these loans to prospective buyers, including Sherman.  (*Id.*, Ex. D, Ishmael Dep. 15:11-15, 75:19-77:13.)

18.     Although Sherman submitted a bid for the Conn portfolio in April 2014, Conn selected a different buyer, TF LoanCo III, LLC ("TF LoanCo").  (FD ¶ 26.)

19.     On April 30, 2014, Conn entered into a purchase and sale agreement with TF LoanCo (the "TF PSA").  TF LoanCo agreed to purchase 13 deliveries of Conn accounts through January 2015.  By May 9, 2014, TF LoanCo and Conn had closed on the "bulk" delivery and the first two "fresh forward flow" deliveries.  (HD, Ex. E, Mounts Dep. 17:22-19:14.)

20.     Between June and August, 2014, TF LoanCo raised serious issues it was experiencing with the accounts it purchased.  TF LoanCo asserted that accounts had been previously settled by Conn, Conn delivered accounts with deceased borrowers, and the account balances that Conn reported were inaccurate, among other things.  As a result, TF LoanCo considered many of the accounts in the Conn portfolio to be unenforceable. (HD, Ex. L,

---

[3] This announcement resulted in several shareholder derivative lawsuits currently pending in this District, *In re Conn's Inc. Securities Litigation*, No. 4:14-cv-548 (S.D. Tex.).  Moreover, since November 2014, the SEC has been investigating Conn's accounting treatment of its credit operations and loan portfolio.  (*Id.*, Ex. J, Conn's Dec. 10, 2014 Form 10-Q; *id.*, Ex. B, Bell Dep. 15:3-19.)

CONNS_SHE0010324-10328; Ex. K, CONNS_SHE0011988-11990; Ex. D, Ishmael Dep. 321:1-323:13; Ex. E, Mounts Dep. 20:20-21:22, 33:14-18, 36:2-37:15, 42:16-43:5.)

21.     The parties attempted to resolve these issues for months.  Their negotiations included an in-person meeting and multiple letters exchanged by counsel.  In August 2014, after these extended unsuccessful negotiations, TF LoanCo refused to close on any further deliveries, alleging that Conn had materially breached the TF PSA and committed fraud.  (*Id.*, Ex. K, CONNS_SHE0011988-11990; Ex. E, Mounts Dep. 30:17-20, 53:22-54:7.)

22.     Conn sued TF LoanCo for breach of contract in the U.S. District Court for the Eastern District of Texas on August 23, 2014.  (Dkt. #1, *Conn Credit I, LP v. TF LoanCo III, LLC*, Civ. A. No. 1:14-cv-00429 (the "TF LoanCo Litigation".)  TF LoanCo filed counterclaims for fraud and breach of contract (*id.*, Dkt. #29).

23.     Despite TF LoanCo's issues with the accounts, Conn moved immediately to re-sell the remainder of the portfolio to Sherman.  (FD ¶ 27.)

24.     Conn decided not to tell Sherman about TF LoanCo's problems with the accounts, nor about TF LoanCo's allegations of Conn's breaches and fraud, and instructed Garnet "to limit what [it] discussed with Sherman" regarding TF LoanCo.  (HD, Ex. D, Ishmael Dep., 54:6-10, 97:13-98:8.)  Conn authorized Garnet to tell Sherman only that TF LoanCo had been "unable to fund" further deliveries.  (*Id.*, Ex. B, Bell Dep., 128:11-129:19, 136:4-16; Ex. D, Ishmael Dep. 331:22-332:6; Ex. F, Faliero Dep. 259:17-260:14.)

25.     On or about September 2, 2014, Bryan Faliero of Sherman asked Lou DiPalma of Garnet via phone and email why the accounts were again available for purchase, and whether the prior purchaser had "stop[ped] funding because of performance."  Mr. DiPalma told Mr. Faliero that the prior purchaser had been "unable to fund" any further deliveries.  (*Id.*, Ex. M,

7

GARNET0009018; Ex. D, Ishmael Dep. 54:15-55:1, 94:25-95:14; 99:24-100:4; Ex. B, Bell Dep. 128:11-129:21, 131:9-133:2; Ex. F, Faliero Dep. 99:3-9; 105:3-107:5.)

26.     No one from TF LoanCo ever told Conn or Garnet that it was "unable to fund" or otherwise having difficulty financing the transaction.  (*Id.*, Ex. C, Poppe Dep. 172:7-173:1, 173:13-174:4, 182:1-20; Ex. B, Bell Dep., 81:24-82:7, 83:16-18; Ex. A, Walton Dep. 280:23-282:21; Ex. E, Mounts Dep. 19:15-20:13, 27:23-28:13.)  TF LoanCo's refusal to accept additional accounts had nothing to do with financing.  Had the account-related issues been resolved, TF LoanCo could have and would have closed on future deliveries.  (*Id.*, Ex. E, Mounts Dep. 30:17-20, 39:22-40:11, 52:6-7, 53:22-54:7.)

