UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CONN CREDIT I, LP, | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 4:15-cv-3713 |
| | ) | |
| SHERMAN ORIGINATOR III LLC, | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |

## DECLARATION OF BRYAN FALIERO

BRYAN FALIERO hereby declares as follows:

1. I am an adult resident of the State of South Carolina, am over the age of twenty-one (21) years, am competent to testify as to the matters stated herein, and have personal knowledge of the facts and statements in this declaration.

2. Since 2005, I have been a Director at Sherman Capital Markets LLC, which provides management services on behalf of various affiliates of Sherman Capital Markets LLC (collectively, "Sherman"). Such affiliates include Sherman Originator III LLC, Resurgent Capital Services L.P., and others. Sherman Capital Markets LLC is located at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

3. Since January 2016, I have been President of Resurgent Capital Services L.P. ("Resurgent"), which is the management company for the entities that purchase and service charged-off and distressed receivables for Sherman.

4. In my roles as a Director of Sherman Capital Markets LLC and President of Resurgent, I am a senior manager directly involved in the day to day operations of Sherman's debt purchasing business.

5.      In total, I have approximately 30 years of experience in the distressed debt industry, including senior roles related to the origination, servicing, collection, and sale of such debt, and have held significant positions in industry trade associations such as DBA International, as further described below.

6.      In the course of performing my responsibilities at Sherman, I have become familiar with the dispute between Conn Credit I, LP ("Conn") and Sherman that is the subject of this litigation.  I make this declaration from my personal knowledge acquired in the course of performing my work with Sherman and based upon my review of the business records of Sherman maintained in the ordinary course of business.  I make this declaration in support of Sherman's Motion for Summary Judgment.

### Sherman's Experience Purchasing Charged-off Accounts

7.      Since 1998, Sherman has been in the business of purchasing charged-off and distressed debts ("Receivables"), and during that time has been one of the largest buyers of Receivables in the country.

8.      Since 1998, Sherman has entered into more than 500 contracts to purchase portfolios of Receivables, covering more than 7,000 individual portfolios, and including more than 100 million individual Receivables, with an aggregate face value of over $100 billion.

9.      The Receivables purchased by Sherman include a broad range of credit types, including credit cards, installment loans, student loans, auto loans, mortgage loans, and lines of credit, across a broad range of consumer credit risk classes, ranging from low sub-prime consumers, typically defined as consumers with a FICO credit score of 630-650 or lower, to super prime consumers, typically defined as consumers with a FICO credit score of 740 or greater.

2

10. Because the classification of Receivables as "prime" or "sub-prime" has subjective elements, I am not able to quantify the number of such loans purchased by Sherman, but I believe that Sherman has purchased many millions of charged-off, sub-prime consumer installment loans, such as those offered for sale by Conn.

11. This case is the only instance in Sherman's entire history and its more than 500 contracts involving more than 7,000 portfolios where Sherman has ever been involved in litigation with a Receivables seller arising out of Sherman's unwillingness to purchase any pool of Receivables under the terms of a purchase and sale agreement.

### Sherman's Sub-Prime Credit Sales Experience

12. In addition to being an experienced purchaser of charged-off, sub-prime consumer Receivables, Sherman also has considerable experience selling pools of charged-off, sub-prime Receivables originated by Sherman's affiliates, which have included a consumer loan company, an auto loan company, and a credit card company. In my roles at Sherman and Resurgent, I am directly involved in the day to day operations of Sherman's debt sales business.

13. Since I joined Sherman in 2005, Sherman has sold portfolios of newly charged-off consumer credit card Receivables originated by its affiliates, as well as portfolios of debt purchased from third parties. These sales were made to numerous buyers in a competitive bidding environment. Sherman receives multiple bids in each auction, including bids from repeat buyers who have been purchasing from Sherman over a period of several years.

14. Sherman has never been involved in any litigation related to the sale of these Receivables.

## Sherman's Reputation Within the Debt Sales Industry

15.     Sherman is a longstanding member of DBA International, the largest trade association of debt buyers and debt sellers in the United States and the primary trade association for the debt purchasing industry.

16.     I am a past President of DBA International and have served as Chairperson of the DBA International Regulatory Committee.

