EXECUTION VERSION

PURCHASE AND SALE AGREEMENT

between

Conn Credit I, LP,

as Seller

– and –

Sherman Originator III LLC

as Buyer

Dated and Effective as of

September 15, 2014



POPPE
**83**

October 5, 2016
Court Reporter:
Stephanie M. Harper, RPR, CSR

SHERMAN0000511

CONFIDENTIAL

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "*Agreement*") is entered into this 15th day of September, 2014, by and between Conn Credit I, LP, a Texas limited partnership ("*Seller*") and Sherman Originator III LLC, a Delaware limited liability company ("*Buyer*").

### W I T N E S S E T H:

WHEREAS, Seller desires to sell certain Accounts (as defined herein) on a monthly flow basis throughout the Purchase Period;

WHEREAS, Buyer has reviewed and evaluated, to Buyer's full satisfaction, the Accounts, and the documents and records relating to the Accounts made available by Seller; and

WHEREAS, Buyer was the successful bidder for purchase of the Accounts for the consideration and under the express terms, provisions, conditions and limitations as set forth herein; and

WHEREAS, Seller is willing, subject to the express terms, provisions, conditions, limitations, waivers and disclaimers as may be expressly set forth herein, to sell, transfer, assign and convey to Buyer all of Seller's right, title and interest, in, to and under the Accounts.

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE I
### DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

"**Account**" means each and any account identified on each Exhibit A attached to a Bill of Sale in the form attached hereto as Exhibit B and made a part hereof and to be sold by Seller to Buyer under the terms, conditions and provisions of this Agreement and includes for each of the Accounts identified on **Exhibit A**, all obligations owed to Seller from each Obligor with respect to each Account (including any deficiency), all rights, powers, liens or security interests of Seller with respect to any such account, and the interest of Seller in any litigation or bankruptcy to which Seller is a party or claimant relating to any of the Accounts. "**Account Balance**" means the unpaid balance owed on any individual Account as of the applicable Cutoff Date and reflected on the applicable Account Schedule. The Account Balance may include pre-charge-off, accrued interest and/or fees, but does not include post-charge-off accrued interest or fees.

"**Account Documents**" means, to the extent available, the original or copy (whether paper or imaged) of the documents shown on **Exhibit E**.

"**Account Schedule**" means the schedule, in electronic form, identified as Exhibit A that will be sold to Buyer on the applicable Closing Date, setting forth the following information for each Account as of the applicable Cutoff Date: the Account number, the name of primary Obligor, the Account Balance and the Allocated Account Price.

"**Agreement**" means this Purchase and Sale Agreement, including the cover page and all Addenda, Exhibits and Schedules hereto.

1

CONFIDENTIAL

"**Allocated Account Price**" means the individual price of any Account sold hereby which is calculated as the product of the Purchase Price Percentage multiplied by the Account Balance for such Account sold hereby.

"**Amount Due at Closing**" means the Purchase Price, as may be adjusted, as set forth on the applicable Settlement Statement.

"**Bulk Delivery**" means, collectively, the Accounts sold hereby that were charged-off in the months of April 2014, May 2014, June 2014 and July 2014.

"**Business Day**" means any day on which Seller is open for business other than a Saturday, a Sunday or a federal holiday.

"**Closing Date**" means the closing date of each Delivery as set forth in the definition of "Delivery Schedule".

"**Collectible**" or "**Collectability**" means receiving full or partial payment from or on behalf of an Obligor, applicable to one or more Accounts.

"**Computer File**" means the data file or files provided by Seller to Buyer in the timeframe as set forth in the Delivery Schedule. The Computer File shall be in a mutually acceptable electronic format, and shall contain Account-specific information for each of the Accounts sold hereby. Seller will use its best efforts to ensure the accuracy and completeness of the data. The Computer File shall reflect data as of the applicable Closing Date, and shall include, but shall not be limited to, the fields shown on Exhibit F to the extent available for each Account.

"**Cutoff Date**" means the date reflected in the Delivery Schedule for each Delivery and shall be the dates on which the Account Balances shall be determined for purposes of calculating the Purchase Price and Allocated Account Prices.

"**Delivery Schedule**" means:

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Delivery | Month of Charge-Off | Cutoff Date (through and including) | Computer File Delivered to Loan Sale Advisor | Computer File Delivered to Buyer | Closing Date (on or by) |
| Bulk Delivery | 04/2014 | 07/31/2014 | Complete | Complete | 09/19/2014 |
| | 05/2014 | 07/31/2014 | Complete | Complete | 09/19/2014 |
| | 06/2014 | 07/31/2014 | Complete | Complete | 09/19/2014 |
| | 07/2014 | 07/31/2014 | Complete | Complete | 09/19/2014 |
| 1 | 08/2014 | 08/31/2014 | 09/12/2014 | 09/16/2014 | 09/19/2014 |
| 2 | 09/2014 | 09/30/2014 | 10/09/2014 | 10/14/2014 | 10/17/2014 |
| 3 | 10/2014 | 10/31/2014 | 11/10/2014 | 11/13/2014 | 11/18/2014 |
| 4 | 11/2014 | 11/30/2014 | 12/10/2014 | 12/15/2014 | 12/18/2014 |
| 5 | 12/2014 | 12/31/2014 | 01/09/2015 | 01/15/2015 | 01/21/2015 |
| 6 | 01/2015 | 01/31/2015 | 02/10/2015 | 02/13/2015 | 02/19/2015 |
| 7 | 02/2015 | 02/28/2015 | 03/10/2015 | 03/13/2015 | 03/18/2015 |
| 8 | 03/2015 | 03/31/2105 | 04/10/2015 | 04/15/2015 | 04/20/2015 |
| 9 | 04/2015 | 04/30/2015 | 05/11/2015 | 05/14/2015 | 05/19/2015 |
| 10 | 05/2015 | 05/31/2015 | 06/10/2015 | 06/15/2015 | 06/18/2015 |
| 11 | 06/2015 | 06/30/2015 | 07/10/2015 | 07/15/2015 | 07/20/2015 |
| 12 | 07/2015 | 07/31/2015 | 08/10/2015 | 08/13/2015 | 08/18/2015 |

2

CONFIDENTIAL

SHERMAN0000513

"**Downstream Buyer**" means any third-party who acquires Accounts from Buyer or any successor(s) to Buyer.

"**Government Agency**" means the Consumer Financial Protection Bureau, the Federal Trade Commission, the Department of Justice, a state Attorney General's office, or any other state or federal banking, regulatory or enforcement agency.

"**Issuer**" means the entity which originated an Account, if Seller did not originate such Account.

"**Loan Sale Advisor**" means Garnet Capital Advisors, LLC.

"**Obligor**" means the current and unreleased obligor(s) on an Account including, without limitation, any and all co-makers, guarantors, judgment debtors or other persons or entities liable on the Account.

"**Obsolete Account**" means an Account that, as of the applicable Closing Date, may have passed the date for obsolescence provided for in Section 605(a) of the Fair Credit Reporting Act, 15 U.S.C. § 1681c.

"**Out-of-Statute Account**" means an Account that, as of the applicable Closing Date, may have passed the applicable statute of limitations date for such Account.

