```
 1                UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   HOUSTON DIVISION
   CONN CREDIT I, LP,              )
 3                                 )
       Plaintiff,                  )
 4                                 )
   VS.                             )
 5                                 )   Case No. 4:15-cv-3713
   SHERMAN ORIGINATOR III LLC,     )
 6                                 )
       Defendant                   )
 7

 8

 9          ---------------------------------------

10               ORAL/VIDEOTAPED DEPOSITION OF

11                       CLINT WALTON

12                    SEPTEMBER 14, 2016

13          ---------------------------------------

14          ORAL/VIDEOTAPED DEPOSITION OF CLINT WALTON,

15   produced as a witness at the instance of DEFENDANT, and

16   duly sworn, was taken in the above-styled and numbered

17   cause on September 14, 2016, from 8:53 a.m. to 5:35

18   p.m., before Michelle Rodriguez, CSR in and for the

19   State of Texas, recorded by machine shorthand, at the

20   offices of 363 North Sam Houston Parkway East, Suite

21   1200 Houston, Texas 77060, pursuant to the Texas Rules

22   of Civil Procedure and the provisions stated on the

23   record or attached hereto; that the deposition shall be

24   read and signed before any notary public.

25                    JOB NO. 1-HOU-223517
```



U.S. LEGAL SUPPORT
(713) 653-7100



Clint Walton
September 14, 2016                                          42

1   you're targeting in your customer?

2        A.   Well, you know, a customer who -- who wants to

3   use their other platinum major card, we'll take that as

4   well or work out a -- a cash arrangement.  Or in the

5   past several years, we've adopted the rent-to-own

6   function of our business, as well.

7        Q.   Okay.  Do you know what percentage of Conn's

8   sales on an annual basis are financed to a product that

9   you offer through Conn's?

10       A.   The Conn's in-house credit program today is

11  about 70 percent of our business that we -- of all of

12  our sales today would have our credit in-house program

13  finance those retail sales.

14       Q.   Okay.  And I just want to make sure that I'm

15  clear.  You're not saying that 70 percent of what you

16  sell on credit is Conn's.  You're saying 70 percent of

17  total sales is through the Conn's-branded financing

18  product?

19       A.   I -- I agree with that.

20       Q.   Okay.  I just want to make sure I understand.

21  As opposed to like, I don't think they have it anymore,

22  but GE Consumer Finance or some other

23  manufacturer-driven finance program?

24       A.   We --

25       Q.   You offer those as well?

1  have a program for.

2       Q.  Okay.  And that's a very important customer

3  base to Conn's financial performance.

4                  Is that fair to say?

5       A.  I would say that -- actually, all of our

6  customer interaction, all of our customer bases are just

7  as important.  I don't know that I would signify just

8  this specific bullet point as a significant or more

9  important than the other.

10      Q.  Okay.  All right.  Well, on the same side, if

11  you look at that third bullet point, it says, "Large and

12  growing core customer base."

13                  Do you see that?

14      A.  Yes, sir, I do.

15      Q.  And then the -- the bullet under that says,

16  "Underserved credit constrained consumers."

17                  Do you understand that underserved credit

18  constrained consumers are Conn's core customer base?

19      A.  My understanding is that the reference to

20  underserved is traditionally those customers that are

21  not able to obtain financing through traditional means

22  of a bank, et cetera.  I do understand that that is a

23  percentage of our customer base that -- that we have a

24  niche in the market for.

25      Q.  Okay.  Is that a high percentage of your

Clint Walton
September 14, 2016                                          50

1        Q.   Uh-huh.

2        A.   -- like we offer or maybe it's the rent-to-own

3   customer, things of that nature.

4        Q.   Okay.   And are unbanked consumers a focus of

5   Conn's business strategy?

6        A.   They're -- they're one of our group of -- of

7   customers that we really market to.

8        Q.   Okay.   Who does Conn's identify as its

9   competitors in the niche that you've identified.   So

10  selling retail to underserved credit consumers?   Do you

11  have competitors that you've identified?

12       A.   My hesitation to you is that the question,

13  it's -- it's always difficult for us because we operate

14  as a -- as a retailer first.   And it's been my

15  experience for our business that we -- we have customers

16  who have shopped at a -- a retail competitor for

17  appliances in -- through any name --

18       Q.   Uh-huh.

19       A.   -- that you can think of that was not able to

20  obtain financing at that company.   The same or similar

21  items we were able to -- to work with that customer and

22  finance that for them.

23             That -- that's how I would phrase my answer

24  to that -- that question because it's -- it's really

25  different based on maybe the -- the actual product.   And

Clint Walton
September 14, 2016                    125

1       Q.   Okay.  All right.  And the extended warranty

2  products that you've identified, those are also

3  financeable, yes?

4       A.   They can be financed.

5       Q.   Okay.  So you pay -- you pay the full, upfront

6  cost one way or the other, either through a loan from

7  you or with your own funds?

