```
 1                UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION
    CONN CREDIT I, LP,              )
 3                                  )
         Plaintiff and              )
 4  Counter-Defendant,              )
                                    )
 5  VS.                             ) Civil Action No.
                                    ) 4:15-cv-03713
 6  SHERMAN ORIGINATOR III LLC,     )
                                    )
 7       Defendant and              )
    Counterclaimant.                )
 8                                  )

 9        -----------------------------------------

10              ORAL/VIDEOTAPED DEPOSITION OF

11                    ROBERT F. BELL

12                  SEPTEMBER 15, 2016

13        -----------------------------------------

14          ORAL/VIDEOTAPED DEPOSITION OF ROBERT F. BELL,

15  produced as a witness at the instance of DEFENDANT, and

16  duly sworn, was taken in the above-styled and numbered

17  cause on September 15, 2016, from 8:58 a.m. to 2:21

18  p.m., before Michelle Rodriguez, CSR in and for the

19  State of Texas, recorded by machine shorthand, at the

20  offices of 363 North Sam Houston Parkway East, Suite

21  1200 Houston, Texas 77060, pursuant to the Texas Rules

22  of Civil Procedure and the provisions stated on the

23  record or attached hereto; that the deposition shall be

24  read and signed before any notary public.

25                    JOB NO. 1-HOU-223519
```

                            U.S. LEGAL SUPPORT
                              (713) 653-7100



EXHIBIT B

Robert F. Bell
September 15, 2016                                          15

```
 1       A.   On the credit side?
 2       Q.   Yeah.
 3       A.   We -- obviously, I mean, this is public
 4  information -- have our FCC, you know, investigation.
 5  So, you know, I've been involved with that process.
 6       Q.   Okay.
 7       A.   From a regulatory prospective, I do not recall
 8  anything of significance.  Excuse me.  I think -- yeah,
 9  that's probably the most significant.  The others are
10  regulatory or were predominantly -- from my
11  recollection, just the kind of one-off-consumer-type
12  issues that were resolved.
13       Q.   Okay.  And I don't want to and don't intend to
14  get into the details of it, but the FCC matter is still
15  pending.  It's still open.
16       A.   It is.
17       Q.   And is it at the investigation stage or the
18  enforcement stage?
19       A.   It's investigation.
20       Q.   Okay.  During your time at Conn's, did you have
21  any responsibility --
22            THE WITNESS:  Thank you very much.
23            MR. WRONSKI:  No.  No problem.  Should've
24  had some water out for you.
25            THE WITNESS:  Yeah, gets dry pretty quick.
```

1  financially restructure the deal. And I was asking you
2  if he told you why he wanted to financially restructure
3  the deal. And you said essentially, well, I assume it's
4  because he thinks he made a bad deal and he was trying
5  to get out of it. That was your conclusion, right?
6              MR. MONTGOMERY: Form.
7      A.  That he was trying to restructure the deal
8  because he made a bad deal.
9      Q.  (BY MR. WRONSKI) Misvalued it, I think --
10     A.  Misvalued it.
11     Q.  You thought they were trying to get out of the
12 deal?
13     A.  Yes.
14     Q.  You didn't think there was any merit to what
15 they were raising?
16     A.  I don't -- I don't necessarily agree with the
17 statement that I don't think there was any merit. I
18 mean, they raised questions and we addressed those
19 questions and we investigated those questions. So
20 whether -- so it's a broad statement, you know, "I don't
21 agree that there was any merit to this questions they
22 raised." They were valid questions, and we answered
23 them appropriately. So --
24     Q.  Okay. But neither Mr. Brewer or anyone else
25 from Trax ever said, "Hey, Robert, we just missed this

1  one, you know, we didn't value this right and we need
2  some relief on your end." He didn't say that. That was
3  your assumption as to what was going on?
4      A.  Mr. Brewer did not use those words. But
5  through conversations and proposals and Garnets', you
6  know, expertise in this business, that's what we
7  reasonably believed.
8      Q.  That's what you concluded?
9      A.  That's what we --
10             MR. MONTGOMERY: Objection. Form.
11     A.  That's what we reasonably believe the basis
12 that they were trying to get out of the deal was for
13 those reasons.
14     Q.  (BY MR. WRONSKI)  Okay. So we all started this
15 because -- we started this line of questioning because
16 you used the phrase "raising funding issues." And so
17 that's -- that's what you meant. What we just discussed
18 is what you meant by "raising funding issues," yes?
19     A.  Inability to pay for their future allocations.
20     Q.  They never told you they weren't able to pay
21 for their future allocations, right?
22     A.  Mr. Brewer never conveyed to me the exact
23 words, "We cannot pay for this." However, their
24 actions, conversations, proposals, not just to Conn's
25 but to our experienced Garnet broker. Based on the