27.     Sherman and Conn entered into their PSA on or about September 15, 2014. Sherman agreed to purchase 13 deliveries of accounts from September 2014 through August 2015 – starting with the April 2014 through July 2014 charge-offs that, unbeknownst to Sherman, TF LoanCo had rejected (the "Accounts").  (FD, Ex. 1.)

28.     At no time before Sherman and Conn entered into the PSA did Conn or Garnet inform Sherman of (a) the identity of the prior purchaser; (b) TF LoanCo's reasons for refusing to fund further deliveries; (c) the TF LoanCo default letters sent to Conn; (d) the known problems and disputes regarding Conn's commercial practices; nor (e) the TF LoanCo Litigation. (HD, Ex. C, Poppe Dep. 193:15-194:22; Ex. B, Bell Dep. 136:17-138:13; FD ¶ 29.)

29.     Sherman and Conn closed on the "Bulk Delivery" and "Delivery 1" in September 2014, with Sherman paying Conn $3,542,995.62 (FD ¶ 38), and on "Delivery 2" in October 2014, with Sherman paying Conn $862,287.70 (*id*. ¶ 46).

30.     In total, Sherman paid Conn $4,383,366 for the Accounts it purchased, and to date has collected $392,592 from the Accounts.  (*Id.* ¶ 48.)

**V.      Sherman Experiences Unprecedented Dispute Rates on the Conn Portfolio.**

31.      Shortly after receiving the initial deliveries of Accounts, Sherman placed them for

collection.  As an initial step, Sherman's collectors reached out to the account debtors through

letters and other communications.  Sherman's initial collection efforts resulted in a tremendous

and unprecedented number of disputes from the debtors (Conn's customers).  (FD ¶¶ 38, 42, 44.)

32.      By November 17, 2014, 6.52% of "right party contacts" (successful contacts with

the correct debtor) had raised a dispute with Sherman.  That dispute rate was unprecedented in

Sherman's industry experience.  The rate was approximately **13 times** higher than Sherman's

historical and expected dispute rates for similar loans to sub-prime customers.  (*Id.* ¶ 44.)

33.      The disputes lodged by these consumers included that merchandise had

been returned but not credited to the Account; that the Account balances reflected insurance that

consumers had not purchased or had not received promised benefits from; that Conn had told the

consumer that they would receive their purchase for free, but issued a charge or failed to issue a

credit; that Conn had deceptively marketed insurance; that Conn had provided deceptive

descriptions of the goods; that Conn had not honored its warranties; and that Conn's products

were defective.  (HD, Ex. N, CONNS_SHE0000893-895; Ex. F, Faliero Dep. 217:1-18; 225:24-

226:6; FD ¶ 44.)

34.      Many of these same disputes, including fraud and balance disputes, if encountered

by a Conn collector, would require Conn to stop collecting on that account until the dispute was

resolved.  (HD, Ex. A, Walton Dep. 172:22-173:21, 174:8-175:16; Ex. O,

CONNS_SHE0051628.)

35.      These disputes and the unprecedented dispute rate constituted a legal and

regulatory "red flag" that led Sherman to conclude that it could no longer legally attempt to

collect the Accounts, because Sherman had reason to doubt the accuracy and reliability of the Account balances provided by Conn.  (FD ¶ 47; PD, Ex. 1.)

36.     Sherman notified Conn that the high dispute rate and other issues with the Accounts constituted a breach of the PSA.  Sherman notified Conn that it would not accept more Accounts and demanded repurchase of the majority of the Accounts.  (HD, Ex. P, SHERMAN0001073-1075; *id.*, Ex. Q, CONNS_SHE0000883-885; *id.*, Ex. R, CONNS_SHE00029801.)

37.     After Sherman provided information about the disputes to Conn, Conn conducted a limited review of its records (including account notes not available to Sherman) and confirmed that many of the disputes Sherman received were already reflected in Conn's records, including prior disputes, accounts previously paid in full, and previous claims of fraud.  (*Id*., Ex. A, Walton Dep. 250:5-252:4, 252:21-262:8.)  Conn did not contact any consumers as part of this review.

38.     Nevertheless, Conn told Sherman to continue to collect on the Accounts anyway, and told Garnet that these disputes "were typical of the excuses that borrowers give to Conn's that they routinely hear and routinely deal with and that they're not based in any actual issues." (*Id.*, Ex. S, CONNS_SHE0026960; Ex. D, Ishmael Dep. 361:1-9; Ex. F, Faliero Dep. 224:7-11.)

39.     At this time, Conn had not disclosed, and Sherman was unaware, that the Account balances were also inaccurate and inflated due to Conn's failure to credit the balances for unexpired RSAs.  (Faliero Dep. at 220:9-221:12; FD ¶ 55.)  Had Sherman been aware that the Account balances were inflated and inaccurate for this reason, it would have immediately ceased collection activity, terminated the PSA and demanded repurchase of all Accounts under the PSA, even in the absence of the consumer disputes with respect to the Accounts.  (*Id*. ¶ 56.)