17.     To the best of my knowledge, Sherman has been approved as a debt buyer and is qualified to purchase charged-off debt from all of the national banks that conduct a formal audit and approval process.  Sherman has been formally audited as a potential debt buyer by more than 20 large national debt sellers, and has not been declined as a buyer as a result of any such audit.

18.     To the best of my knowledge, Sherman is invited to participate in materially all of the large debt sales offerings each year.  I believe that we are invited to participate in those sales because we have a reputation in the industry for closing transactions and meeting the terms of our agreements.

## Sherman's April 2014 Initial Bid for the Conn Portfolio

19.     In the course of my duties at Sherman, I regularly receive notices of sale from debt sellers and debt sale brokers, informing me of an auction or request for bids related to the sale of charged-off Receivable portfolios, including but not limited to many such notices from Garnet Capital Advisors ("Garnet").  I have personally bid on and closed a number of transactions with Garnet during my time at Sherman, and in both April and September 2014 I believed Garnet to be trustworthy based upon my experience in those transactions.

4

20.     In April 2014, I received a notice of sale from Garnet regarding a Receivables sale on behalf of Conn for a "bulk" pool of approximately $80,000,000 dollars of charged-off consumer Receivables plus a monthly "flow" of approximately $10,000,000 per month.

21.     I responded to Garnet and indicated that Sherman was interested in bidding for this portfolio, and Garnet then sent Sherman the bid materials, including but not limited to an Offering Memorandum containing a description of Conn's business, a few details about the composition of the loan portfolio Conn was offering for sale, and a limited number of statistics about the Receivables in the portfolio, as well as a data file that provided certain basic account-level information such as account balances and debtor addresses, but did not include any collection notes, account notes, or payment histories.

22.     Sherman then conducted the traditional and customary due diligence it typically performs for transactions of this type.  The due diligence that Sherman performed was consistent with the due diligence customarily performed by other debt buyers for these types of transactions, based on my more than 30 years of industry experience.  That due diligence included a detailed analysis of the account data file, a careful reading of the Offering Memorandum, and follow up questions posed to Garnet.

23.     Sherman's due diligence did not, however, include contacting any consumers associated with the Receivables offered for sale.  It would create significant legal risk for both the buyer and seller of Receivables if, prior to the closing of a transaction and transfer of title, a potential buyer were to contact a consumer to ask questions related to a Receivable (unless the entity had been duly engaged as a licensed third party debt collector by the seller and contacted consumers in its role as a debt collector).

24.     As a result, it is standard industry practice for a debt buyer to refrain from contacting consumers prior to the purchase of a portfolio, and Sherman has never contacted any consumers as part of any due diligence process for the purchase of a Receivables portfolio.

25.     It is also common for purchase and sales agreements in the debt buying industry to expressly state that the buyer shall not contact consumers until after the applicable closing date.  That term was included in section 4.1 of the September 15, 2014 Purchase and Sale Agreement ultimately executed by Sherman and Conn (the "PSA").  A true and correct copy of the PSA is attached hereto as Exhibit 1.

26.     On April 22, 2014, Sherman submitted a bid for the Conn portfolio.  However, Garnet informed Sherman shortly thereafter that Conn had received a higher bid from another party and would accept that other party's bid.

### The Conn Portfolio Again Becomes Available for Purchase by Sherman

27.     In August 2014, Lou DiPalma of Garnet contacted me via telephone and asked if Sherman was still willing to purchase the Conn portfolio, as portions of the "flow" included in the portfolio offered for sale in April were suddenly again available for purchase by Sherman.

28.     In response, I asked Mr. DiPalma why the prior purchaser, whose identity Garnet did not disclose and I did not know, was no longer purchasing the "flow" deliveries.  Mr. DiPalma told me that the prior purchaser "was unable to fund" further deliveries, which I clearly understood to mean that the prior purchaser did not have sufficient funds to close on additional account deliveries.

29.     Neither Mr. DiPalma nor anyone else at Garnet told me, during this call or at any time before the PSA was signed, that there were any other factors contributing to the prior purchaser's decision to stop buying Conn's Receivables, nor did anyone indicate (as I have since

6

learned in the context of this litigation) that the prior purchaser had determined that there were serious issues with the Receivables and the contractual representations and warranties that Conn made to the prior purchaser. Had Garnet or Conn shared that information, I would have been unwilling to purchase any Receivables from Conn unless and until a very detailed inquiry had conclusively determined that the prior purchaser's allegations were without merit.