"**Purchase Period**" means the time period from the date of this Agreement through August 18, 2015, as more specifically set forth on the "Delivery Schedule."

"**Purchase Price**" means the amount, in dollars, to purchase the Accounts on each Closing Date, which is calculated by multiplying the aggregate Account Balances as shown on each Account Schedule by the Purchase Price Percentage.

"**Purchase Price Percentage**" means, (i) in respect to the Accounts subject to the Bulk Delivery, 6.00%, (ii) in respect of every other Account sold, 7.28%.

"**Repurchase Request Deadline**" means the date which is 180 days following the applicable Closing Date.

"**Settlement Statement**" means the settlement statement substantially in the form of Exhibit G which reflects the Amount Due at Closing for each Delivery.

"**Transfer Documents**" means the Bill of Sale and Assignment and such other documents as Seller and Buyer reasonably agree are necessary, proper or appropriate for the legal transfer of Seller's right, title and interest in and to the Accounts purchased pursuant to this Agreement, including but not limited to affidavits of sale and other documents which may be required under state or local law.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

Section 2.1    **Agreement to Sell and Purchase Accounts.** Seller agrees to sell, and Buyer agrees to purchase, the Bulk Delivery on the date hereof, and on a monthly basis during the Purchase Period as set forth in the "Delivery Schedule," the Accounts described in each Account Schedule, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement.

Section 2.2    **Account Schedule.** On or before three Business Days before each Closing Date, Seller shall provide Account Schedules setting forth all of the Accounts which Buyer has agreed to purchase on each Closing Date.

3

CONFIDENTIAL

SHERMAN0000514

**Section 2.3**   **Payment of the Amount Due at Closing.** Buyer shall pay the Amount Due at Closing as reflected on the applicable Settlement Statement to Seller on or before 5:00 p.m. eastern time on the applicable Closing Date. Such Amount Due at Closing shall be paid to Seller in United States Dollars by wire transfer of immediately available funds to the account specified by Seller on Exhibit G.

**Section 2.4**   **Closing Deliverables.** On each Closing Date after the receipt of the Amount Due at Closing (or on the Business Day following such Closing Date if Seller is unable to verify receipt of the Amount Due at Closing on the related Closing Date), Seller shall deliver to Buyer:

(a)  Bill of Sale and Assignment.  A Bill of Sale and Assignment, in the form of Exhibit B hereto, executed by an authorized representative of Seller, which Bill of Sale and Assignment shall sell, transfer, assign, set-over, quitclaim and convey to Buyer all right, title and interest of Seller in and to each of the Accounts sold and the proceeds of the Accounts received by Seller, if any, from and after the applicable Cutoff Date. The Bill of Sale and Assignment shall have the same effect as an individual and separate bill of sale and assignment of each and every Account referenced therein. Buyer shall be responsible at its own expense for the recording and/or filing of the originals of any such assignments as it deems necessary or appropriate in its sole discretion.

(b)  Limited Power of Attorney.  A Limited Power of Attorney in the form of Exhibit C.

**Section 2.5**   **UCC Filings by Buyer.**  Immediately upon the sale of the Accounts to Buyer from Seller on each Closing Date and at any time thereafter, Buyer may file, in each appropriate office any UCC financing statement, and any amendments or any continuation statements thereto, required to perfect the sale of Accounts by Seller to Buyer.  Seller shall have no obligation to make any such filings.

**Section 2.6**   **Payments Received/Adjustments to Purchase Price.**  To the extent that (i) payments have been made by or on behalf of an Obligor and received by Seller on or prior to the applicable Cutoff Date that are not reflected in the related Account Balance or (ii) the Account Balance reflects payments made by or in behalf of an Obligor which have been credited or deposited to the Balance of the Account, but which may have been subsequently dishonored and thus returned to Seller, (a) Buyer shall be entitled to a refund of the Purchase Price Percentage multiplied by the difference between the Account Balance shown on the applicable Schedule A for the related Account and the Account Balance that would have been shown on such Schedule A if the payment(s) in Section 2.6(i) had been applied to the Account, and (b) Seller shall be entitled to the Purchase Price Percentage multiplied by the difference between the Account Balance shown in the applicable Schedule A for the related Account and the Account Balance that would have been shown on such Schedule A if the NSF payment(s) in Section 2.6(ii) had been reflected in the Account Balance; provided that, with respect to amounts owed under this Section 2.6, Buyer and Seller shall be permitted to net or offset amounts owed against any amounts they are entitled to in accordance with applicable terms of this Agreement.

**Section 2.7**   **Apportionment of Costs.**  Except as otherwise specifically provided in this Agreement, each party will be responsible for all fees, costs and expenses which it incurs in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

CONFIDENTIAL

SHERMAN0000515

## ARTICLE III
## POST-CLOSING MATTERS

**Section 3.1**    **Delivery of Post-Cutoff-Date Payments**.  Seller shall pay over and deliver all payments or other consideration received by Seller with respect to any Account after the applicable Cutoff Date (including any payment that may be made by an Obligor in a retail store location) within 15 days after the end of the month in which any such payment is received. Such payments by Seller shall be made with an endorsement in the form substantially as follows: "Pay to the order of Buyer without representations, warranties, and without recourse." Such payments shall be without interest thereon from Seller. At Seller's sole option, Seller may provide a credit to the Amount Due at Closing for such amounts that are known as of the time the applicable Settlement Statement is completed.

Seller shall indicate on the records related to any of the Accounts transmitted to Buyer with the payment remittances the account number, the date of receipt of the payment, the amount of the payment and any other detail reasonably required to allow Buyer to properly post the payments to its collection system.

For any funds remitted after the 12 month period following the applicable Closing Date, Seller shall charge Buyer a processing fee equal to the lesser of (i) 5% of the amount remitted, or (ii) $5.00 per payment processed. Such amounts may be deducted by Seller prior to remittance to Buyer. Such fee shall be borne by the Buyer and such cost shall not be passed on by Buyer to any Obligor.

If Seller has deposited payments received from any Obligor and issues a check or payment therefor to Buyer, Buyer shall retain the risk that any such payment so deposited by Seller shall be returned due to insufficient funds. Seller shall have a period of 30 days after the later of the date that (i) Seller delivers to Buyer payments made by or on behalf of any Obligor on or after the applicable Closing Date and (ii) such payments were returned due to insufficient funds to Seller, to notify Buyer in writing that any such payments were returned due to insufficient funds and specifying the amount thereof, whereupon Buyer shall immediately, and not later than 30 days following receipt of such notice, pay to Seller the amount of such payment.

Seller shall be under no obligation to continue processing ACH payments or accepting branch payments after the applicable Closing Date.

**Section 3.2**    **Requests for Account Documents.**

Seller shall provide all Account Documents in its possession to Buyer within 30 days following the applicable Closing Date. Buyer shall be responsible for shipping charges and for arranging shipping and/or pickup of the Account Documents. Seller has estimated in good faith that it will be able to deliver Account Documents for at least 98% of the Accounts; however, it shall only be obligated to deliver those Account Documents that are in its possession and reasonably retrievable. After such 30-day period, Seller shall charge a fee of $25 per Account (plus Seller's out-of-pocket costs, if applicable) for any request for Account Documents related to such Account.