8       A.   That's correct.

9       Q.   Okay.

10       A.   Yes.

11       Q.   How is the pricing for those products

12  determined?

13       A.   It's contractually agreed between Conn's and

14  Assurant for each of the -- the products.

15       Q.   All right.  And is it based on the type of

16  product or the amount financed or some matrix of all

17  those things?

18       A.   A bit of all of the above.

19       Q.   Okay.

20       A.   Yes.

21       Q.   Does the customer's risk score, as you've

22  talked about --

23       A.   Uh-huh.

24       Q.   -- impact the pricing of the extended warranty

25  products at all?

1       A.   That's correct.

2                 MR. WRONSKI:   Okay.  All right.  Why don't

3    we go off the record and we can change the tape.

4                 THE VIDEOGRAPHER:   Okay.  Off the record at

5    1:48 p.m.

6                 (Discussion off the record.)

7                 THE VIDEOGRAPHER:   On the record at 2:00

8    p.m.

9                 (Discussion back on the record.)

10      Q.   (BY MR. WRONSKI)  All right.  I'm going to ask

11   some questions about collections.

12                Are there -- okay.  So, obviously,

13   sometimes when your collectors are making calls or

14   having contacts with borrowers, inevitably the borrowers

15   will raise some type of complaint or dispute to explain

16   why they haven't paid or aren't paying, right?

17      A.   It comes up.

18      Q.   And that's part of what your people are trained

19   to deal with --

20      A.   That's correct.

21      Q.   -- correct?

22                Are there any types of -- types is the

23   wrong word -- any categories of complaint or dispute

24   that get kind of escalated immediately out of

25   collections to compliance or, you know, somewhere else

1  because it's -- could be a serious problem or at least

2  on its face, it has that potential and so you want

3  someone else handling it?  Are there any categories like

4  that?

5      A.   There are some.

6      Q.   And what are they?

7      A.   Situations of fraud, deceased situations.

8  Obviously, in those situations, where we're talking to,

9  you know, the spouse's family members or et cetera that

10 are alerting us to that scenario.  Litigation, that they

11 have either attorney representation or that they are

12 lodging litigation against Conn's.  Anything around a

13 credit history bureau dispute.  And then balance dispute

14 because of many scenarios.

15          As we were discussing earlier, the system

16 controls on validating balances and such are preset, so

17 those scenarios would be outside the scope of a

18 collection agent.  I may have missed a category or a

19 scenario, but I think those five areas covers some

20 unique handling situations that we have specific

21 training for.

22     Q.   Okay.  And what -- what do you put under the --

23 and I know there's a myriad of examples.  But I just

24 kind of want to get what was in your head.

25          What do you put under that species of

```
 1   fraud, like identity theft, things like that or other
 2   things, too?
 3        A.   It could be identity theft or that no, I'm --
 4   I'm the right person, but I never made that purchase at
 5   Conn's.  I think you have something else taking place.
 6   So when we generalize the term "fraud," it could be any
 7   occurrence thereof.
 8        Q.   Okay.  So is it fair to say that in those
 9   situations, you -- Conn's stops it collections activity
10   and escalates it to a different group or a different --
11        A.   That's correct.
12        Q.   Okay.
13        A.   That's correct.
14        Q.   And why do you -- why do you do that?
15        A.   It's certainly the best practice.  And in that
16   classification, if we're speaking directly to fraud, is
17   handled by a specialized group internal to Conn's to
18   properly validate that claim.  While our frontline
19   agents are trained to ask some initial questions to get
20   our fraud teams started, there are other policies and
21   procedures related to handling that this particular team
22   is specialized to address those concerns.
23        Q.   Okay.  And so while those specialized teams are
24   looking at that or individuals, whoever they are, it's
25   gotten escalated or routed somewhere else, does the kind
```

Clint Walton
September 14, 2016                                    175

1   of line-level collection activity stop?

2        A.   It does.

3        Q.   So if it was scheduled for a recorded call,

4   that call will not go out?

5        A.   That's true.  The timing of that just --

6        Q.   There's some lead times to some of that?

7        A.   There's some lead times, you know.

8        Q.   But generally speaking, you try to stop

9   ordinary collection activity until that gets resolved?

10       A.   That is correct.

11       Q.   Okay.

12       A.   Yes.

13       Q.   And you do that because of legal requirements,

14  the regulatory environment, best practice, all of the

15  the above?

16       A.   All of the above.  To -- to emphasize my

17  earlier comment, we take all of those types of concerns,

18  complaints, disputes, et cetera, with the utmost

19  importance because our -- you know, I've kind of gone

20  back to this a few times, our need to have that

21  customer, a valid customer, I understand that we take

22  those so -- so urgently and so important to their --

23  their needs.  We need them to come back and re-shop us

24  and vet out those issues that they bring to us.