Robert F. Bell
September 15, 2016                         83

1   issues that they had raised to date, which did not form
2   the basis in our view of a valid contract claim, that is
3   what we reasonably concluded.
4       Q.  Okay.  And I understand what you believe and I
5   understand why you're telling me you believed it.  I
6   understand that 100 percent.  You said that Mr. Brewer
7   didn't use those exact words; but in reality, he didn't
8   use any words like that.  You didn't now, says, you
9   talk to Garnet, you thought you knew what was going on,
10  you thought they couldn't fund, and that's what you
11  reasonably believed he said.  But Mr. Brewer never said
12  anything even remotely like that.  He didn't say, "We're
13  having trouble funding.  We have an inability to fund.
14  We're not sure if we can fund."  He never said anything
15  about their ability to fund, correct?
16      A.  He did not explicitly say to me, "We cannot
17  fund flows three and four," or whatever flows were
18  upcoming to purchase.
19          THE VIDEOGRAPHER:  Five minute warning on
20  the tape.
21          MR. WRONSKI:  Okay.  Thanks.  Yup.
22          THE WITNESS:  Sorry.  To get ahead of you.
23          MR. WRONSKI:  No, not at all.  If I were
24  you, I'd want to move things along too.
25          MR. WRONSKI:  This is 66.

Robert F. Bell
September 15, 2016                         126

1  what to tell Garnet they could or couldn't say.
2  Mr. Poppe, ultimately, made that decision. He signed
3  off on, "Yes, I agree with that. Go ahead."
4      A.  I think that's putting it a bit too
5  formalistic, you know, for a sign-off. I think it was a
6  discussion; and we agreed what the appropriate, you
7  know, message is. And I provided, you know, input,
8  advice to management and Garnet and kind of helped
9  structure what the message might be.
10     Q.  Okay. So what -- what -- what did Conn's
11 authorize Garnet to say to Sherman about why the
12 accounts were back on the market?
13     A.  When we talked to Garnet, again, we -- we took
14 Garnet's input into consideration, as well. So this
15 was -- and I'll use the word "collaborative" again.
16 But, you know, conversations with Mr. Poppe, Garnet, you
17 know, I was involved in those conversations. And at
18 that point in time, it was because we felt -- and which
19 Garnet concurred with -- this was a funding issue that
20 TF LoanCo was having. And they breached the contract
21 and that's why these assets, because they didn't
22 perform.
23     Q.  Okay. So is it your testimony that Garnet was
24 authorized to tell Sherman that Trax breached your PSA?
25     A.  My testimony is that, you know, we had the

1  discussion with Garnet and that the reasons these assets
2  were on the market is because TF LoanCo didn't fulfill
3  their obligations under the contract or because they
4  didn't perform and they weren't going to fund and due
5  the funding issues, that we believed.
6      Q.  Okay.  So you authorized Garnet to tell Sherman
7  that the reason the accounts were back on the market was
8  because TF LoanCo was having funding issues?
9             MR. MONTGOMERY:  Form.
10     A.  Well, I guess, one, we never authorized Garnet
11 to tell him who the other buyer was.  So I think we
12 should just make that clear.  This was purchase
13 agreement.  But we conveyed it as the "other buyer."
14     Q.  (BY MR. WRONSKI)  Okay.
15     A.  But that the other buyer for variety -- were
16 having issues funding and could not continue, you know,
17 their obligations.  That was the essence of why these
18 assets were back on the market.
19     Q.  Okay.  So you -- Conn's authorized Garnet to
20 tell Sherman that the reason the accounts were back on
21 the market was because the other purchaser could not
22 perform due to funding issues?
23            MR. MONTGOMERY:  Objection.  Form.
24     A.  We collectively agreed that that was --
25     Q.  (BY MR. WRONSKI)  Okay.  This is yes or no