## STATEMENT OF ISSUES

1.     Did Conn fraudulently induce Sherman to enter into the PSA by instructing Garnet to lie to and mislead Sherman into thinking the prior purchaser had been "unable to fund" further account deliveries, and omit all of the prior purchaser's issues with the Accounts and the pending litigation with TF LoanCo, entitling Sherman to summary judgment on its fraud claim?

2.     Did Conn materially breach the representations and warranties made in Sections 8.5, 8.6 or 8.7 of the PSA, allowing Sherman to terminate the agreement, requiring repurchase by Conn of the Accounts affected by Conn's breaches, and entitling Sherman to summary judgment on Conn's breach of contract claim and Sherman's breach of contract counterclaim?

## STANDARD OF REVIEW

Summary judgment should be granted if the record, taken as a whole, together with any affidavits, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Stone v. Unocal Termination Allowance Plan*, 542 F. Supp. 2d 605, 611 (S.D. Tex. 2008), *aff'd*, 570 F.3d 252 (5th Cir. 2009).

## ARGUMENT

## I.     CONN FRAUDULENTLY INDUCED SHERMAN TO ENTER INTO THE PSA THROUGH MATERIAL MISREPRESENTATIONS AND OMISSIONS.

Under Texas law, fraudulent inducement requires "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).[4]

When Sherman learned from Garnet that the Accounts were back on the market, it specifically asked Conn and Garnet why.  As instructed by Conn, Garnet told Sherman that the prior

---

[4]  Texas also recognizes the claim of fraud by omission, which has similar elements, but additionally requires concealment or failure to disclose a material fact that the defendant had a duty to disclose, and the defendant's knowledge that the plaintiff was ignorant of and did not have an equal opportunity to discover such material fact.  *See, e.g.*, *In re Arnette*, 454 B.R. 663, 689 (Bankr. N.D. Tex. 2011).

purchaser was "unable to fund." This response was false, incomplete and misleading. Had Sherman known the truth, it would not have purchased the Accounts. These undisputed facts satisfy each element and require summary judgment for Sherman.

### A.   Conn Willfully Concealed TF LoanCo's Issues with the Accounts, and When Sherman Directly Inquired About TF LoanCo, Conn Lied.

After Conn's deal with TF LoanCo fell apart, Garnet asked whether Sherman remained interested in purchasing the accounts. Knowing that Conn had sold the accounts to someone else, Sherman naturally wanted to know what happened, and Mr. Faliero specifically asked why the prior purchaser refused to purchase further accounts. (SOUF ¶ 25.)[5] Mr. Faliero's inquiry specifically sought highly material information regarding Sherman's potential transaction with Conn, namely why the Accounts were suddenly available for purchase again and whether the prior purchaser had experienced issues that led to the unexpected end of the deal.

By that time, Conn and Garnet had already decided not to disclose TF LoanCo's complaints about the accounts, TF LoanCo's allegations of fraud and breaches of Conn's representations about the accounts, the exchange of demand letters between Conn and TF LoanCo, or the fact that Conn had sued TF LoanCo. (*Id.* ¶ 24.) Instead, they agreed that Sherman would be told only that the prior purchaser was "unable to fund." Garnet looked to Conn (and, specifically, its General Counsel) for instruction on what to disclose and what to conceal in response to Mr. Faliero's inquiry, and Garnet followed Conn's instruction to the letter. (*Id.*) With Conn's authorization, Garnet told Mr. Faliero that the prior deal fell through because the prior purchaser had been "unable to fund" additional deliveries. (*Id.* ¶ 25.)

---

[5] Sherman cites to paragraphs of its Statement of Undisputed Facts using the abbreviation "SOUF."

That representation was indisputably false.  Conn concedes that TF LoanCo never told either Garnet or Conn that TF LoanCo was "unable to fund" or that TF LoanCo otherwise lacked the financial ability to close on future deliveries of Accounts.  (*Id.* ¶ 26.)  Conn either knew that its representation was false or that it lacked any factual basis for it.  Indeed, a representative of TF LoanCo testified unequivocally that, at all relevant times, TF LoanCo had the financial ability to close on future deliveries.  (*Id.*)  Conn has no evidence to the contrary.[6]

Not only was that representation false, it was incomplete and misleading, omitting numerous material facts about the relationship between Conn and TF LoanCo.  Conn did not disclose and instead concealed that TF LoanCo had raised numerous issues with its accounts, including questioning the account balances and whether the accounts were enforceable.  (*Id.* ¶¶ 20, 24.)  Conn and TF LoanCo had been going back and forth on these issues for months.  Indeed, by the time of Mr. Faliero's inquiry, TF LoanCo and Conn had exchanged multiple demand letters and Conn had sued TF LoanCo.  Garnet omitted and concealed all of this material information from Sherman, at Conn's instruction.[7]  (*Id.* ¶¶ 21-22, 24, 28.)