30.     Following Garnet's false and misleading answer to my specific question, we reviewed our prior analysis of the Conn Receivables, and on September 4, 2014, Sherman told Garnet that we would be willing to purchase the flow portion of the Receivables at the same price at which we had bid in April, and would purchase the Receivables that had accumulated between the end of the prior purchaser's agreement and the beginning of our agreement (the "Bulk") with a small price adjustment to account for a few months of aging.

31.     After some negotiation regarding the purchase price, Garnet informed us on September 10, 2014 that Conn had accepted our bid, and sent a draft of the PSA, which had been based off of a Garnet template and subsequently modified by Conn. Sherman reviewed and revised portions of the draft PSA, but did not modify Sections 8.5, 8.6, 8.7 or 9.4 thereof, which were accepted as proposed by Conn.

32.     On September 11, 2014, Sherman sent its revised version of the PSA back to Conn, through Garnet. Conn again revised the PSA, and sent a proposed final version on September 15, 2014, which was accepted and signed by Sherman that same day.

### The Performance of – and Issues With – the Conn Portfolio

33.     Sherman has a broad range of tools available to monitor the performance of the more than 7,000 loan portfolios it has purchased, which measure the portfolios on a broad range of metrics, including financial performance and regulatory compliance.

34.     Sherman's performance expectations are based on its considerable industry experience.  Due to the uncertain nature of the debt purchasing business, some portfolios underperform expectations on a relatively regular basis.  Typical reasons for poor performance include problems getting the Receivables placed into collection, capacity constraints at collection agencies, late receipt of closing documents, and similar operational factors.  At times, portfolios perform poorly even when all of the operational factors have been dealt with effectively.  About half of the portfolios that Sherman purchases fail to meet our initial expectations, and a small percentage of portfolios fall seriously short of our expectations.  As a result of its experience, Sherman has developed the ability to find and, where possible, fix those problems and improve the performance of those portfolios.  But even if Sherman cannot fix the portfolio's poor performance, Sherman does not consider such poor performance to be grounds for a seller to repurchase accounts already sold to Sherman.  In such cases, we maximize collections to the extent possible but otherwise "take our losses."  As indicated above, prior to this transaction, Sherman has never sought to have a seller repurchase a portfolio or been involved in litigation due to the poor financial performance of a portfolio that we acquired.

35.     The financial performance of every portfolio purchased by Sherman is tracked and reported to senior management on a monthly basis.  Each portfolio's total collections, collection costs and other metrics are reported to management on the second day of each month, including a comparison of the actual financial performance to expected financial performance.  I personally review those reports every month, and have done so since I started working at Sherman.

36.     In addition to financial performance, Sherman closely monitors each portfolio's regulatory compliance.  Because regulatory compliance information has subjective components,

8

is more difficult to collect, and is best measured over a longer time frame, this information is collected and reported on a variety of intervals, including monthly, quarterly, and annual reporting. Periodic reports compile consumer disputes, lawsuits against Sherman affiliates, credit bureau disputes, and other factors. This regulatory compliance information is critical to Sherman's business, as Sherman, like all debt buyers, is subject to the broad authority of regulators such as the Federal Trade Commission ("FTC") and Consumer Financial Protection Bureau ("CFPB") that closely scrutinize debt buyers and collectors, and have the power to investigate and sanction regulatory violations.

37.     In addition to the regularly published reports, Sherman has a team of business analysts and strategy analysts who may prepare reports regarding specific portfolios as questions arise.

38.     Sherman took delivery of the Bulk, accounts that Conn had charged-off between April and July 2014, and the first "flow" of Conn Receivables, accounts that Conn had charged-off in August 2014, on September 17, 2014, and paid Conn $3,542,995.62, in aggregate, for these Receivables. On September 19, 2014, these Receivables were placed with a number of different third-party debt collection agencies retained by Sherman to attempt to collect upon the Receivables.

39.     I reviewed the performance of the Conn portfolio when the September 2014 reports were published, though at that time the Conn Receivables had only been placed with the collection agencies for approximately two weeks. Those reports indicated that the Conn portfolio, although still very early in the process, was already significantly underperforming expectations.