After the transfer of Account Documents to Buyer pursuant to the terms of this Agreement, Buyer agrees that Seller shall have the continuing right to use, inspect, and make extracts from, or copies of, any such Account Documents upon Seller's reasonable

CONFIDENTIAL

SHERMAN0000516

notice to Buyer and at Seller's expense, provided Buyer may legally share such information.

Buyer may request Affidavits of Debt in the form of Exhibit H. Requests shall contain sufficient information about the relevant Accounts to allow Seller representatives to locate Account information to complete the affidavits. Buyer shall provide such requests in a standardized format developed by Seller at Seller's option. Seller will use commercially reasonable efforts to provide Buyer, upon Buyer's request, certain affidavits required by local, state and federal law to evidence the sale of the Accounts by Seller to Buyer. Any affidavits requested by Buyer shall be treated as if they were Account Documents and Seller shall charge $25 for each such affidavit.

Buyer shall not use any court process, subpoena, or legal proceeding to obtain any Account Document or other information about the Accounts unless required to defend Buyer, its affiliates, or Seller in an action instituted by an Obligor.

**Section 3.3**  **Forwarding Notices / Correspondence.** If Seller shall receive notices or correspondence related to any Account after the Closing Date, it shall forward the same to Buyer within 30 days of receipt.

**Section 3.4**  **Reporting to Credit Bureaus.** For those Accounts which Seller was reporting to credit reporting agencies at the time of Closing, Seller will report such Accounts to the appropriate credit reporting agencies as sold/transferred and/or tradeline deleted. Except as required by law, Seller shall have no further obligation with respect to credit reporting.

**Section 3.5**  **Affidavit of Sale of Accounts.** Within 60 days following the Closing Date, Seller shall deliver to Buyer an Affidavit of Sale of Accounts by Seller with a Certificate of Conformity in the form of Exhibit I to this Agreement. If Seller does not provide such documentation, Buyer may, at its option, require Seller to repurchase any Account where the Obligor is a resident of New York City in accordance with the repurchase procedures in Section 6.2.

### ARTICLE IV
### SERVICING/COLLECTION

**Section 4.1**  **Servicing/Collection After Closing Date.** The Accounts shall be sold and conveyed to Buyer on a servicing-released basis. As of each Closing Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of the Accounts shall pass to Buyer, and Seller shall be discharged from all servicing liability therefore. Buyer shall have no right to communicate with any Obligor or otherwise take any action with respect to any Account or any Obligor until after the applicable Closing Date. Buyer shall be responsible for fees and out-of-pocket costs incurred by any third-party agencies or attorneys incurred after the Cutoff Date, to the extent such fees or services were authorized or requested by Buyer, which may be netted out of payment remittances in accordance with Section 3.1, but otherwise for which Buyer shall be directly responsible.

**Section 4.2**  **Notification to Obligors.** Seller and Buyer acknowledge and agree that Buyer will make written notification to all Obligors that have made a payment within the 12-month period prior to the applicable Closing Date of the transfer of the Accounts to Buyer within thirty (30) days of the applicable Closing Date and direct all future payments to be made to Buyer's address. Buyer shall comply with all applicable laws regarding notifications to other Obligors. If requested by Seller, Buyer shall provide Seller with confirmation that

6

SHERMAN0000517

the required written notifications have been sent not later than 5 Business Days after requested by Seller.

**Section 4.3**   **Debt Collection of Accounts.**  If Buyer collects or attempts to collect on an Account, Buyer will, and will cause its agent(s), at all times to:

(a) comply with all state and federal laws applicable to debt collection including without limitation, the Consumer Credit Protection Act, the Telephone Consumer Protection Act, the California Rosenthal Fair Debt Collection Practices Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act;

(b) maintain licensure, insurance, bonding, registration, as required by all jurisdictions in which it attempts to collect on an Account, and carry general liability insurance in an amount not less than $1,000,000;

(c) actively maintain and abide by an established written information technology security plan to protect Account information in accordance with applicable laws and regulations;

(d) for any Account where the statute of limitations has run, not represent that a lawsuit will be filed if the Obligor does not pay;

(e) for any Account where the reporting period allowed for under the Fair Credit Reporting Act has run, not report such account to any credit reporting agency;

(f) not charge any Obligor any convenience fees or late charges; and

(g) maintain a system to track and respond to Obligor complaints.

**Section 4.4**   **Complaints.**  Buyer and Seller will provide the other party with prompt reasonable notice of any demand letters threatening to sue Buyer or Seller, any filed lawsuits and/or any threatened regulatory proceedings regarding the Accounts (whether such complaint is related to a purported action or inaction by Buyer or Seller or either party's agents). Upon request of a Government Agency, such information may be shared with the Government Agency.  In addition, Buyer will reasonably cooperate with Seller and any Government Agency in connection with any request by a Government Agency for information or documents relating to the Accounts or Buyer's handling of the Accounts.

**Section 4.5**   **Use of Seller's Name.**  Buyer will not use or refer to the name of Seller or any of its affiliates, will not portray itself as Seller's agent, partner, or joint venturer with respect to the Accounts. However, Buyer may use the name of Seller for purposes of identifying an Account in communications with the Obligors or in the caption of any litigation against Obligor (so long as it is apparent that Seller are not set forth in such caption as the party plaintiff) in order to collect amounts outstanding on the Accounts.  In contacting an Obligor, filing suit, or selling Accounts, Buyer will not state or represent in any way that Buyer is contacting the Obligor, filing suit or selling loans for or on behalf of Seller or that any of the above will take any action with regard to the Account or the Obligor.

**Section 4.6**   **Documents and Records.**  Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and

7

SHERMAN0000518

records are to be retained and making any disclosures to Obligors as may be required by law.

**Section 4.7**    **Enforcement/Legal Actions.** Buyer shall not institute any enforcement or legal action or proceeding on an Account that is out of legal statute or in the name of Seller or any subsidiary thereof. Buyer shall not make reference to any of the foregoing entities in any correspondence to or discussion with any particular Obligor regarding enforcement or collection of the Accounts, except to identify the subject debt as set forth in <u>Section 4.5</u>. Buyer will comply in all respects with all applicable laws including, but not limited to, those relating to debt collection practices, in connection with the Accounts and not to take any enforcement action against any Obligor which would be commercially unreasonable and that Buyer will not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Buyer as the owner of the Accounts.

## ARTICLE V
## SELLER'S RIGHT TO REPURCHASE ACCOUNTS

**Section 5.1**    **Accounts Affected.** Seller shall have the right to repurchase any Account that has not been paid in full, released or compromised by Buyer, if Seller reasonably determines that there is a pending or threatened suit, arbitration or other legal proceeding or investigation relating to an Account or an Obligor, and naming Seller, for which Seller determines (in its reasonable discretion) that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Account.

**Section 5.2**    **Procedure for Account Repurchase.** Seller shall promptly notify Buyer in writing of the identity of such Accounts, and Buyer shall promptly reassign such Account to Seller. Buyer will immediately cease releasing, collecting, or compromising the Account after Buyer receives Seller's notice. Buyer shall promptly remit to Seller any payments received on such Account from and after the date that Seller provides Buyer with notice.