25                   So while, yes, there's a regulatory

Clint Walton
September 14, 2016                                      199

1      Q.   But are there any other circumstances where an
2   account would not be charged off at month end of the 210
3   day delinquency?
4      A.   There may be a few.  I think we've pretty well
5   categorized what we typically run into.  There may be a
6   few.
7      Q.   Okay.  So I just want to understand then from
8   an accounting and finance perspective, and I'm not going
9   real deep into this, I just want to understand the ticks
10   and tacks here.  What happens when the account is
11   charged off.
12           So as I understand it, upon charge-off,
13   Conn's no longer accrues interest on the account?
14      A.   That's correct.
15      Q.   Okay.  And no long accrues late fees on the
16   account?
17      A.   That's correct.
18      Q.   Okay.  And I'll just tell you right now, I read
19   your deposition from the TF LoanCo case, I find this to
20   be somewhat confusing.  But hopefully we can figure it
21   out.
22      A.   Okay.
23      Q.   I understand that at charge-off, if there are
24   non-expired extended warranty agreements or credit
25   insurance, those are automatically canceled.

1       A.  At time of charge-off, yes.

2       Q.  Okay.  All right.  And as a result of that

3   cancelation, at times there can be money owed from

4   Assurant back to Conn's; is that right?

5       A.  Specific to repair service agreements or

6   warranties --

7       Q.  Yeah, okay.

8       A.  -- yes.

9       Q.  Not --

10      A.  Not credit insurance.

11      Q.  Okay.  All right.  Very helpful.

12      A.  Yes.

13      Q.  Okay.  So on warranties there can be money

14  that's owed to Conn's.  That's because you pay Assurant

15  up front for the whole plan?

16      A.  That's correct.

17      Q.  Okay.  What happens to those funds when they're

18  received by Conn's?  How are they accounted for?  Are

19  any of them applied to the customer account, or does

20  Conn's retain them in an account for them?  I don't know

21  how.

22      A.  We do retain those.

23      Q.  Okay.

24      A.  In our prior handling, before August 2015,

25  those funds were handled on the accounting side specific

1   to the account.  I am not certain to give you that

2   answer of where the technical terms for accounting is to

3   which they're held.

4        Q.  Or how they're booked, right?

5        A.  Correct.  But prior to August 2015, Conn's

6   would receive that refund for what they paid -- what we

7   paid to Assurant.  Once we receive that refund back, the

8   monies were not refunded back to the account after time

9   of charge-off.

10       Q.  Okay.  Since August of 2015, what happens?

11       A.  There is a pro rata credit that goes back to

12  the charge-off account.

13       Q.  Okay.  So you -- so you charge off less?

14       A.  Ultimately, yes, that's correct.

15       Q.  Okay.

16            THE VIDEOGRAPHER:  Can we take a quick

17  break for a moment, please?

18            MR. WRONSKI:  Sure.

19            THE VIDEOGRAPHER:  Thank you.  Off the

20  record at 2:40 p.m.

21            (Discussion off the record.)

22            THE VIDEOGRAPHER:  On the record at 2:56

23  p.m.

24            (Discussion back on the record.)

25       Q.  (BY MR. WRONSKI)  All right.  Before the break,

Clint Walton
September 14, 2016                    202

1   we were talking about charge-offs of accounts and we had

2   ended, I think, talking about the change in policy at

3   Conn's in August of 2015 with respect to refunds

4   received when RSA's or other extended warranties were

5   cancelled at charge-off.

6       A.   That's correct.  That's where we left off.

7       Q.   Okay.  All right.  And you explained that prior

8   to August of 2015, Conn's did not credit any portion of

9   those funds coming back to the customer's account.

10      A.   That's correct.

11      Q.   And since August of 2015, Conn's now does

12  credit that to the account?

13      A.   That's correct.

14      Q.   All right.  What was the reason for that change

15  in policy?

16      A.   Specifically, a review of industry business

17  practices by our executive team and our accounting

18  management team.

19      Q.   Do you know if there's any written record of

20  that review?  Was that like a project that somebody did

21  and made a presentation and analyzed it?

22      A.   I don't know of any writing.  And I'm not -- I

23  don't know of any type of written presentation that was

24  given.

25      Q.   Okay.  Do you know who, either by name or by

Clint Walton
September 14, 2016                                        203

1  department, was charged with looking at that issue?

2        A.   I don't specifically, regarding that issue to

3  initiate that process.

4        Q.   Okay.  Was that change made on a prospective

5  basis only?

6        A.   Yes, it was.

7        Q.   Okay.  And now, today, when those refunds are

8  credited to the customer's account, how are they

9  reflected in your payment system?  As a miscellaneous

10  credit?  As payment?  What box do they go in?

11       A.   They show as a rebate of the RSA to the payment

12  ledger.

13       Q.   Okay.  So kind of a new field for that?

14       A.   That is correct.

15       Q.   Okay.  All right.  Now, I think you referenced

16  earlier that the practice has changed from time to time,

17  but what does Conn's do as far as collection of accounts

18  that have been charged of?