1  question.  Not collectively.
2      A.  Well, no, you're saying authorized.
3      Q.  Well, they're your agent, right?  They were not
4  allowed to tell anyone anything you didn't want them to
5  say, correct?
6          MR. MONTGOMERY:  Mr. Bell, answer the
7  question that he asked, that he interrupted.  And then
8  you go and answer this question.
9      A.  Okay.  So the question is -- repeat the
10 question.
11     Q.  (BY MR. WRONSKI)  Garnet was your agent,
12 correct?
13     A.  They were our broker.
14     Q.  And they were your agent, right?  I mean,
15 they're defined as the funding agent in the PSA?
16     A.  Correct.
17     Q.  Okay.  So they could not make any
18 representation or statement on behalf of Conn's unless
19 authorized by Conn's, correct?
20     A.  I mean, generally, there was a lot of dialogue
21 that Garnet had with buyers just answering questions,
22 generally.  So they -- I mean, we weren't necessarily
23 involved in every single one of those conversations.
24 But generally, they sought our input for significant
25 decision points.

Robert F. Bell
September 15, 2016                                129

```
 1        Q.   And this was a significant decision point.
 2             .    Do you agree with me on that?
 3        A.   It was --
 4        Q.   -- or what to tell Sherman about this issue of
 5   why the accounts were back on the market.  That was
 6   significant?
 7        A.   It was a decision point.
 8        Q.   And they were looking for your guidance and
 9   your authorization on that?
10        A.   Correct.  We agreed -- we agreed on the message
11   that, you know, we -- they would take back to Sherman on
12   the question as to why these assets --
13        Q.   Right.  So you the authorized them to tell
14   Sherman that.  You said, "That's okay.  That's okay with
15   us."
16        A.   That's okay.
17        Q.   Right.  And that's authorization, right?
18        A.   (Indicating.)  We agree that they could convey
19   that message, yes.
20        Q.   You gave them permission, yes?
21        A.   We -- yes.
22        Q.   You did not give them permission to say that
23   the other purchaser had raised performance issues that
24   you did not believe were valid and that you thought were
25   a pretext for a problem with funding, right?
```

Robert F. Bell
September 15, 2016                                131

1    A.  But to say that did not authorize them presumes
2  I -- at least in my mind, that Garnet asked the
3  question, "Well, can we tell them X, Y, and Z," and we
4  said no.  That I don't -- that conversation, you know,
5  I don't recall a specific conversation around that.
6  Because all the issues that TF LoanCo was raising are
7  issues that we believe we adequately and appropriately
8  addressed in the purchase and sale agreement.
9            So we did not affirmatively, as best as I
10 can recall, tell them, "No, you cannot tell them TF
11 LoanCo, you know, has raised these issues on specific
12 accounts."  I don't recall that conversation ever having
13 occurred.
14   Q.  Okay.  But as you've testified, through your
15 collaborative discussions, you gave Garnet permission to
16 tell Sherman that the other party didn't perform because
17 of funding issues.
18   A.  We told -- the question Garnet was -- was that,
19 you know, as to, you know, that we believe that TF
20 LoanCo failed to perform because of funding issues.
21   Q.  Okay.  You did not tell Garnet that they could
22 say that TF LoanCo had raised a number of issues with
23 the accounts that Conn's believed it had fully addressed
24 and that those issues were just a pretext for funding
25 issues, right?

Robert F. Bell
September 15, 2016
132

1     A. Can you repeat that question?
2         MR. WRONSKI: Sure. Read it back, please.
3     A. Thank you.
4         (Requested portion read back.)
5     A. I don't believe they told Garnet that they
6 could or couldn't. I just -- that wasn't the nature of
7 the conversation that we're having with Garnet is -- is
8 with respect to why the accounts were back on the
9 market. And it's because TF LoanCo didn't perform.
10     Q. (BY MR. WRONSKI) So if somebody from Garnet
11 got up and testified at trial that they were told
12 specifically what they could or could not say in this
13 conversation with Sherman about why the accounts were
14 back on the market, you could disagree that they
15 weren't -- you would say that they weren't told that?
16     A. That they were not told --
17     Q. What they could or could not say.
18     A. Again, in general? Or on a specific -- I
19 guess --
20     Q. In response to a question from Sherman about
21 why the accounts were back on the market?
22     A. We -- we -- we had -- we had a discussion both
23 at Conn's and Garnet, internally, as to how to address
24 the question if asked by Sherman or any other buyer for
25 that matter. And it was, we believe to be -- and Garnet