The substance and timing of Mr. Faliero's inquiry reveal that Sherman was attempting to discern whether the prior purchaser had encountered issues with the Accounts that would affect

---

[6] Conn has suggested that it merely shared its opinion, reflecting its reasonable belief based on its dealings with TF LoanCo.  (HD, Ex. B, Bell Dep. 126:13-127:13; 132:22-133:2.)  Neither Conn nor Garnet ever told Sherman that they were supposedly sharing an "opinion" or disclosed any facts that supported that "opinion."  Rather, Conn and Garnet, with knowledge of all the issues raised by TF LoanCo, represented that TF LoanCo was "unable to fund" as a fact without qualification.  This constitutes a misrepresentation.  *See Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 219 (Tex. App. 1999) ("When a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts--for example, when the facts underlying the opinion are not equally available to both parties--a party may maintain a fraud action.")

[7] Conn knew that this information was material.  Section 4.4 of the PSA required Conn to provide Sherman with "prompt reasonable notice of any demand letters threatening to sue" Conn, and "any filed lawsuits . . . regarding the Accounts."  (FD, Ex. 1, p. 7.)  Notwithstanding this provision, Conn never notified Sherman of TF LoanCo's demand letter; nor anything about the TF LoanCo Litigation.

Sherman's decision to purchase them.  Conn knew this was material; indeed, Conn and Garnet discussed what to tell Sherman about why the Accounts were back on the market even before Mr. Faliero asked the question.  (*Id.* ¶ 24.)  Any reasonable purchaser would ask that question.  Conn knew it was coming and that its answer would impact whether Sherman wanted to buy the Accounts and how much it would pay for them.  That is precisely why Conn and Garnet concocted the "unable to fund" response; they wanted Sherman to believe that TF LoanCo's decision had nothing to do with the Accounts themselves.

Sherman believed and relied on Conn's representation, which Garnet delivered.  Sherman believed Garnet trustworthy from prior transactions.  (FD ¶ 19.)  Sherman did not know the prior purchaser's identity, so Conn was its only reasonable source of information as to why the Accounts were back on the market.  Sherman asked the right questions and entered into the PSA relying on Conn's answer.  Had Sherman known the truth, it would not have entered into the PSA without additional diligence and perhaps not at all.  (*Id.* ¶ 29.)

Sherman was damaged when it purchased the Accounts, which had incorrect balances and high levels of disputes that made them unenforceable and denied Sherman the benefit of its bargain with Conn.  Sherman's damages equal $3,990,774.  (*Id.* ¶ 48.)

**B.      The PSA Does Not Immunize Conn's Fraud.**

Conn cannot hide behind the PSA's merger clause or so-called "anti-reliance" representation to immunize its fraudulent conduct.  Neither provision gave Conn a license to mislead and defraud Sherman.

Section 13.8 of the PSA contains a boilerplate integration and merger clause.  Texas law is clear that such a provision will not bar a fraudulent inducement claim.  It is black letter law that a contract "is subject to avoidance on the ground of fraudulent inducement" or antecedent fraud, even when it contains a merger clause.  *Italian Cowboy*, 341 S.W.3d at 331.

Similarly, Section 7.1 of the PSA is a boilerplate buyer's representation, entitled

"Independent Evaluation."  Among other things, Section 7.1 represents that the buyer (Sherman)

did not rely on extra-contractual statements by Conn and certain of its representatives:

> Buyer has relied solely on its own investigation and has not relied upon any oral or written information provided by ***Seller or its personnel, agents, representatives or independent contractors*** (including information contained in the Offering Memorandum) other than those representations and warranties contained in this Agreement.  Buyer acknowledges and agrees that no ***employee, agent, representative or independent contractor of Seller*** has been authorized to make, and that Buyer had not relied upon, any statements other than those specifically contained in this Agreement.  (FD, Ex. 1, p. 10 (emphasis added).)

Such provisions do not provide carte blanche to commit fraud.  Courts have held that

"anti-reliance" clauses will not bar fraud claims where the subject matter of the fraud is within

the peculiar knowledge of the misrepresenting party and the deceived party has no independent

means of ascertaining its truth.  *See, e.g., DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359

(S.D.N.Y. 1999) (denying motion to dismiss as a trier of fact could find that defendants' fraud

was so well concealed that it was within defendants' exclusive knowledge, despite plaintiff's

sophistication); *see also Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital

Markets, LLC*, 910 N.Y.S.2d (Sup. Ct. 2010) (denying motion to dismiss as peculiar knowledge

exception can apply both when facts are within the exclusive knowledge of the defendant and

where the truth theoretically might have been discovered, but only with great difficulty).[8]

Furthermore, under Texas law, "when one voluntarily discloses information, the whole truth

---

[8] Though Texas courts have not yet addressed the peculiar knowledge exception, it has been black-letter Texas law for decades that sellers of real estate may commit fraud by failing to disclose material facts which would not have been discoverable by a buyer, or which could not be uncovered by a reasonable investigation.  *See, e.g., Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979).

must be disclosed," and "when one makes a partial disclosure and conveys a false impression," a duty to disclose arises. *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. 1997); *see also Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller.  Seller cannot have it both ways:  he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase 'as is', and then disavow the assurance which procured the 'as is' agreement.").  Here, Sherman made a specific inquiry about why the "prior purchaser" (whose identity was unknown to Sherman) refused to close on further purchases of accounts.  Sherman had no way to verify this information and Conn took advantage of that in order to defraud Sherman.