9

40.     After reviewing the reports, I discussed the results of the Conn collections efforts to date with the Resurgent managers responsible for managing the collection of the Conn portfolio, as well as with other senior management personnel.  I asked the managers and analysts to work with the third-party agencies to help identify the root cause of the portfolio's poor performance.

41.     The investigation into the poor performance of the Conn portfolio started broadly by looking at, among other things, how many of the Receivables had been placed with collection agencies, when they were placed, what type of collection strategies they were placed into, whether the Receivables were placed with the documents the agencies needed to work the accounts, and whether the collection agencies were able to contact the applicable debtors.

42.     As part of that performance analysis, the Resurgent managers contacted the collection agencies that were working the Conn Receivables.  Those agencies reported that the primary driver of the poor performance was that the consumers were raising a substantial number of various disputes about the Conn Receivables.

43.     Among other things, the consumers complained that they had been charged for goods that they did not agree to buy or that had not been delivered, that they had not received credit for goods they returned to Conn, and that Conn had not applied insurance proceeds or that the consumers were unaware that they had purchased insurance, among other disputes.

44.     The number of disputes received on the Conn portfolio in the first few weeks of collections was significantly higher than Sherman has experienced on any other portfolio that it has ever purchased.  While the Conn portfolio was only collected for a short period of time, the Conn portfolio had a much higher dispute rate than other portfolios using any reasonable measure of disputes.  A typical portfolio of sub-prime charged-off Receivables has a dispute rate

of less than 0.5% over the life of the portfolio. By November 17, 2014, the Conn dispute rate was at 6.52% of "right party contacts" (meaning successful telephone contacts with the correct debtor) – 13 times higher than the expected rate. Furthermore, the Conn dispute rate was 10 times higher than the average portfolio if you measure only disputes received in the first month of collections, and the dispute rate was much higher than average even if you compared the first month of disputes to the lifetime number of disputes of the average portfolio.

45. The high volume of disputes received so early in the collection process was unprecedented in my experience at Sherman and was alarming. Even though Sherman had not yet reported the Receivables to credit reporting agencies, a process that typically generates a significant number of disputes, and had made contact with only a small percentage of consumers due to the brief time since the Receivables had been placed in collections, disputes on the Conn portfolio already exceeded the lifetime expectations of a typical sub-prime charge-off portfolio.

46. As it evaluated these disputes, Sherman continued to perform its obligations under the terms of the PSA and purchased the second "flow" delivery on October 17, 2016. Sherman paid Conn $862,287.70 for these Receivables.

47. However, Sherman and its affiliates continued to receive disputes from consumers, and as we continued to collect information on the volume and nature of the disputes, we determined that the volume and rate of the disputes were a "red flag," which is the term used by the CFPB, that would cause a reasonable debt buyer to doubt the validity of the account balances and the information on the data file sent by Conn. As described in the CFPB's July 28, 2016 Small Business Review Panel for Debt Collector and Debt Buyer Rulemaking, when a debt buyer has reason to believe that a data file provided by a seller is not reliable, the debt buyer must cease collecting on the accounts or otherwise enforcing them until it can confirm the

11

accuracy of the data, if it is possible to obtain such confirmation. It would not be best practice, and could be illegal, to continue to attempt collection on Receivables where the debt buyer does not trust the accuracy of the information in the data file. Debt collectors simply cannot attempt to collect on Receivables where they have reason to believe that the account information they've been provided by the seller – particularly as to the balance owed by the consumer – is not accurate. Here, because Sherman determined that we could not trust the accuracy of the data file that Conn provided (particularly as to the account balances), we determined that we could no longer contact consumers, could not file any lawsuits, and could not credit report on the accounts. Since we could no longer even attempt to collect on the Receivables because of our doubts about the account data, we had no method by which to legally continue to enforce the consumers' loan obligations.

48.     By December 6, 2014, Sherman had ceased all collection activity on nearly the entire Conn portfolio, with the exception of a handful of Receivables where the debtor had already made payments to Sherman's agencies without raising any disputes, and we recalled the vast majority of Conn Receivables from our collection agencies. In total, Sherman paid Conn $4,383,366 for the Conn Receivables and to date has collected a total of $392,592.