Seller shall refund to Buyer the Allocated Account Price for such Account, less any amounts collected by Buyer after the applicable Cutoff Date and prior to Buyer's receipt of Seller's notification. The repurchase price shall be paid to Buyer within 30 days after Seller's receipt of the documents and instruments required to reassign such Account to Seller.

## ARTICLE VI
## SELLER'S OBLIGATION TO REPURCHASE ACCOUNTS

**Section 6.1**    **Accounts Affected.** Upon written notice from Buyer received no later than the Repurchase Request Deadline, Seller will repurchase any Account to which any of the following conditions applies on or prior to the applicable Cutoff Date:

     (a)   death of all Obligors;

     (b)   the filing of bankruptcy proceedings by all Obligors after the related account origination date without subsequent dismissal;

     (c)   the Account was created as a result of fraud or forgery;

8

SHERMAN0000519

(d) the only remaining liable Obligor on the Account is a business entity and such business entity is defunct;

(e) Seller received payment in full settlement of the Account (including but not limited to issuance of Form 1099C);

(f) a claim has been made to the Buyer under applicable law, including but not limited to claims under the Fair and Accurate Credit Transactions Act (FACTA);

(g) the Obligor has initiated litigation or is included in a certified or proposed class action lawsuit as an actual or proposed member of a class, and such litigation is against Seller; or

(h) the Account is a duplicate record of any other Account being sold hereby.

**Section 6.2**    **Buyer's Obligation in Requesting Repurchase.**   For any Account which meets a condition set forth in Section 6.1, Buyer will immediately cease releasing, collecting, or compromising the Account and shall notify Seller before the applicable Repurchase Request Deadline that such Account meets a condition described in Section 6.1. Upon Seller's request, such notice shall include reasonably detailed information and documentation regarding the basis for such request to demonstrate to Seller's reasonable satisfaction that the Account meets one of the stated conditions.

**Section 6.3**    **Account Repurchase Procedure.**   Within 30 days of Seller's receipt of Buyer's notice and delivery to Seller of the evidence required under Section 6.2, Seller shall provide Buyer with an Account-level response to such request detailing which Accounts Seller agrees meet the Section 6.1 conditions and which Accounts Seller does not agree meet such conditions. The parties will work in good faith to come to agreement on which Accounts meet such conditions. Where necessary, the Buyer shall provide additional information documenting the Accounts where the parties are not in agreement.

The repurchase shall be completed within 10 Business Days following such agreement by Buyer providing transfer documentation to Seller and Seller paying Buyer an amount equal to the Allocated Purchase Price for such Account, less any amounts collected by Buyer after the applicable Cutoff Date for Accounts. After the repurchase is completed, Buyer shall promptly remit to Seller any payments received on such Account from and after the date that Buyer notifies Seller that such Account meets a condition described in Section 6.1.

**Section 6.4**    **Limitation of Buyer's Right to Require Repurchase.**   Seller is not and shall not be obligated to repurchase any Account as to which:

(a) the terms have been modified in any material respect by a written agreement between Buyer and Obligor;

(b) Buyer has obtained full payment on the Account from Obligor or any guarantor or surety therefor, or otherwise accepted partial payment thereof in full satisfaction of the debt evidenced thereby;

(c) any of the Obligors have been released by Buyer; or

9

CONFIDENTIAL

SHERMAN0000520

(d) Buyer has not provided evidence or proof reasonably satisfactory to Seller that the conditions set forth in Section 6.1 are met.

**ARTICLE VII**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER**

Buyer hereby represents, warrants and covenants, as of the date of this Agreement and as of each Closing Date as follows:

Section 7.1     **Independent Evaluation.** Buyer is a sophisticated investor, has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated by this Agreement, and that its bid for and decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's own independent evaluation of information deemed relevant to Buyer, and of the information made available by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer, which Buyer acknowledges and agrees were made available to it and which it was given the opportunity to inspect to its complete satisfaction. Buyer has relied solely on its own investigation and has not relied upon any oral or written information provided by Seller or its personnel, agents, representatives or independent contractors (including information contained in the Offering Memorandum) other than those representations and warranties contained in this Agreement. Buyer acknowledges and agrees that no employee, agent, representative or independent contractor of Seller has been authorized to make, and that Buyer has not relied upon, any statements other than those specifically contained in this Agreement. Buyer acknowledges that Seller has attempted to provide accurate information to Buyer but that Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the materials submitted to Buyer except as provided in this Agreement. Buyer has made such independent investigations as it deems to be warranted into the collectability and value of the Accounts, and all other facts it deems material to its purchase and is entering into this transaction solely on the basis of that investigation and Buyer's own judgment, and the covenants, representations and warranties in this Agreement.

Section 7.2     **Authorization.** Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

Section 7.3     **Binding Obligations.** This Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

Section 7.4     **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer, or result in the violation of any law, rule, regulation, order, judgment or decree to which Buyer or its property is subject.

10

CONFIDENTIAL

SHERMAN0000521

**Section 7.5**    <u>Accounts Sold As Is</u>. BUYER ACKNOWLEDGES AND AGREES THAT ALL ACCOUNTS, ALL DOCUMENTATION, INFORMATION, ANALYSIS AND/OR CORRESPONDENCE, IF ANY, ARE SOLD, TRANSFERRED, ASSIGNED AND CONVEYED TO BUYER ON AN "AS IS, WHERE IS" BASIS, WITH ALL FAULTS, <u>EXCEPT AS PROVIDED IN THIS AGREEMENT</u>. BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT AND DOES NOT REPRESENT, WARRANT OR COVENANT THE NATURE, ACCURACY, COMPLETENESS OR COLLECTIBILITY OF ANY OF THE ACCOUNTS, AND/OR THE ACCOUNT DOCUMENTS, <u>EXCEPT AS PROVIDED IN THIS AGREEMENT</u>.

**Section 7.6**    <u>Pending Litigation</u>. There is no proceeding, action, investigation or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially its ability to perform under the terms of this Agreement.

**Section 7.7**    <u>Approvals and Notices</u>. No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

**Section 7.8**    <u>Economic Risk</u>. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities". Buyer acknowledges, understands and agrees that the acquisition of these Accounts involve a high degree of risk and are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Accounts indefinitely or bear the partial or entire loss of the value.

**Section 7.9**    <u>Nondisclosure</u>. Buyer is in full compliance with its obligations under the terms of the confidentiality agreement executed by Buyer to review the information made available by Seller or its personnel, agents, representatives or independent contractors to all potential bidders for the Accounts. Furthermore, Buyer shall keep the terms of the Agreement confidential.

**Section 7.10**    <u>Identity</u>. Buyer is a "United States person" within the meaning of Paragraph 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

**Section 7.11**    <u>Status of Buyer</u>. Buyer is a sophisticated purchaser that is in the business of buying or originating or collecting Accounts of the type being purchased or that otherwise deals in such Accounts in the ordinary course of Buyer's business and is purchasing for its own account with the intent to collect such Accounts. Notwithstanding the foregoing, and subject to Article XI, Buyer retains the right to sell, transfer, or assign the Accounts to a third party.