19             So as of right now you're collecting up to

20  a third-party agency; is that right?

21       A.   We're actually doing both.

22       Q.   Okay.

23       A.   In-house collection and through a third party,

24  as well.

25       Q.   All right.  And are you doing that in the

U.S. LEGAL SUPPORT
(713) 653-7100

1  loosening or tightening.

2      Q.  So you don't agree with me that -- without

3  looking at a document, you can't agree with me that in

4  2013, Conn's was approving more applications than in

5  other years by, among other things, lowering the credit

6  score?

7      A.  I can't agree, no, sir.  Not without looking at

8  some documents or something.

9      Q.  Okay.  So the huge write-off that you had in

10  2014 of largely loans originated in 2014, what was that

11  about?

12      A.  I'm not sure I follow what you're referencing

13  on a "huge write-off."

14      Q.  Well, you had a huge spike in origination

15  starting in 2013, correct?  I mean, you were originating

16  30, 40 percent more than you had in prior years.

17      A.  I think during that period of time -- and I'm

18  not agreeing with the 30, 40 percent.  I don't know that

19  number specifically.  But that was during the period of

20  time that we were opening new store locations in new

21  states.  So I do agree that we experienced growth during

22  that period of time.

23      Q.  Okay.  And your metrics for 60-plus days

24  delinquent and your charge-offs were increasing rapidly

25  even on a percentage basis, not on an absolute basis

1  ,during that same period of time, right?

2      A.  I do recall we had delinquency increases.  What

3  those metrics were, without looking at those reports,

4  it's been some time ago.

5      Q.  Okay.  But these loans here and that are

6  charged-off in late '13, that's included in --

7      A.  Yes.

8      Q.  -- in those originations?

9      A.  No, sir.  The September '13, December '13

10 vintage, this would have included originations that may

11 have stemmed from 2012, 2011, during that period of

12 time.

13          So that's why I'm referencing, without

14 knowing that detail or that analysis, I wouldn't be able

15 to agree, specifically, with those numbers.

16     Q.  Okay.  Well, did you have discussions with

17 Garnet about what they understood when they asked the

18 question what A, B, C, and D meant on this survey?

19     A.  I don't recall that I had any conversation with

20 them.

21     Q.  All right.  You can put that one aside for now.

22     A.  Okay.

23     Q.  Okay.  I want to show you what's been marked as

24 Exhibit No. 48.

25          (Exhibit No. 48 marked for identification.)

1      Q.   Okay.  All right.  Okay.  So we've got a couple

2   different people here who were assigned to these

3   particular accounts.

4      A.   Yes, sir.

5      Q.   What mechanically did they do to look at this?

6   What investigation or review did they actually conduct

7   here?

8      A.   It's exactly the process we talked about this

9   morning.  Treating it as a customer complaint or inquiry

10   and performing a review of the account history, the

11   notes, documents, if there was anything to review or

12   determine.  And as an example, to speak plainly, the

13   first line that I'm looking at here, in an effort to

14   protect the customer's identity, I'll just refer to the

15   origination number -- the last four digits as 4232.

16            4232, which was assigned to our Conn's

17   team --

18      Q.   Yup.

19      A.   - our reply was that after her review and

20   research, that there was no dispute on file.  From

21   Sherman there wasn't anything given to us other than it

22   was registered on the spreadsheet from Sherman, but we

23   didn't find anything on file that related to a dispute.

24   The second one down from there shows that our Conn's

25   reply, as an example, customer wanted to file an

1   insurance claim, however, did not make any payments on

2   the account.

3           So after we performed our research, our

4   conclusion based on the review of the account history

5   and our notes, we came to that conclusion, which didn't

6   meet the dispute or burden that was originally launched.

7   And that was our approach.  So we took a very root cause

8   analysis for each of the accounts that were submitted to

9   us.

10      Q.  Okay.  Now, you didn't do anything but check

11  existing notes and records, right?

12      A.  That would be correct.

13      Q.  You didn't reach out to any customers.  You

14  didn't call them to talk about the account or the

15  dispute that they raised when they were contacted by

16  Sherman?

17      A.  You are correct.  We did not reach out to the

18  consumers.

19      Q.  All right.  The information that you used to

20  review this was that information that was available to

21  Sherman?

22      A.  Specifically, the account notes that were

23  maintained in Latitude, those were not a part of the

24  documents for the debt sale.  However, if it involved

25  looking at the contracts and some of the payment

1   histories, as I think some of these were.  Sixth one

2   down mentions that the account was paid off.  We would

3   have reviewed the shame document that Sherman would have

4   reviewed.

5        Q.  Okay.

6        A.  Yes, sir.

7        Q.  All right.  So the columns -- I just want to

8   make sure I understand.  The columns under Conn's reply

9   where the -- not the column -- the row says, "No dispute

10  on the file," does that mean that Sherman didn't

11  identify a particular dispute on the spreadsheet?  Or

12  does that mean when you looked at the collection notes,

13  you didn't see any evidence of a prior dispute?