Robert F. Bell
September 15, 2016                             133

1  concurred and based on Mr. Brewer's e-mails and
2  otherwise would seemingly suggest on the funding issues.
3          I don't recall every specific conversation,
4  but I don't -- I'm sorry, I'm sort of -- I'm trying --
5  the question -- answer your question is: If Garnet
6  testified at trial -- repeat the question one more time.
7      Q.  Sure.  If somebody from Garnet testified at
8  trial that they were told by Conn's what they could or
9  could not say in response to a question from Sherman
10 about why the accounts were back on the market, would
11 you agree or disagree with that testimony?
12     A.  Depends on the testimony.  I think --
13     Q.  I just gave you the testimony.
14     A.  And the testimony is that they were told --
15     Q.  What they could and could not say.  That the
16 parameters of what they are allowed to say to Sherman at
17 this point were set by Conn.
18     A.  To say it was set by Conn's, I think -- I think
19 we came to a mutual agreement on what we thought made
20 sense.  So Conn's didn't unilaterally, I mean, yes, they
21 are our agents and we had collaborative discussions on
22 how to present it to Sherman.  But, you know -- and we
23 gave our recommendation on how to proceed.  But, you
24 know, I don't -- I don't -- we never told them -- my
25 recollection would absolutely -- they should not say --

Robert F. Bell
September 15, 2016                                    136

1  just want to sort of clarify. Conn's and Garnet had a
2  discussion about how to -- what to -- how to address the
3  question.
4              All right. So "should I call her and find
5  out what we can share by way of explanation?" What we
6  ultimately agreed on, both internally at Conn's and
7  Garnet, was sort of collaborative, what we believed to
8  be the case and what made sense. So that's what
9  ultimately Garnet was authorized and presented to
10 Sherman.
11     Q.   (BY MR. WRONSKI) Okay. I understand that. My
12 point is Garnet was looking to you, though, to Conn's.
13 I don't mean you personally. Was looking to Conn's for
14 authority or authorization about what they could or
15 couldn't say, right?
16     A.   Some direction.
17     Q.   Okay. Now, Conn's didn't disclose to Sherman
18 the name of the former buyer you said, right?
19     A.   I don't believe so.
20     Q.   At least prior to signing the Sherman PSA in
21 September.
22     A.   Right.
23     Q.   Okay. So I think this is obvious, but then
24 Conn's also did not disclose to Sherman, before the
25 Sherman PSA was executed, the demand letter that Trax

Robert F. Bell
September 15, 2016                                                137

1  had sent to Conn's?
2      A.  The letter -- and, again, I'll go back to sort
3  of demand.
4      Q.  I'm sorry.  The Notice of Breach I think is
5  what it's called.
6      A.  Right.
7      Q.  That came from the Houston law firm.  That was
8  not disclosed to Sherman before the PSA was signed.
9      A.  Do not believe that it was disclosed to
10 Sherman.
11     Q.  And your response to that letter was not
12 disclosed to Sherman, correct?
13     A.  It was not.
14     Q.  And the fact that Conn's had filed suit against
15 TF LoanCo on August 23rd of 2014 was not shared with
16 Sherman?
17     A.  Except to the extent available in pacer.  To my
18 knowledge, it was not affirmatively.
19     Q.  Neither Conn's nor Garnet, to your knowledge,
20 volunteered and provided that information with Sherman?
21     A.  We didn't -- my recollection is -- did not --
22 the fact that these assets were on the market, at least
23 to me, indicated or should indicate to, you know, a
24 buyer that a prior deal has fallen through.
25             And therefore, when you have a breach of

Robert F. Bell
September 15, 2016                    138

1  contract, there's always a potential for litigation. At
2  this point, this is, in our view, we had addressed all
3  the issues that they hadn't and we do not believe that
4  we have breached the PSA. And so I'm not aware that the
5  litigation itself are claims against TF LoanCo for
6  breach were -- were shared.
7      Q.  Okay.  And it's not that you were not aware
8  whether they were.  You know they weren't.  No one from
9  Conn's told them about the lawsuit.
10     A.  Correct.
11     Q.  Okay.  And no one from Garnet told them about
12 the lawsuit.
13     A.  To my knowledge.
14     Q.  Okay.  The -- I don't want to get hung up on
15 the word, right, but the result of your collaborative
16 discussion with Garnet about what should be said in
17 response to Sherman's inquiry about the other
18 purchaser's nonperformance, was that all done on the
19 phone?  Is there e-mail correspondence relating to that?
20 I haven't seen any e-mail correspondence.  Is there
21 anything in writing where this was scripted out?
22     A.  On the conversations --
23     Q.  On how to respond to Sherman's question.
24     A.  Not aware of any -- I mean, I -- probably phone
25 call I think.  I mean, this e-mail -- or this exhibit