Moreover, it is undisputed that Conn authorized Garnet to represent to Sherman that TF LoanCo was "unable to fund."  (SOUF ¶ 24.)  Construed with the PSA as a whole, Section 7.1 does not apply to any representations by Garnet.  Conn expressly authorized Garnet to be the exclusive intermediary between Conn and potential buyers of the Accounts.  It knew that buyers like Sherman would necessarily rely on statements and information from Garnet.  For that reason, the PSA carves Garnet out of Section 7.1.  Specifically, the PSA identifies Garnet exclusively through the use of a defined term, "Loan Sale Advisor."  (FD, Ex. 1, p. 3.)  Section 7.1 states only that Sherman has not relied on statements made by Seller or its "employees, agents, representatives or independent contractors."  Section 7.1 makes no reference whatsoever to the "Loan Sale Advisor" and therefore no reference to Garnet.  Sherman, therefore, did not disclaim reliance on representations made by Garnet.

Garnet's contractually-defined role as the "Loan Sale Advisor" made it the party that Conn *directed* Sherman (and other potential buyers) to ask questions during due diligence.  Mr.

Faliero did just that in asking Garnet why TF LoanCo backed out of the deal.  Section 7.1's

general "anti-reliance" language cannot negate Sherman's ability to rely on representations that

Garnet made at Conn's specific instruction in order to respond to a specific inquiry by Sherman

for information that Sherman had no other reasonable means to obtain.

        The Court should not interpret the PSA to give Conn and Garnet a license to lie.  *See*

*Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008) ("Today's holding should not be

construed to mean that a mere disclaimer will forgive intentional lies regardless of context.").

Nothing in the PSA precludes Sherman's fraud claim, and the Court should grant summary

judgment on that claim and enter judgment in the amount of $3,990,774, plus prejudgment

interest, costs and attorneys' fees.

## II.    THE UNDISPUTED FACTS AND PLAIN LANGUAGE OF THE PSA DEMONSTRATE CONN'S MATERIAL BREACH OF ITS CONTRACTUAL REPRESENTATIONS AND ENTITLE SHERMAN TO TERMINATION OF THE PSA AND REPURCHASE OF THE ACCOUNTS BY CONN.

        In the PSA, Conn made express representations relating to the validity and enforceability

of the Accounts and to the accuracy of the information that Conn would provide to Sherman.

These representations were essential to the transaction and to Sherman's ability to receive the

benefit of its bargain.  If the Accounts were not valid and enforceable, or if the information that

Sherman received was inaccurate, Sherman would not receive the economic benefits for which it

bargained, because its ability to collect would be impaired.  The debt collection industry is

heavily regulated, and regulators insist that buyers (like Sherman) receive contractual assurances

from sellers that the accounts being acquired are valid, enforceable, and legally binding, and that

the seller-provided information used to collect them is accurate.  To that end, Conn made the

following representations:

**Section 8.5  Compliance with Law.**  The Accounts have been originated, serviced and collected in accordance with all applicable laws.

**Section 8.6  Accounts Valid and Enforceable.**  Except for Accounts eligible for repurchase under Article VI, each Account represents the valid, enforceable, legal and binding obligation of each Obligor, except as may be limited by applicable law.  A valid and otherwise enforceable Account may not be collectible.

**Section 8.7  Computer File.**  The information included in the applicable Computer File as of the date the Computer Files are transferred to Buyer are materially accurate, provided that Buyer acknowledges and agrees that certain information, such as addresses and telephone numbers, may not be current.[9]

(FD, Ex. 1, pp. 12-13.)[10]

The PSA unambiguously describes the remedies for Conn's breach of these representations.  Either party may terminate the PSA "if there has been a material violation or breach by the other Party of any covenant, representation or warranty contained in this Agreement."  (*Id.*, p. 15, § 10.1(a).)  The PSA is equally clear that upon termination Sherman had "no obligation to purchase any further accounts."  (*Id.*, p. 16, § 10.4.)  Finally, with respect to Accounts that had already been delivered to Sherman, Section 9.4 defines repurchase of those Accounts by Conn as Sherman's "sole and exclusive" remedy.  (*Id.*, p. 15, § 9.4.)

The undisputed facts demonstrate that Conn breached its express contractual representations in Sections 8.5, 8.6 and 8.7.  Conn has admitted that the balances reported on the

---

[9] As reflected in Exhibit F of the PSA, the Computer File was required to include, for each Account, the "Account Balance as of the applicable Closing Date."  (FD, Ex. 1, p. 26.)