49.     While many prior portfolios Sherman purchased had failed to meet our expectations regarding collections, we had always been able to continue to attempt collection on such portfolios. And if our collections ultimately fell short, even substantially short, of expectations, we considered that a normal part of business in the debt sale industry. By contrast, by early November 2014, barely 6 weeks after closing on the first delivery with Conn, Sherman had determined that it could no longer even try to collect on the Conn Receivables due to the volume of disputes and red flags about the accuracy of the account balances without risking

12

regulatory investigation or violating the law. As a result, Sherman had no choice but to demand that Conn repurchase the Receivables.

## Sherman Requests that Conn Repurchase the Portfolio

50.     In response to the high volume of disputes and Sherman's resulting inability to enforce the Receivables, on November 5, 2014, I sent Garnet a list of disputes that Sherman's collection agencies had received on the Conn portfolio, and informed Garnet that due to Conn's breach of its representations and warranties made in the PSA, specifically sections 8.5, 8.6, and 8.7, Sherman was not comfortable with the account balances, would not close on any more "flows" unless and until these issues could be resolved, and as a result of the volume and type of disputes received to date, was likely to request that Conn repurchase nearly the entirety of the portfolio, in accordance with the remedy the parties agreed to in Section 9.4 of the PSA for a breach by Conn of any of its representations and warranties.

51.     Throughout November 2014, Sherman negotiated with Conn, including providing additional summaries of specific consumer disputes its collection agencies had received, and repeatedly informing Conn and Garnet that the dispute rate was many times larger than comparable portfolios. Conn's response, as conveyed by Garnet and communicated directly to Sherman by Conn employee Clint Walton, was that Sherman should keep pushing through and continue to call consumers to attempt to collect on the Receivables. Conn stated to Sherman that as these accounts were "sub-prime," Sherman therefore should have expected a high number of disputes, all the while dismissing the disputes raised by consumers as "excuses" that should not prevent Sherman from continuing to attempt collection on the Receivables. Conn insisted that Sherman continue collecting and resolve any further disputes on an account-by-account basis as they continued to arise.

52.     Sherman responded to Conn that contacting consumers, credit reporting, or filing lawsuits where we had reason to believe the data file was materially inaccurate would be a violation of the law, irrespective of whether the consumers were sub-prime or not.

53.     During negotiations, Sherman repeatedly requested that Conn repurchase the Receivables under the section 9.4 of the PSA, the repurchase provision for any breach by the seller of its representations and warranties. On January 6 and January 14, 2015, Sherman sent lists of the Receivables to be repurchased to Conn, again requesting repurchase of the majority of the portfolio.

54.     Sherman never offered, nor was Sherman willing to consider, a price adjustment or other remedy that would have forced Sherman to continue to attempt to enforce the Receivables in the Conn portfolio.  Price adjustment of any kind is not a remedy mentioned in the PSA, nor is it a customary remedy in this industry for breach of a seller's representations and warranties, and continuing to attempt collection on the Conn Receivables would have subjected Sherman to continued legal and regulatory risk, due to the volume of disputes and the now admitted inaccuracy of the account balances. Due to Conn's breaches of the PSA, as well as Conn's dismissive response when Sherman raised these breaches and the disputes it had received, Sherman had a total lack of confidence in its ability to continue to legally attempt collection, and had legitimate concerns about violating the practices prescribed by its regulators, including the FTC and CFPB.

55.     Since Sherman was sued by Conn, I have learned, through information filed in the case between TF LoanCo III, LLC and Conn, through discovery in this case, and through the reports of Conn's expert witness Bruce L. Blacker, that Conn failed to credit the account balances of the Receivables in the portfolio Sherman purchased for money it received for

14

unearned warranty time after cancelling such warranties, including Repair Service Agreements ("RSAs"), upon charge-off of the account, despite being legally required to do so.  It is my understanding that more than 60% of the Conn Receivables purchased by Sherman should have been credited for cancelled RSAs and other Conn warranty products, meaning that the account balances for more than 60% of the Conn Receivables purchased by Sherman were inaccurate, contrary to Conn's representations in the PSA.

56.    If Sherman had known at any time from September through November 2014 that the balances of the majority of the Conn Receivables were inaccurate as a result of Conn's failure to apply credits for cancelled RSAs and other Conn warranty products, we would have stopped attempting to collect on the Receivables, terminated the PSA, and demanded repurchase by Conn of the Receivables, with or without the substantial amount consumer disputes that we received regarding the Conn Receivables.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: November 29th, 2016

Bryan Faliero

15