**Section 7.12**    <u>No Collusion</u>. Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid, or any bid other than a bona fide bid, in connection with the sale resulting in Buyer being the highest bidder for the Accounts subject to this

11

Agreement, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or the bid price of any other bidder at the sale resulting in Buyer being the highest bidder for the Accounts subject to this Agreement, or to secure any advantages against Seller.

**Section 7.13**   **Broker.** Buyer has not engaged any broker or agent in connection with this Agreement or the transactions contemplated by this Agreement or to which this Agreement relates and Buyer covenants to defend with counsel approved by Seller and hold harmless and indemnify Seller from and against any and all costs, expense or liability for any compensation, commissions and charges claimed against Seller by any broker or agent based upon a written agreement with Buyer relating to this Agreement or the transactions contemplated herein.

## ARTICLE VIII
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants and covenants, as of the date of this Agreement and as of each Closing Date as follows:

**Section 8.1**   **Authorization.** Seller is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Seller to the terms of this Agreement.

**Section 8.2**   **Binding Obligations.** This Agreement and all of the obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 8.3**   **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller, or result in the violation of any law, rule, regulation, order, judgment or decree to which Seller or its property is subject.

**Section 8.4**   **Title to Accounts.** Seller is the lawful holder of clear and marketable title to the Accounts, and is duly and legally authorized to sell, transfer, convey and assign its rights therein. Seller has not made any prior assignment, conveyance, transfer or sale of any of its rights or interests in the Accounts.

**Section 8.5**   **Compliance with Law.** The Accounts have been originated, serviced and collected in accordance with all applicable laws.

**Section 8.6**   **Accounts Valid and Enforceable.** Except for Accounts eligible for repurchase under Article VI, each Account represents the valid, enforceable, legal and binding obligation of each Obligor, except as may be limited by applicable law. A valid and otherwise enforceable Account may not be Collectible.

12

CONFIDENTIAL

**Section 8.7**    **Computer File.** The information included in the applicable Computer File as of the date the Computer Files are transferred to Buyer are materially accurate, provided that Buyer acknowledges and agrees that certain information, such as addresses and telephone numbers, may not be current.

**Section 8.8**    **Collection/Contingent Fees/Future Advances.** No Account sold hereunder is subject to third-party collection or contingency fees as of the applicable Closing Date. Each Account has been charged off by Seller, with no obligation on the part of the Buyer to advance any funds of any kind to or on behalf of any Obligor in respect of his or her Account. For the avoidance of doubt, Buyer recognizes that an Obligor may currently have, and/or in the future may have, other non-charged off accounts with Seller. The Parties further agree and acknowledge that this Section 8.8 nor any other provision in this Agreement shall preclude Seller from extending credit and/or advancing future funds to such Obligor related to accounts that have not been charged-off by Seller at the time of credit extension or advancement of funds.

**Section 8.9**    **Account Documents.** Account Documents provided pursuant to <u>Section 3.2</u> are accurate in all material respects.

**Section 8.10**    **Broker.** Seller has not engaged any broker or agent in connection with this Agreement or the transactions contemplated by this Agreement or to which this Agreement relates except Loan Sale Advisor for whose fees Seller shall be solely responsible in accordance with its agreement with Loan Sale Advisor and Seller covenants to defend with counsel approved by Buyer and hold harmless and indemnify Buyer from and against any and all costs, expense or liability for any compensation, commissions and charges claimed against Buyer by any broker or agent based upon a written agreement with Seller relating to this Agreement or the transactions contemplated herein.

**Section 8.11**    **No Adverse Selection.** The Seller has not used any account scoring model, asset scrub, employment scrub, or other means intended to assess the liquidity of the Assets to a means to select the Assets sold under the terms of this Agreement.

**Section 8.12**    **Settlement Offers.** As of the date of this Agreement, the (i) Accounts have not been subjected to mass settlement offers by the Seller, meaning an unsolicited written offer by Seller mailed to a material portion of the Accounts (**"Mass Settlements"**) in the Bulk Delivery, and (ii) the terms described in the third bullet of the Offering Memorandum provided to the Buyer prior to sale are materially true and correct. Further, Seller agrees that the Accounts sold to Buyer in accordance with the Delivery Schedule after the date of this Agreement will not have been subject to Mass Settlements.

EXCEPT FOR THOSE EXPRESSED IN THIS AGREEMENT, INCLUDING <u>ARTICLE VIII</u>, NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, HAVE BEEN MADE BY SELLER OR BY ANYONE ACTING ON ITS BEHALF. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, NO WARRANTIES OR REPRESENTATIONS HAVE BEEN MADE OR ARE MADE REGARDING (i) THE COLLECTIABILITY OR ENFORCEABILITY OF ANY THE ACCOUNTS, (ii) THE CREDITWORTHINESS OF ANY OBLIGOR WITH RESPECT TO ANY OF THE ACCOUNTS, OR (iii) THE VALUE OF ANY COLLATERAL SECURING PAYMENT OF ANY INDEBTEDNESS UNDER ANY OF THE ACCOUNTS.

CONFIDENTIAL

SHERMAN0000524

## ARTICLE IX
## INDEMNIFICATION

**Section 9.1**   **Buyer's Indemnification.**  With respect to Accounts sold on each Closing Date, from and after the applicable Closing Date, Buyer shall indemnify, defend and hold Seller and its affiliates, and each or their respective officers, owners, employees, and agents, harmless against and from any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature asserted by any third party (herein "claims") including, without limitation, all reasonable expenses incurred by Seller in investigating, preparing or defending against any such claims and reasonable attorneys' fees both for such defense and all costs and expenses incurred by Seller to enforce this indemnification, which Seller shall incur or suffer as a result of:

(i)   the material inaccuracy of any of Buyer's representations or warranties herein,

(ii)   the material breach of any of Buyer's covenants herein,

(iii)   any claim by any Obligor regarding servicing, collection or administration of the Accounts by Buyer or Buyer's arising out of acts or omissions on or after the applicable Closing Date,

(iv)   any violation or alleged violation of any federal, state, and local statutes, laws, rules and regulations which may be applicable to Buyer or Seller occurring after the applicable Closing Date and related to the transaction contemplated hereunder, including without limitation any federal or state securities laws, the Right to Financial Privacy Act, the Fair Debt Collections Practices Act, the Privacy Act of 1974, the Gramm-Leach-Bliley Act of 1999, the FACT Act, or the Fair Credit Reporting Act by Buyer in connection with the performance of this Agreement or the servicing, collection or administration of the Accounts.

**Section 9.2**   **Seller's Indemnification.**  With respect to Accounts sold on each Closing Date, from and after the applicable Closing Date, Seller shall indemnify, defend and hold Buyer and its affiliates, and each or their respective officers, owners, employees, and agents, harmless against and from any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature asserted by any third party (herein "claims") including, without limitation, all reasonable expenses incurred by Buyer in investigating, preparing or defending against any such claims and reasonable attorneys' fees both for such defense and all costs and expenses incurred by Buyer to enforce this indemnification, which Buyer shall incur or suffer as a result of:

(i)   the material inaccuracy of any of Seller's representations or warranties herein,

(ii)   the material breach of any of Seller's covenants herein,

(iii)   any claim by any Obligor regarding the origination, servicing, collection or administration of the Accounts by Seller or Seller's agents arising out of acts or omissions prior to the applicable Closing Date.