14       A.  The latter.  That we reviewed our account

15  history, our comment fields, and no dispute was on file.

16       Q.  Okay.  So the fact that a customer didn't

17  previously make a dispute does not mean that when they

18  were contacted by Sherman that they didn't dispute the

19  debt, correct?

20       A.  I would agree with that statement.

21       Q.  Okay.  All right.  So, let's look at -- I want

22  to just look at a couple of these.  One, two, three,

23  four, five, rows down.  So using your convention, I

24  guess, the last four digits of origination are 0232.

25       A.  Okay.  I follow you.

Clint Walton
September 14, 2016                                253

```
 1        Q.  Bradshaw.
 2             MR. HEARTFIELD:  We're not supposed to say
 3   the name.
 4             MR. WRONSKI:  Okay.  There's a gallion
 5   [sic] of them.  It's probably not Terry Bradsaw.
 6             MR. HEARTFIELD:  You said it.  I didn't say
 7   it.
 8        Q.  (BY MR. WRONSKI)  So it says, "ROM was signed
 9   in February of 2014."  What does that mean?  Return of
10   Merchandise?
11        A.  It does.  That's correct.
12        Q.  Okay.  So this the one of those voluntary
13   repossession cases, correct?
14        A.  Yes.
15        Q.  So this, as we discussed earlier, should have
16   been an account that was never included in the sale; is
17   that right?
18        A.  This would have been one.
19        Q.  Okay.  But it was included in the sale?
20        A.  It was.
21        Q.  Okay.  Then let's look down one, two, three,
22   four, five, six below that.  Last four digits, 8534.
23        A.  Okay.
24        Q.  "Customer disputed accounts semicolon."  Do you
25   see that?
```

1      A.  I do.

2      Q.  So it said, "Customer disputed account;

3  however, merchandise was delivered on January 2014.  She

4  has not made a payment on the account."  Do you see

5  that?

6      A.  I do.

7      Q.  Okay.  So your collection notes actually did

8  reflect a prior dispute by this customer, correct?

9      A.  It did.

10      Q.  Okay.  So why -- explain to me why there's a --

11  you're accepting -- I don't know that this was a putback

12  request, but why you were agreeing to take this back.  I

13  don't understand the notes.

14      A.  Well, sure.  We were able to validate that the

15  same dispute that Sherman had identified to us was

16  indeed a match to our records, and that's why we would

17  have agreed to a putback or buyback for Sherman.

18      Q.  Okay.  So if there was a known dispute on this

19  account, why was it included in the sale?

20      A.  It wasn't properly class coded.

21      Q.  Okay.  And it's possible that other accounts

22  that where Sherman made a contact and received a dispute

23  from a customer were not properly coded, correct?

24      A.  Could be possible.

25      Q.  Okay.  A little more than halfway down, last

1   four digits 7830.

2        A.   Okay.

3        Q.   It's a paid prior.

4        A.   Okay.  Yes, I see that.

5        Q.   "Submitted recall request on" 10/17/14 --

6   "10/7/14.  Customer paid in full on 09/12/14."  What was

7   that one?

8        A.   That was the situation that we looked at in the

9   offering memorandum.  Where the previous 30 days prior

10  to cutoff, customer actually paid.  Now, while that was

11  stated in the offering memorandum, that was not part of

12  the exclusion that was agreed to in the PSA.  And after

13  reviewing that particular account, that payment would

14  have been forwarded to Sherman as due to Sherman.

15       Q.   Okay.  But Sherman didn't give you this list as

16  a putback request under the PSA.  Sherman gave you this

17  list as an example of disputes received by customers

18  when it was making its right party contacts, right?

19       A.   That's my understanding.

20       Q.   Okay.  So when this customer told Sherman that

21  they had paid this account, that was, in fact, true?

22       A.   On that account, yes.

23       Q.   Okay.  All right.  Let's look at the one three

24  below that, last four digits 5330.

25       A.   Okay.

　
Clint Walton
September 14, 2016                                    256

1      Q.  Customer claimed fraud in June 2014 but never

2  returned a completed fraud affidavit to the fraud

3  department.  Account was not processed as fraud because

4  there was no evidence to support the fraud claim.  So

5  even though the customer claimed fraud, this was not

6  listed as a class code 53; is that right?

7      A.  That's absolutely, correct.

8      Q.  And how come?

9      A.  It wasn't valid.  We attempted the dispute

10 process with the customer to validate the fraud, and

11 they did not complete the fraud return on the account.

12     Q.  And that, in your view, is not a known dispute?

13     A.  While it may be and I think that can be

14 arguable whether it's a dispute, it would still

15 constitute in our -- Conn's opinion as a collectible

16 account.

17     Q.  Okay.  Well, I didn't ask if it was

18 collectible.  I asked if it was a known dispute, right?