[10] In addition, Section 3.2 required Conn to "provide all Account Documents in its possession to Buyer within 30 days following the applicable Closing Date."  Exhibit E to the PSA makes clear that invoices were among the "Account Documents" Conn was to provide.  Conn failed to provide invoices to Sherman for more than 11,000 Accounts until mid-December (more than 30 days after the Closing).  (HD, Ex. C, Poppe Dep. 196:8-20; Ex. A, Walton Dep. 264:6-267:14.)  This admitted failure constitutes an independent breach of the PSA.

Computer File for at least 60% of the Accounts were inaccurate because Conn failed to credit those balances when it cancelled RSAs upon charge-off, as the Texas Service Contract Regulatory Act ("TSCRA") required.  Moreover, almost immediately after the first deliveries of Accounts, Sherman was confronted with an unprecedented rate of consumer disputes that raised regulatory "red flags" about the validity and accuracy of the Account balances and required Sherman to cease all collection activity.

As a result of these undisputed facts, Conn materially breached its representations in Sections 8.5, 8.6 and 8.7 of the PSA.  Sherman informed Conn that it would not accept further deliveries and was terminating the Agreement.  Conn then further breached the PSA by refusing to repurchase the Accounts in accordance with Section 9.4.

### A.    Conn's Admitted Failure to Credit the Accounts for Unearned RSA Charges Indisputably Breached Sections 8.5, 8.6, and 8.7 of the PSA.

Conn offers extended warranties, including RSAs, to its customers, paid for in full at the time of purchase.  (SOUF ¶ 7.)  The vast majority of Conn customers that purchase RSAs finance that purchase through credit obtained from Conn.  Conn's sale and administration of RSAs is subject to the TSCRA, which regulates the sale of "service contracts."  *See* Tex. Occ. Code §§ 1304.101-105; 1304.003(a)(2).  In 2011, the TSCRA was amended to make clear that when extended warranty and similar service agreements are cancelled before expiration, the consumer "is entitled to a prorated refund of the purchase price of the contract…"  Tex. Occ. Code § 1304.159(a), (c).

When Conn charges off an account, it automatically cancels any unexpired RSA on that account.  Since the customer paid for the RSA in full at origination, this cancellation results in a credit due for the unused portion of the RSA (*i.e.*, the remaining term of the RSA).  Despite the TSCRA, Conn did not credit these amounts to the account balances or refund any sums to its

customers.  (SOUF ¶¶ 7-11.)  This practice violated Texas law.[11]  As a result, the account

balance for every Conn charged-off account involving an RSA was inaccurate and inflated.

Conn changed this policy in August 2015 (undoubtedly because TFLoanCo raised the

issue), but ***only on a prospective basis***.  Conn made no credit or adjustment for unearned RSAs

to the Accounts that were actually delivered to Sherman.  Even without considering any other

disputes or issues with the Accounts (of which, there were many), Conn admits that more than

64% of the Accounts it delivered to Sherman had inflated and inaccurate balances and that those

balances were, in the aggregate, overstated by more than 7.3% (approximately $5 million).[12]

These undisputed facts demonstrate a material breach of Conn's contractual

representations.  Specifically:

- Because Conn did not credit the Account balances in the amount of the unearned RSA balances upon charge-off as Texas law requires, Conn did not service and collect the Accounts in accordance with all applicable laws.  By failing to credit the Account balances, Conn further engaged in unfair, deceptive, or abusive acts or practices unlawful pursuant to the Dodd-Frank Act, 12 U.S.C. §§ 5481 and 5536(a).  Conn therefore breached Section 8.5 of the PSA.

- Because the balances for more than 64% of the Accounts were inaccurate and inflated, the Accounts delivered to Sherman were not "valid, enforceable, legal and binding obligation[s]."  Obviously, Sherman could not enforce the Accounts with respect to amounts that the account debtors did not owe under Texas law.  Further, it is illegal under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §

---

[11] In the TF LoanCo Litigation, Judge Clark recently granted judgment to Conn, ruling that the TSCRA, though applicable to Conn's RSAs, did not require Conn to refund any RSA amount if the customer did not pay cash upfront for the RSA.  (Dkt. #110, pp. 12-13.)  This conclusion is not binding on this Court and should not be adopted because it is wrong.  Specifically, Judge Clark ignored the fact that whether a customer pays for an RSA using cash or credit, the customer pays in full at the time of purchase, and must be credited when an expired RSA is cancelled.  Conn's corporate representative conceded the point at his deposition.  (SOUF ¶ 7.)

[12] Under the PSA, each of the additional Flows would have been delivered to Sherman before Conn decided to start following the law in August 2015.  Conn's own expert report from Mr. Blacker reflects that each of those Flows would have likewise included significant unearned RSA balances.  For Flow Nos. 3 through 12, 65% of the Accounts included unearned RSA balances and the aggregate amount of the RSA balances impermissibly included in the Account balances equaled approximately $11.64 million.

1692e(2)(A), to attempt to collect upon accounts with even potentially incorrect balances.  Conn therefore breached Section 8.6 of the PSA.

- Because the Account balances for more than 64% of the Accounts were inaccurate and inflated, the information that Conn transmitted to Sherman in the applicable Computer Files was not materially accurate.  Both the "Account Balance" and "payoff balance" reflected in the Computer File were materially inaccurate.  Conn therefore breached Section 8.7 of the PSA.