(iv)   any violation or alleged violation of any federal, state, and local statutes, laws, rules and regulations which may be applicable to Buyer or Seller occurring

CONFIDENTIAL

SHERMAN0000525

prior to the applicable Closing Date and related to the transaction contemplated hereunder, including without limitation any federal or state securities laws, the Right to Financial Privacy Act, the Fair Debt Collections Practices Act, the Privacy Act of 1974, the Gramm-Leach-Bliley Act of 1999, the FACT Act, or the Fair Credit Reporting Act by Buyer in connection with the performance of this Agreement or the servicing, collection or administration of the Accounts.

Section 9.3    **Procedure for Indemnification.**  Any party seeking indemnification with respect to a claim or loss shall give prompt written notice thereof to the party against whom indemnification is sought upon first becoming aware of a claim of threatened claim. Indemnitor shall have the right to assume the defense of any and all claims for which indemnification is sought hereunder, and indemnitee agrees to cooperate with indemnitor in any such defense. If the amount of any claim or loss shall, at any time subsequent to payment pursuant to this Agreement, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the indemnitee to the related indemnitor.

Section 9.4.    **Repurchase of Accounts as Exclusive Remedy.**  Except for the indemnification remedies provided herein, Buyer and Seller agree that, as to any breach by Seller of any of its representations or warranties in respect to any Account, Buyer's sole and exclusive remedy for damages other than third party claims arising out of such breach shall be the Seller's repurchase of such Account.

Section 9.5    **Survival.**  All representations and warranties in this Agreement and any Transfer Document shall expire on the second anniversary following each applicable Closing Date and will thereafter terminate, together with any associated right of indemnification; provided, however, that the representations and warranties in Sections 7.1 (Independent Evaluation), 7.2 (Authorization), 8.1 (Authorization), 8.4 (Title to Accounts), and 8.10 (Brokers) shall survive indefinitely (the "***Fundamental Representations***"). The covenants, agreements or obligations of the Parties in this Agreement and the Transfer Document shall remain operative and in full force and effect and survive until such time as they have been fully performed or satisfied. Any cause of action for any inaccuracy, misrepresentation, failure or breach of a representation or warranty, covenant, agreement or obligation contained herein or in any Transfer Document shall expire and terminate unless the Party claiming that such inaccuracy, misrepresentation, failure or breach occurred delivers to the indemnifying party written notice and a reasonably detailed explanation of the alleged inaccuracy, misrepresentation, failure or breach on or before the date on which such representation or warranty, covenant, agreement or obligation expires pursuant to this Section 9.5.

### ARTICLE X
### CONDITIONS PRECEDENT AND TERMINATION

Section 10.1 **Termination.**  This Agreement may be terminated:

(a)    by a Party, if there has been a material violation or breach by the other Party of any covenant, representation or warranty contained in this Agreement.

(b)    by Seller, if there is a change-in-control of Buyer. A change-in-control of Buyer shall mean (i) the sale or exchange by its members of more than 50% of the

15

SHERMAN0000526

outstanding securities of Buyer, or (ii) the sale of all or substantially all of the assets of Buyer (except as otherwise permitted under this Agreement).

(c) With sixty (60) days written notice to the other party, provided that neither party shall be entitled to terminate this Agreement with an effective date of termination any earlier than May 20, 2015. For the avoidance of doubt, this Agreement shall remain in full force and effect until immediately after the Closing for Delivery 9 (as defined in the Delivery Schedule) with respect to Accounts charged-off by Seller in April 2015.

**Section 10.4**   **Effects of Termination.** Except for those provisions that shall expressly survive the expiration or prior termination of this Agreement, in the event of the termination of this Agreement, this Agreement shall become void and have no force or effect, without any liability on the part of any party hereto (or the stockholders or controlling persons or directors or officers of any party hereto). Notwithstanding the foregoing, a termination of this Agreement shall not relieve any party hereto from any liability for damages incurred as a result of a breach by such party of its covenants and agreements hereunder occurring before such termination. Upon termination, Seller shall have no obligation to sell any further Accounts, and Buyer shall have no obligation to purchase any further accounts, as would otherwise be required under the Delivery Schedule had the Agreement not been terminated.

**ARTICLE XI**
**RESALE OF ACCOUNTS**

Except as set forth in this <u>Article X</u>, Buyer may not assign any rights under this Agreement to any person or entity without the express prior written consent of Seller.

Buyer shall not sell or assign its rights in, under and/or to any Account at any time without Seller's prior written approval which approval must be requested 30 days prior to the resale transaction. All subsequent purchasers must agree in writing to the same, or substantially similar, resale, representations, warranties, covenants, and indemnification obligations and other terms applicable to Buyer that are set forth in this Agreement. Buyer's assignment of some or all Assets shall not relieve Buyer of any of its liabilities or obligations hereunder and Buyer shall be liable to Seller for any failure of any subsequent purchaser to comply with the terms of its Agreement.

Notwithstanding the preceding, the Buyer may assign the Assets and its rights under this Agreement to a wholly-owned affiliate without notice to or approval by the Seller. In the event of such a Transfer, the Buyer shall remain and retain all of the obligations under this Agreement and shall remain liable to the Seller for any violation of Buyer's obligations under this Agreement and under any and all indemnities set forth in this Agreement.

Notwithstanding the preceding, the Buyer may resell the Accounts without prior approval where such resale is part of the sale of materially all of the Sellers assets, so long as such sale is made to a reasonably qualified purchaser, as determined by Buyer's commercially reasonable due diligence. Any such purchaser shall be certified as a buyer under Debt Buyer's International certification program, as in effect at the time of such sale.

16

SHERMAN0000527

# ARTICLE XII
## NOTICES

**Section 12.1**    **Notice Requirements.**   Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered but no later than the second Business Day following mailing sent by overnight mail or overnight courier, (b) when delivered, if sent by facsimile and receipt is confirmed by telephone, or (c) when received, if sent by e-mail and an e-mail confirming receipt is sent by the recipient, in each case to the parties as set forth in this <u>Article XII</u> (or at such other addresses as shall be specified by like notice.