19 You knew the customer disputed the account?

20     A.  We know that they launched the complaint or the

21 dispute.  But to my earlier comment, I think what would

22 be arguable is whether or not we would have mark that

23 one as "dispute."  And in this case, we did not.

24     Q.  Okay.  And then if you go two more down, last

25 four digits, 1031.  There's another one, "Customer filed

 1   fraud dispute.  Account was not found to be fraud."  Do

 2   you see that?

 3        A.  I do.

 4        Q.  So are these cases where when the customer

 5   makes a fraud dispute, it gets coded as a 53 and then

 6   you take that off after investigation?

 7        A.  There are times when we remove that class code

 8   out.

 9        Q.  And you can't tell from this why it was found

10   not to be fraud, right?

11        A.  No, sir, I can't.

12        Q.  Would there be other information in the

13   collection notes that would explain that conclusion?

14        A.  There could be.  Or our fraud department would

15   have some of their records for the work that they had.

16        Q.  Okay.  Let's look at the next page.  Second

17   from the bottom.

18        A.  Okay.

19        Q.  7560.  Which is also a paid prior, I think,

20   right?

21        A.  Yes.

22        Q.  Okay.  So the account was closed with zero

23   balance on September 5th of 2014.  So that customer's

24   dispute that raised to Sherman was a legitimate dispute

25   and they were right?

Clint Walton
September 14, 2016                                    258

1      A.   That's correct.

2      Q.   Okay.  The next page, it's about a fourth of

3   the way down, 8730.  The dispute is -- "disputing bill

4   is:  Has paid off".  And then the Conn's comment is.

5   "Cash option dispute."  What does that mean?  I don't

6   understand that.

7      A.   Okay.  A cash option at Conn's is a no interest

8   promotion that we offer to some qualifying customers.

9   And those can range and have ranged over different

10  periods of time to be a three, six, or twelve month

11  period, by which the customer can pay in full and not

12  receive any finance charges.  That's what a cash option

13  would be.

14     Q.   Okay.  So what does a cash option dispute mean?

15  I don't understand what this comment means as far as

16  explaining away the dispute from the customer.

17     A.   I would have to look at that one a bit more

18  closely to understand the underlying note there.  I

19  would be making an assumption at the moment, but I can

20  definitively say that the cash option portion indicates

21  the customer had a no interest period on their

22  underlying account.

23     Q.   Okay.  All right.  A little more than halfway

24  down, 6938 are the last four digits.  And the Conn's

25  comment is, "Debt or requested voluntary repo."

1        A.  Yes, I do see that one.

2        Q.  Okay.

3        A.  And that was marked as a pending, so I don't

4    know the outcome at the moment.

5        Q.  Well, because there was a repo in process, that

6    shouldn't have been included in any event, correct?

7        A.  Not necessarily.  And that's why it was marked

8    as pending.

9        Q.  Okay.  The next one down, 1831.

10       A.  Okay.

11       Q.  I just don't understand the comment.  "No fraud

12   claim ever received by the fraud department.  This

13   account was never reviewed for fraud.  However, the note

14   here indicates that the SSN doesn't match and belongs to

15   a diseased individual.  When I searched in Accurint by

16   SSN, I cannot find any records of this person being

17   deceased."  What -- are they referring to your

18   collection notes or to the Sherman note?

19       A.  They're referring to our collection notes.

20       Q.  Okay.  So you have collection notes that say

21   that the Social Security on this account doesn't match

22   the borrower.  Who you are contacting?

23       A.  No.  Let me correct that.  The second sentence

24   it states, "The account was never reviewed for fraud,

25   however, the note here indicates that the Social doesn't

1  match."  They're referring to the note from Sherman.

2  And so they performed an independent review to come back

3  with the rest of their statement that it doesn't match

4  and it belongs to a deceased individual.

5      Q.  Okay.  All right.  The next page near the

6  top -- my eyes are getting bad here.  0033 Conn's

7  comment is, "Service issue with sinking mattress."

8      A.  Yes, I do see that one.

9      Q.  Okay.  So your collection notes indicated that

10 this client had previously complained about the

11 mattress?

12     A.  I'm not certain that our collection notes

13 showed that information.

14     Q.  Okay.  Some notes you had?

15     A.  Some notes -- we do have access that we didn't

16 discuss earlier today.  We do have access to our service

17 department.  That may be a references to our service

18 department in the notes that reside in that platform

19 which we did discuss, the S400.

20     Q.  Okay.

21     A.  So I'm not 100 percent positive on which

22 platform.

23     Q.  Okay.  But your records, globally, Conn's

24 records reflected that the dispute raised with Sherman

25 had previously been raised with Conn's?