**B.    As a Result of the Remarkably High Dispute Rate Precipitated by Conn's Origination, Servicing and Collection Practices, the Accounts Were Not Valid, Binding and Enforceable Obligations and the Account Balances Provided to Sherman Were Materially Inaccurate, Breaching Conn's Representations.**

The undisputed facts demonstrate that, almost immediately after placing the Accounts for collection, Sherman began receiving customer disputes at a very high rate.  (SOUF ¶¶ 31-32.)  Most cast serious doubt on the accuracy of the Account balances that Conn provided to Sherman in the Computer File.  Consumers complained that Conn had failed to issue appropriate credits for merchandise that was returned, damaged or never delivered, that Conn failed to apply properly the proceeds of RSAs or insurance that the consumer had purchased, or that consumers were unaware that they had purchased RSAs or insurance, among other disputes.  (*Id*. ¶ 33.)  Sherman has tremendous experience in the collection of consumer debt, including sub-prime debt.  It is used to receiving consumer complaints and disputes.  Sherman's experience with the Accounts was extraordinary.  The dispute rate was ***13 times*** higher than Sherman's historical experience with comparable sub-prime portfolios.  (*Id*. ¶ 32.)

This extraordinary dispute rate had serious consequences.  Not only did it call into question the accuracy of the Account balances with respect to those consumers who complained, it meant that Sherman could no longer reasonably believe that the balances for any of the Accounts in the portfolio were accurate and enforceable.  (FD ¶ 47.)  Based on its early collections, Sherman believed that further collections or reporting the Accounts to the credit

bureaus would have resulted in massive numbers of disputes.  Once Sherman reached that

conclusion, applicable rules from the Federal Trade Commission and the Consumer Financial

Protection Bureau, as well as the FDCPA, required that Sherman immediately cease all

collection activity with respect to the Accounts, which Sherman did.  (*Id.*; *see also* 15 U.S.C. §

1692e(2)(A); 15 U.S.C. § 45; 12 U.S.C. §§ 1301, 1306.)[13]

Sherman detailed these disputes for Conn, explained that the dispute rate precluded further

collection activity, and demanded that Conn repurchase the Accounts.  Even though Conn's

initial review of the disputes revealed that several had merit, Conn refused to repurchase.

Instead, Conn informed Sherman that these were "sub-prime customers" and that Sherman just

needed to "push through" and keep collecting, notwithstanding the dispute rate.  (FD ¶ 51.)

Sherman declined that invitation and followed the law.

There is no question that Conn did not represent that Sherman would ultimately collect on

each of the Accounts, much less collect them in full.  Sherman bore the economic risk of this

transaction, as it has many times in the past.[14]  Conn plainly represented, however, that Sherman

would be able to ***attempt collection*** of the Accounts without external legal impediments.  Mr.

Poppe, Conn's President and COO of Credit and Collections, admitted as much:

> Q.      Okay.  And the – the assumption in this transaction and in
> sales of those accounts are that the buyer should at least be able to
> go out and ask the borrowers to pay.  There shouldn't be any legal
> impediment that prevents them from asking – trying to collect?

---

[13] *See also* PD, Ex. 1, at 2, ("It therefore was reasonable for Sherman to suspend collection on a portfolio of accounts because of the concern that it would be subject to a CFPB examination or investigation or to an FTC investigation if it continued to collect on the accounts that it received from Conn.")

[14] Sherman has purchased over 7,000 portfolios and made its share of "bad deals" that did not meet its economic expectations, but has never previously demanded a repurchase of accounts in those circumstances and has never been in litigation with a seller over a repurchase request.  (FD. ¶¶ 11, 49.)  The difference here was Sherman's inability to attempt further collection of the Accounts due to the extraordinary dispute rate.

SHERMAN'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

> A.      Generally, that makes sense, yeah.
>
>                                . . .
>
> Q.      Okay.  But generally speaking you agree that Conn is representing and warranting that there's nothing that would prevent the buyer from trying to collect, from asking the borrowers to pay?
>
> A.      Conceptually, that makes sense.

(HD, Ex. C, Poppe Dep. 68:17-23; 69:16-21.)  That is precisely what Conn's representation that the Accounts were "valid, enforceable, legal and binding" obligations in Section 8.6 necessarily means.  "Enforceable" has a straightforward meaning – "capable of being enforced," or here, collected.  *See Meltzer/Austin Rest. Corp. v. Benihana Nat. Corp.*, No. A-11-CV-542-AWA, 2014 WL 7157110, at *3 (W.D. Tex. Dec. 15, 2014) ("Black's Law Dictionary defines 'enforce' to mean, 'To put into execution; to cause to take effect; to make effective; as, to enforce a particular law, a writ, a judgment, or the collection of a debt or fine; to compel obedience to.'")