**Section 12.2**    <u>Notices to Seller.</u>   c/o Conn Credit I, LP
     Attn:    Clint Walton, Sr. Manager-Compliance, Credit and Collections
     4055 Technology Forest Blvd
     The Woodlands, Texas 77381
     Fax: 877-303-2445
     Email: Clint.Walton@conns.com

     With a copy to (which shall not constitute notice):

     c/o Conn Credit I, LP
     Attn:  General Counsel
     4055 Technology Forest Blvd
     The Woodlands, Texas 77381
     Fax: 877-303-2445
     Email: Robert.Bell@conns.com

**Section 12.3**    <u>Notices to Buyer.</u>   Sherman Originator III LLC
     In care of Sherman Capital Markets LLC
     200 Meeting Street, Suite 206
     Charleston, SC 29401
     Attn:    Jon Mazzoli
     Tel:     (843) 266-1717

     E-Mail: jmazzoli@sfg.com

     All consumer inquires shall be directed to

     Resurgent Capital Services, L.P.
     P.O. Box 10497
     Greenville, SC 29603
     Attn:    Customer Service
     Tel:     (888) 665-0374

CONFIDENTIAL

SHERMAN0000528

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**Section 13.1**  **Obsolete Accounts.**  The parties acknowledge and agree that some of the Accounts conveyed under the terms of this Agreement may be Obsolete Accounts.  However, Seller is not selling, transferring, or assigning any right to credit report on Obsolete Accounts.  Seller is expressly withholding from this sale any rights it may have, if any, to report to any credit reporting agency regarding any Obsolete Account.

**Section 13.2**  **Out-of-Statute Accounts.**  The parties acknowledge and agree that some of the Accounts conveyed under the terms of this Agreement may be Out-of-Statute Accounts.  However, Seller is not selling, transferring, or assigning any right to initiate arbitration or file a lawsuit to collect on Out-of-Statute Accounts.  Seller is expressly withholding from this sale any rights it may have, if any, to initiate arbitration or legal action to recover on any Out-of-Statute Account.

**Section 13.3**  **Severability.** If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 13.4**  **Rights Cumulative; Waivers.** The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied other than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**Section 13.5**  **Headings.** The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**Section 13.6**  **Construction.** Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

**Section 13.7**  **Binding Effect.**  Subject to Article XI, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.

**Section 13.8**  **Prior Understandings.** This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Accounts and other matters contained herein, and this Agreement contains the sole and entire

18

CONFIDENTIAL

SHERMAN0000529

understanding between the parties hereto with respect to the transactions contemplated herein.

**Section 13.9**    **Integrated Agreement.** This Agreement and all Addenda, Exhibits and Schedules hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

**Section 13.10**    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart.

**Section 13.11**    **Non-Merger/Survival.** Each and every covenant hereinabove made by Buyer or Seller shall survive the delivery of the Transfer Documents and shall not merge into the Transfer Documents, but instead shall be independently enforceable.

**Section 13.12**    **Governing Law/Choice of Forum.** This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the law of the State of Texas, without giving effect to any choice of law principles. Buyer unconditionally and irrevocably consents to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States District Court for the District of Texas for any actions, suits or proceedings arising out of or related to this Agreement (and Buyer agrees not to commence any action, suit or proceeding relating thereto except in such courts) and Buyer further agrees that service of any process, summons, notice or document by certified mail to Buyer's address as set forth herein shall be effective service of process for any action, suit or proceeding brought against Buyer in such court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs. Each party to this Agreement unconditionally and irrevocably waives, to the maximum extent allowed by law, any right to a jury trial for any claim or action arising out of this Agreement. Any such claim or action shall be heard before a judge and not a jury.

**Section 13.13**    **No Third-Party Beneficiaries.** This Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity. This Agreement shall not be assigned by operation of law or otherwise without the express written consent of the other Party.

**Section 13.14**    **DTPA Waiver.** Buyer has knowledge and experience in financial and business matters that enables Buyer to evaluate the merits and risks of the transactions contemplated hereby. Further, Buyer is not in a disparate bargaining position relative to Seller. Buyer hereby waives, to the maximum extent permitted by law, any and all rights, benefits and remedies under any state deceptive or unfair trade practices/consumer protection act, with respect to any matters pertaining to this Agreement and the transactions contemplated hereby.

**Section 13.15**    **Confidentiality.** Buyer and Seller shall keep the terms of this Agreement confidential. Notwithstanding the foregoing, Seller and Buyer will obtain the approval of each other before issuing, or permitting any agent or affiliate to issue, any press releases or otherwise making or permitting any agent or affiliate to make any public statements with respect to this Agreement and the transactions contemplated hereby; provided, this provision will not restrict either party from issuing any press release or public statement required by applicable law.

19

SHERMAN0000530

**Section 13.16**   **Further Assurances**.  The parties shall, upon the written request of the other, execute and deliver to each other such reasonable and appropriate additional documents, Transfer Documents, lien releases, instruments or agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement.

*[Signature Page Follows]*

20

CONFIDENTIAL

SHERMAN0000531

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**BUYER:**

**SHERMAN ORIGINATOR III LLC**

By:_____
Name:_____
Title:_____

**SELLER:**

**CONN CREDIT I, LP**

By: **CONN CREDIT CORPORATION, INC., its sole General Partner**

By:_____
Name: _Brian E. Taylor_____
Title: _Chief Financial Officer & Treasurer_

21

CONFIDENTIAL

SHERMAN0000532

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**BUYER:**

SHERMAN ORIGINATOR III LLC

By:_____
Name:_____
Title:_____

**SELLER:**

**CONN CREDIT I, LP**

By:  **CONN CREDIT CORPORATION, INC., its sole General Partner**

By:_____
Name:_____
Title:_____

21

CONFIDENTIAL

SHERMAN0000533

**EXHIBIT A**
**ACCOUNT SCHEDULE**

Summary of Accounts Sold:

Delivery:
Month of Charge-Off:
Closing Date:

| | Aggregate Account Balances | Number of Accounts | Purchase Price Percentage |
|---|---|---|---|
| Fresh Charge-Offs | | | |
| Total: | | | |

LIST OF ACCOUNTS TO BE ATTACHED

22

CONFIDENTIAL

SHERMAN0000534

**EXHIBIT B**
**BILL OF SALE AND ASSIGNMENT OF ACCOUNTS**

Conn Credit I, LP, a limited partnership organized under the laws of Texas with an office at 4055 Technology Forest Blvd, The Woodlands, Texas 77381 ("Seller") hereby absolutely sells, transfers, assigns, sets-over and conveys to [_____], a [_____] with an office at [address], ("Buyer") without recourse and without representations or warranties, express or implied, of any type, kind or nature except as set forth in the Agreement (hereinafter defined):

     (a) all of Seller's right, title and interest in and to each of the Accounts identified in the Account schedule attached hereto as Exhibit A (the "*Accounts*"), and

     (b) all principal, interest or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Seller on or prior to [Cutoff Date], with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Seller and Buyer dated [_____], 2014 (the "*Agreement*"). The Accounts are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the State of Texas without regard to the conflicts-of-laws rules thereof.

DATED: _____

                                        SELLER:
                                        CONN CREDIT I, LP
                                        By:  CONN CREDIT CORPORATION,
                                        INC., its sole General Partner

                                        By:_____
                                        Name:_____
                                        Title:_____

STATE OF TEXAS)
) ss.
COUNTY OF MONTGOMERY)

On _____, before me the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of Conn Credit I, LP, a Texas limited partnership, signer and sealer of the foregoing instrument, and that he/she as such officer, being authorized so to do, acknowledged the execution of the same to be his/her free act and deed as such officer and the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand.