Clint Walton
September 14, 2016                                    261

```
 1        A.  On one of our systems.
 2        Q.  And it doesn't show any kind of resolution of
 3   that at all?
 4        A.  No.
 5        Q.  And if you look just down this row, there's a
 6   couple of other service-type issues.  All right.
 7   There's one service issue with a king bed.  If you go
 8   down further beyond that, "Debtor dissatisfied with box
 9   spring.  Unclear if issue ever resolved."  And those all
10   are reflected in Conn's records somewhere?
11        A.   In either the Latitude comments or our
12   services.
13        Q.  Okay.  So at least for -- I mean, obviously, we
14   didn't look at every row on the five or six pages of the
15   spreadsheet.  At least for a number of these, the
16   complaint that Sherman was reporting to you was exactly
17   the same as the complaint that Conn's had gotten
18   previously regarding the account, correct?
19        A.   There were some matches.
20        Q.   Okay.  And those disputes would likely have
21   been raised, at least in part, on the collection floor
22   with collections, collection agents who had tried to
23   collect the account?
24        A.   I wouldn't clarify that -- or classify that as
25   one of the only methods.  I think we found a few
```

1   examples with our service department, as well.  And that

2   would not be known to us on the collection side of

3   business.

4        Q.  But at least the ones that are in the

5   collection notes were made to somebody that was on the

6   collection floor?

7        A.  Anything with collection, right.  I would agree

8   with that.

9        Q.  Okay.  I'm going to show you what's been marked

10  as Exhibit No. 51.

11              (Exhibit No. 51 marked for identification.)

12       Q.  (BY MR. WRONSKI)  Looks like an e-mail chain

13  produced by Conn's.  It's Conn's 859 through 861.  So

14  take a look at that, and let me know when you can answer

15  a couple questions.

16       A.  Okay.

17       Q.  Okay.  In this e-mail, Sherman is asking some

18  questions about some information that it thinks it's

19  missing; is that right?

20       A.  Yes.

21       Q.  Okay.  And specifically, as reflected on the

22  first page on the e-mail from Erin Ziegler to you,

23  October 31st 2014, last payment amounts for, I guess,

24  NSF items; is that right?

25       A.  Yes.

1        A.   That's correct.  And, again, going back to the

2    period of the time of the cutoff and the payments were

3    made within 30 days of cutoffs.

4        Q.   Okay.  I'm going to show you what's been marked

5    as Exhibit No. 52.

6             (Exhibit No. 52 marked for identification.)

7        A.   Thank you.

8        Q.   (BY MR. WRONSKI)  It's a document that's been

9    produced by Conn's.  It's an e-mail chain.  It's Conn's

10   29599 through -- that can't be right -- sorry.  It's got

11   an extra page on the back that we'll just take off.  It

12   doesn't belong there.

13       A.   Yup.

14       Q.   Sorry about that -- so it should be 29599 to

15   29605.

16       A.   Okay.

17             MR. HEARTFIELD:  Just take off the last

18   page?

19             MR. WRONSKI:  Yes, please.  Which I think

20   is 29764.  And that does not belong with this exhibit.

21       A.   Okay.

22       Q.   (BY MR. WRONSKI)  Just take your time and take

23   a look at that.

24       A.   Okay.

25       Q.   Okay.  So you're familiar with this e-mail

1   chain?

2        A.   I am.

3        Q.   Okay.  If we start at the back, the last e-mail

4   chain -- the last e-mail in the chain -- or I'm sorry.

5   The first e-mail in the chain which appears on Conn's

6   29604, it's an e-mail from Jeremy Albert at Resurgent to

7   you, asking about some missing information and some

8   missing media, right?

9        A.   Yes.

10       Q.   And the date of that e-mail is in September --

11  no, sorry.  It's November 5th of 2014, correct?

12       A.   Yes, sir.

13       Q.   Okay.  And I don't want to go through each of

14  those e-mails.  But as I read the chain, about a month

15  later, Conn's looked into this and discovered that, in

16  fact, significant amounts of information were missing

17  and not provided to Sherman; is that right?

18       A.   The reference to Jeremy who started the inquiry

19  to us, the missing documents, as I recall, were the

20  invoice and payment history, if I recall, out of the

21  original request.  It didn't completely reconcile it.  I

22  think is the appropriate answer.

23       Q.   Okay.  Well, if we look at -- I just want to

24  make sure I understand.  At Conn's 29601, which is the

25  third page of the exhibit.

Clint Walton
September 14, 2016                                    266

1      A.   Okay.  I'm there.

2      Q.   Mr. Rutledge sent you and Mr. Bell an e-mail on

3  December 9 that says, "Out of the 16,678 accounts Jeremy

4  identified as missing, 11,175 were not originally

5  extracted."  Do you see that?

6      A.   I do see that.

7      Q.   Okay.  Does that mean that, at least as you

8  identified it, more than 11,000 files were incomplete in

9  terms of a computer file that was provided to Sherman?

10     A.   The invoices were the documents out of the

11 three contract invoices and payment histories.  It goes

12 back to No. 29600, where Mr. Rutledge replies back and

13 identifies the media that were specific to the invoices.