Sherman could not attempt to enforce the Accounts as a result of the extraordinary dispute rate that attended Sherman's preliminary collection efforts, which raised a "red flag," caused Sherman to question the accuracy of all of the Account balances, and required Sherman to cease all collection activity under applicable law.  These undisputed facts establish a breach of Conn's representations in Section 8.6 – the Accounts were not valid and enforceable obligations – and Section 8.7 – the Account balances reflected on the Computer File were not accurate.  Conn's origination, servicing and collection processes gave rise to these disputes and left Sherman with no choice but to immediately cease all collection activity.[15]  Conn, therefore, breached its contractual representations in Sections 8.6 and 8.7 as a matter of law.

---

[15] Conn continues to insist that Sherman had to "push through," pursue collection activity, and resolve every dispute with Conn on an account-by-account basis, notwithstanding these red flags.  As explained, Sherman could not continue to collect consistent with the law.  Moreover, the PSA itself prohibits Sherman from undertaking any collection activity that fails to conform with all applicable law.  Section 4.3(a) provides: "If

**C.  As a Result of Conn's Undisputed Material Breaches, Sherman Was Entitled to Terminate the PSA and Refuse to Accept Further Deliveries of Accounts.**

Section 10.1(a) of the PSA permits either party to terminate immediately "if there has been a material violation or breach by the other Party of any covenant, representation or warranty contained in this Agreement." (FD, Ex. 1, p. 15.) As Section 10.4 of the PSA makes clear, upon termination, Sherman had "no obligation to purchase any further accounts, as would otherwise be required under the Delivery Schedule." (*Id*. p. 16.) As demonstrated, Conn materially breached its contractual representations in Sections 8.5, 8.6 and 8.7. Upon such breach, Sherman exercised its contractual right to terminate the PSA and informed Conn that it would not accept further deliveries of Accounts. As Section 10.4 makes clear, Sherman had no obligation to accept more Accounts. Sherman is entitled to summary judgment on Conn's claim for breach of contract.

**D.  Conn Breached the PSA by Refusing to Repurchase the Accounts in Accordance with Section 9.4 of the PSA, Entitling Sherman to Summary Judgment on its Counterclaim for Breach of Contract.**

Section 9.4 of the PSA establishes repurchase as Sherman's "exclusive remedy" with respect to any breach of Conn's representations and warranties. Under Texas law, contracting parties may specify how damages will be calculated in the event of a breach. *See, e.g., Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*, 449 S.W.3d 474, 479 (Tex. 2014). As demonstrated above, Conn materially breached its representations in Sections 8.5, 8.6 and 8.7, and Sherman is entitled to repurchase of the Accounts as a remedy. Sherman paid $4,383,366 for the Accounts and has collected $392,592. As a result, Sherman is entitled to summary

---

Buyer collects or attempts to collect on an Account, Buyer will, and will cause its agent(s), at all times to . . . (a) comply with all state and federal laws applicable to debt collection . . . ." (FD, Ex. 1, p. 7.)

SHERMAN'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

judgment on its counterclaim for breach of the PSA and entry of judgment in the amount of $3,990,774, plus pre-judgment interest, attorneys' fees and costs.

## CONCLUSION

Wherefore Sherman respectfully requests that the Court grant summary judgment to Sherman (1) dismissing all of Conn's claims on the merits and with prejudice; (2) entering judgment on Sherman's counterclaims in the amount of $3,990,774, plus pre-judgment interest, costs and attorneys' fees; and (3) awarding Sherman such other and further relief as the Court deems just and proper.

Dated:  November 30, 2016                                Respectfully submitted,

                                                         BUCK KEENAN LLP

                                                         /s/ William A. Gage, Jr.
                                                         William A. Gage, Jr.
                                                         Attorney-in-Charge
                                                         Texas Bar No.  07566580
                                                         BUCK KEENAN, LLP
                                                         700 Louisiana, Suite 5100
                                                         Houston, Texas 77002
                                                         713.225.4500 Telephone
                                                         713.225.3719 Facsimile
                                                         gage@buckkeenan.com

                                                         Andrew J. Wronski (admitted *pro hac vice*)
                                                         Elizabeth A. N. Haas (admitted *pro hac vice*)
                                                         Gregory N. Heinen (admitted *pro hac vice*)
                                                         FOLEY & LARDNER LLP
                                                         777 East Wisconsin Avenue
                                                         Milwaukee, WI 53202-5306
                                                         414.271-2400 Telephone
                                                         414.297.4900 Facsimile
                                                         awronski@foley.com
                                                         ehaas@foley.com
                                                         gheinen@foley.com

                                                         COUNSEL FOR SHERMAN ORIGINATOR III, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant Sherman Originator III, LLC's Motion for Summary Judgment and Memorandum of Law in Support was served on all counsel of record in this cause by the Clerk's ECF system on November 30, 2016.

**By ECF System**

**COUNSEL OF RECORD**

J. Thad Heartfield
M. Dru Montgomery
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, TX 77706
(409) 866-3318
thad@heartfieldlawfirm.com
dru@heartfieldlawfirm.com

*/s/ William A. Gage, Jr.*
William A. Gage, Jr.