_____
Commissioner of the Superior Court
   Notary Public

23

CONFIDENTIAL

SHERMAN0000535

**EXHIBIT C**
**LIMITED POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that Conn Credit I, LP, a Texas limited partnership ("Seller"), with respect to those certain purchased Accounts, described in that certain Purchase and Sale Agreement dated [                ], 2014 (the "Agreement") between Seller and [                ], a [                ] ("Buyer"), hereby names, constitutes and appoints Buyer, or any of its authorized agents, employees or representatives, its duly authorized attorney and agent with limited power and authority as it relates to the Accounts to (i) endorse checks and other negotiable instruments which may be received by Buyer; (ii) perfect, maintain, and release any security interests; (iii) transfer and obtain any titles, evidence of ownership or Account Documents; (iv) settle any insurance claims or litigation and apply for any insurance, warranty or sales tax refunds; (v) file any transfer of claim associated with a filed bankruptcy claim; (vi) transfer or release any judgment; (vii) file or execute any document related to the collection of the Accounts; and (viii) to perform any and all acts relating to the Accounts which the undersigned was entitled to do as the owner of said Accounts. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Agreement.

EXECUTED this ____ day of _____, ____.

Seller:  CONN CREDIT I, LP
By: CONN CREDIT CORPORATION, INC., its sole General Partner

By:_____
Name:_____
Title:_____

STATE OF TEXAS)
) ss.
COUNTY OF MONTGOMERY)

On _____, before me the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of Conn Credit I, LP, a Texas limited partnership, signer and sealer of the foregoing instrument, and that he/she as such officer, being authorized so to do, acknowledged the execution of the same to be his/her free act and deed as such officer and the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand.

_____
Commissioner of the Superior Court
Notary Public

24

**EXHIBIT E**
**ACCOUNT DOCUMENTS**

**With respect to credit card accounts:**

1. application

2. invoice

3. payment history

**With respect to consumer loan accounts:**

1. promissory note, retail sales contract, lease agreement or other instrument evidencing an obligation to repay an Account

2. invoice

3. payment history

4. Account level affidavits other than those shown in Exhibits H or I, and reasonably requested by Buyer, including but not limited to lost document affidavits, confirmation of sale, and confirmation of payment histories and account information contained in the applicable Computer File.

25

CONFIDENTIAL

SHERMAN0000537

**EXHIBIT F**
**COMPUTER FILE FIELDS**

*all data as of the applicable Closing Date*

1.  Account Balance as of the applicable Closing Date (notwithstanding the fact that the Account Balance as defined is as of the applicable Cutoff Date)

2.  payoff balance (Account Balance plus post-charge-off interest and fees, to the extent charged by Seller)

3.  account number

4.  name, last known address and last known phone number of the primary Obligor (and co-borrowers or guarantors)

5.  social security number of the primary Obligor (and co-borrowers or guarantors)

6.  date of last payment

7.  last payment amount

8.  interest rate

9.  charge-off date

10.  open date

11.  last 12-month payment history by month

{add the following types of fields if Accounts include Accounts originally or still secured}

12.  collateral type

13.  collateral description (i.e. year/make/model/VIN)

14.  Name of Originating Creditor

26

SHERMAN0000538

**EXHIBIT G**
**SETTLEMENT STATEMENT**

Delivery: _____

Month of Charge-Off: _____

Closing Date: _____

Cutoff Date: _____

Buyer Name: _____

Seller Name: Conn Credit I, LP

Amount Due at Closing: $_____

The Amount Due at Closing is calculated as follows:
Purchase Price: $_____
Less Net Post-Cutoff Payments: $_____
Equals Amount Due at Closing: $_____

| Account Classification | Number of Accounts | Aggregate Account Balances | Purchase Price Percentage | Aggregate Allocated Account Prices | Net Post-Cutoff Payments |
|---|---|---|---|---|---|
| Fresh Charge-Offs | | | | | |

Seller's Wiring Instructions:

Bank Name: Capital One Bank, N.A.
Bank Address: Beaumont, Texas
ABA: 111901014
Account Number: 3320004778
Account Name: Conn Appliances, Inc. f/b/o Conn Credit I, LP
Reference: Sherman Debt Sale

27

CONFIDENTIAL

SHERMAN0000539

**EXHIBIT H**
**AFFIDAVIT OF DEBT**

I, [affiant's name], the [affiant's title] of [seller name] am duly authorized make the following statements:

1. There is due and owing from [obligor name] which debtor's account number is [account number], the principal amount [$____] and accrued and unpaid interest of [$____] as of [date] pursuant to the terms and conditions of the account's agreement.  Said agreement holds the debtor liable for [reasonable or a %] attorney fees.

2. Said account was, on [closing date], sold, transferred and conveyed to [buyer name] with full power and authority to do and perform all acts necessary for the collection, settlement, adjustment, compromise or satisfaction of the said claim.  Further, Affiant states that, to the best of Affiant's knowledge, information and belief, there were no uncredited payments against the said debt when sold.  Further, the Affiant acknowledges that, in making this affidavit, [buyer name] is now the owner of said account, and that [buyer name] has complete authority to settle, adjust, compromise and satisfy the same and that [seller name] has no further interest in said debt for any purpose.

Dated: _____

Signature: _____

Name: _____

Title: _____

STATE OF _____
COUNTY OF _____
DATED _____

Personally appeared the above-named Affiant and made oath that he/she has read the above and knows the contents hereof; that the same is true of his/her personal knowledge; and I do hereby certify under my seal that I am authorized to administer oaths under and by virtue of the laws of the State of [State] and that commission, as a Notary Public, expires on [date].

Before me:

_____
Notary Public

28

CONFIDENTIAL

SHERMAN0000540

**EXHIBIT I**
## AFFIDAVIT OF SALE OF ACCOUNT BY ORIGINAL CREDITOR

State of [State], County of [County].

[name of affiant] being duly sworn, deposes and says:

I am over 18 and not a party to this action. I am the [title] of [original creditor name] ("Original Creditor"). In that position I am a custodian of the creditor's books and records, and am aware of the process of the sale and assignment of electronically stored business records.

On or about [date], Original Creditor sold a pool of charged-off accounts ("Accounts") by a Purchase and Sale Agreement and a Bill of Sale to [buyer name] ("Buyer"). As part of the sale of the Accounts, electronic records and other records were transferred on individual Accounts to Buyer. These records were kept in the ordinary course of business of Original Creditor.

I am not aware of any errors in these Accounts. The above statements are true to the best of my knowledge.

Dated: [date]                          _____
                                       [name of affiant]

Sworn to before me [date].

_____
(Notary Stamp)

### CERTIFICATE OF CONFORMITY

The undersigned does hereby certify that s/he is an attorney at law duly admitted to practice in the State of New York; that s/he makes this affidavit in accordance with the requirements of the Clerk of the New York City Courts pertaining to the acknowledgement of the proof of the Affidavit of Sale of Accounts By Original Creditor; that the foregoing acknowledgement of [name of affiant]  named in the foregoing instrument taken before [name of notary], a notary in the State of [state], being the state in which it was taken, and based upon my review thereof, conforms with the law of [state], as to the purpose for which it is submitted and filed.

                                       _____
                                       _____, Esq.

Sworn to before me [date]

_____
Notary Public

29

SHERMAN0000541