14 The original request for Mr. Jeremy Albert on November

15 5th had mentioned about the affidavits.  The affidavits

16 weren't part of the media.  So specific the contract

17 invoice and payment histories is where we focussed our

18 inquiry for Mr. Albert.

19     Q.   Okay.  And those invoices even though they were

20 included as account documents under PSA, have not been

21 provided, right?

22     A.   Right.  Due to some issue that Mr. Rutledge

23 identified.

24     Q.   And I couldn't find an e-mail that shows me --

25 I'm sure there is one somewhere, but I didn't find it.

1  Do you know when this problem was resolved?

2       A.  I don't specifically recall the date, no, sir.

3       Q.  In any event, it was after December 9th of

4  2014, correct?

5       A.  I would assume after that date.  The last

6  e-mail that we're looking at here was at 2:00 o'clock

7  that afternoon.  So I'm not sure if there's another

8  e-mail subsequent to that time.

9       Q.  And that was several months after the initial

10 delivery of these materials to Sherman, correct?

11      A.  That was a few months afterwards, yes, sir.

12      Q.  Certainly, more than 30 days afterwards,

13 correct?

14      A.  It was more than 30.

15      Q.  And did -- what was the conclusion on the other

16 5,000 or so accounts that Mr. Albert had identified?

17 That there was nothing missing?  It's not fully

18 addressed in this e-mail.  Do you recall?

19      A.  If you can point me to the other 5,000

20 accounts, I'm sorry.

21      Q.  Well, on the third page, what we looked at

22 Mr. Rutledge said, "Of the 16,678 accounts Jeremy

23 identified," he says, "11,145 were not originally

24 extracted."

25      A.  Right.

1  period of several months.  Is that fair to say?

2      A.  It was several months, yes.

3      Q.  Okay.  And you had more than one conversation

4  yourself with Mr. Mounts from TF LoanCo about those

5  issues, correct?

6      A.  That's correct.

7      Q.  And did you ever speak with a gentleman named

8  Mr. Brewer from TF LoanCo?

9      A.  Not over the telephone, specifically.

10     Q.  Okay.

11     A.  He attended a visit to our Woodlands, Texas

12 office.  And that was my interaction with Mr. Brewer

13 specific to some of the issues that were raised by TF

14 LoanCo.

15     Q.  Other than Mr. Brewer and Mr. Mounts, did you

16 have any other communications, e-mail, phone, any with

17 other people at TF LoanCo about these issues?

18     A.  No one else at TF LoanCo.

19     Q.  Okay.  In terms of the -- the evaluation of the

20 disputes that TF LoanCo was raising on the Conn's side,

21 were you the point person on that?

22     A.  I was.

23     Q.  Okay.  At any time during those -- that

24 process, were you told by anyone at TF LoanCo that TF

25 LoanCo was financially unable to perform the contract

1   with Conn's?

2        A.   Not in that specific nature.  But there were

3   concerns raised by Mr. Mounts on financing going forward

4   and suggesting amendments to our PSA and contractual

5   agreement on alternatives to finance future forward

6   flows.

7        Q.   Okay.  So we don't have time today, but I'm

8   familiar there was correspondence about potential

9   amendments to the PSA's and things of that nature,

10  right?

11       A.   That's what I'm referring to.

12       Q.   Outside of those negotiations, did Mr. Mounts

13  ever tell you, "We can't fund the future deliveries

14  under this contract?"

15       A.   Never had that specific wording.  But the

16  desire was to renegotiate the funding portion for TF

17  LoanCO as it relates to the PSA.

18       Q.   And did Mr. Mounts or anyone from TF LoanCo

19  ever indicate to you that that desire to renegotiate was

20  motivated by the inability to fund under the contract?

21       A.   Not specific, no, sir.

22       Q.   Generally, did they indicate it was an

23  inability?

24       A.   That was my inference from my conversations

25  with Mr. Mounts.

1        Q.   Based on what?

2        A.   Based on his conversations on making the

3   amendments to the PSA and the concern around funding.

4   Additionally, tying back into earlier conversations on

5   the original negotiations with TF LoanCo and the reason

6   why we had two closing dates, an April 30th and a May

7   9th closing date, and their desire to split those days

8   apart and actually asked for additional time and

9   negotiated to the two dates that we landed.  All of that

10  together was my inference and my conversation with

11  Mr. Mounts as to their concern around funding.

12       Q.   Okay.  But in words, that was never conveyed to

13  you directly?

14       A.   Not as specific as you mentioned earlier.  No,

15  sir.

16       Q.   And not even really generally.  You're

17  inferring it from the negotiations and from the fact

18  that they wanted the two payment dates?

19       A.   Well, I'm putting all of the conversations and

20  my interactions together with Mr. Mounts as TF LoanCo's

21  representative.

22            MR. WRONSKI:  Okay.  Subject to any -- if

23  there's any redirect after any cross, I'm done for the

24  day.

25            MR. HEARTFIELD:  We'll reserve our