UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CONN CREDIT I, LP,                )
                                  )
   Plaintiff and             )
   Counter-Defendant,        )
                                  )
   v.                        )   Civil Action No.
                                  )   4:15-cv-03713
SHERMAN ORIGINATOR III LLC,       )
                                  )
   Defendant and             )
   Counterclaimant.          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL J. POPPE

OCTOBER 5, 2016

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL AND VIDEOTAPED DEPOSITION of MICHAEL J. POPPE,
produced as a witness at the instance of the DEFENDANT
AND COUNTERCLAIMANT, and duly sworn, was taken in the
above-styled and numbered cause on OCTOBER 5, 2016,
from 8:39 a.m. to 4:35 p.m., before Stephanie M.
Harper, RPR, CSR in and for the State of Texas,
recorded by machine shorthand, at the offices of U.S.
LEGAL SUPPORT - HOUSTON, 363 North Sam Houston Parkway
East, Suite 1200, Houston, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto; signature
having been waived.

JOB NO. 225354



1       Q.    That's how you guys talked about it?

2       A.    That's how we generally talk to it.  We don't

3   have an specific internal definition of "subprime."

4       Q.    All right.  Did -- did -- and obviously, I

5   deposed Mr. Walton, as you know, and he explained to me

6   to some extent the -- the algorithms and the other

7   processes that you use in your credit underwriting.

8   But from a higher level, from a strategic standpoint,

9   does someone at -- does someone in Conn's management

10  kind of set what the -- the credit score ranges of

11  acceptable customers, what -- I guess what the floor

12  is?  I'm sure you'd be happy to go all the way up to

13  800.  But what's the -- what's the floor?

14      A.    So we will -- it's varied over time.  But

15  we're not specifically underwriting to FICO.  It'll be

16  a component in the algorithm, in the strategy, in the

17  ultimate decision process.  But we have starting in

18  early 2013, we had -- originations, we had a custom

19  score we built with support for FICO that really used

20  bureau and application characteristics to development a

21  score.

22      Q.    Okay.

23      A.    And then over time, we would set a -- we might

24  set a minimum FICO score as just an early -- as just

25  kind of a subjective cutoff to say, "We're just not

1    going to go below here."  And that moved around over

2    time, but it's generally been in -- depending on time

3    frame and whether it's a new or existing customer, call

4    it generally in the 500 to 550 range, and it's floated

5    over time.  It may have been higher or lower at

6    different times, but that's kind of generally where

7    the -- where the cutoff's been.

8        Q.    Okay.

9        A.    And then we would also -- somebody without a

10   FICO score, we will underwrite those people, too.

11       Q.    Okay.  Has -- has the cutoff ever been below

12   500?

13       A.    For -- in limited circumstances, yes.

14       Q.    Okay.  Can you tell me what you remember about

15   those, like from a time period or what the

16   circumstances were?

17       A.    I'd have to go back to refresh my memory on

18   details.  It was not a significant portion of our

19   origination, so it wasn't a significant volume of

20   accounts that got underwritten.  But for -- when we

21   started opening new stores late, you know, call it

22   "fourth quarter" or late 2012 and into 2013, we

23   would -- for newer stores, we would -- while we were

24   opening the stores, we might start a little lower as we

25   are ramping up the store and then ultimately moved the

1    stores to kind of the standard cutoffs and rules.

2        Q.    Okay.

3        A.    They still would go through the basic decision

4    algorithm, so they could -- even if -- even if they

5    were below -- even if they were above that lower

6    cutoff, they may still get declined.

7        Q.    Right.  Okay.

8        A.    It didn't mean that they got approved; it

9    meant that our custom score indicated that they

10   actually would be a good customer.  By setting that

11   FICO minimum doesn't mean that we should -- that the

12   customers below that FICO minimum would be a bad

13   customer.  We just set that arbitrarily as a -- as

14   floor on the FICO we would put in the portfolio.

15       Q.    All right.  So I think what you're saying is

16   everyone still got underwritten through the -- the

17   algorithm, is what I'm going to call it?

18       A.    Yep.

19       Q.    You had a cutoff, so you could -- you could go

20   through the algorithm and say -- let's assume the

21   cutoff's 500.  You could go through the algorithm

22   and -- and the result would be "yes," but if it's 499,

23   you're going to say "no"?

24       A.    That's right.

25       Q.    But you'd still have people above 500 who you

1    might say "no" to as well?

2        A.    Absolutely.

3        Q.    Okay.  Understood.  All right.

4              Do you know when -- through what period of

5    2013 that cutoff was below 500?

6        A.    It would be -- it depended on the store.  So

7    it wasn't for the entire company.  It wasn't for every

8    store.  It would be for specific stores for periods of

9    time.

10       Q.    Okay.

11       A.    Limited periods of time.

12       Q.    And that was something that was done in

13   conjunction with the -- the new store strategy that

14   Conn was implementing in 2012 and 2013?

15       A.    Yes, it was related to the -- to the new store

16   openings.

17       Q.    It's a -- I don't know if you would use this

18   phrase, but it's kind of a customer acquisition

19   strategy of getting people in the door and into your

20   system, hopefully making them repeat customers?

21       A.    It was used to build the store -- the customer

22   base in new stores.

23       Q.    Okay.

24       A.    Communicate the message of the availability of

25   credit.

1    been there for -- for 20 years?

2            Was the overall underlying -- excuse me.  Was

3    the overall underwriting relaxed in order to grant more

4    credit at the new store, or was it simply that the

5    cutoff was lower?

6        A.    For -- and other than a brief period of time,

7    and I'll come back to kind of late Decem- -- late --

8    from late '12 into January/February of '13, I'll come

9    back to that period --

10       Q.    Okay.

11       A.    -- it was purely just the -- the cutoff.

12       Q.    Okay.

13       A.    The decision algorithm verification rules were

14   all the same.  For, I want to say four or five stores,

15   I'd have to go confirm it, from like November of '12 to

16   early February of '13, we used different verifi- -- we

17   tested using some different verification rules to also

18   make it simpler for newer customers.

19            Didn't like the results we saw, so we

20   stopped that practice.  So it was a limited number of

21   stores for a very short period of time.  It wasn't a

22   significant percentage of -- of dollars originated.

23       Q.    Okay.  And in terms of the verification rules,

24   you're talking about a -- like an employment and income

25   verification or --

1    First, the -- because we give this customer the ability

2    to buy these products with an affordable monthly

3    payment because they don't have the ability to write

4    the check for them, typically, they're able to buy a

5    higher quality, better featured product.  So they're

6    buying a more expensive product than they would

7    otherwise.

8                The other key point to understanding the

9    difference between us and the market is we had changed

10   our product strategy.  We didn't sell and don't compete

11   at the low-price point products with Best Buy and those

12   guys.  We're not selling a bunch of 20 and 27-inch TVs.

13   We've eliminated most of that product from our floor.

14   Our customers -- if they want a $300 TV, they'll get it

15   at Walmart.

16       Q.    Okay.

17       A.    They don't come to us.  We don't add value to

18   that transaction, so we just eliminated those

19   transactions.  Our average selling price used to be

20   much closer to the market before we changed our product

21   strategy.  So we just don't sell most of the low-price

22   point product.

23                All we sell is the better product.  So if

24   that's what you're looking for, is a 55-inch TV, then

25   we can help you with that.  If you want a 30, go to

1      A.    But our typical methodology is weighted

2   average.

3      Q.    And -- and so it's weighted by the amount of

4   financing that that particular customer gets at that

5   particular score?

6      A.    That's right.

7      Q.    Okay.  All right.  Can you look at Page 26,

8   please?

9      A.    Yes.

10      Q.    So can you tell me just what that chart

11   represents and is depicting?

12      A.    So the bars are the percentage of sales

13   financed during each of those fiscal periods.  And the

14   line is the average credit score at the end of the

15   period.  So without verifying it -- I have to verify --

16   but I believe that's similar to what we talked about a

17   couple of pages ago.  That would be the average score

18   of the balances in the portfolio at the end of each of

19   those fiscal periods.

20      Q.    Okay.

21      A.    On a weighted-average basis.

22      Q.    All right.  So what -- what was -- obviously

23   there's a pretty significant increase in the percentage

24   of sales financed in Fiscal Year 2013 and Fiscal Year

25   2014, right?  That num- -- that bar is going up?

1     A.    It is certainly higher than it was in '11 and

2   '12.

3     Q.    Okay.  And the bar representing Fiscal 2013,

4   that would be mostly loans originating in Calendar Year

5   2012, right?

6     A.    That is correct.

7     Q.    Okay.  And same for Fiscal Year 2014, mostly

8   loans originated in Calendar Year 2013?

9     A.    That's correct.

10    Q.    So was there a strategy or something going on

11  at Conn that was driving that number higher during

12  those years?

13    A.    Yes.  This -- this relates back to the

14  discussion we had earlier about product.  So prior to

15  Fiscal '12, which was Calendar 11, beginning of

16  Calendar '11 is when we had the CEO change to Theo

17  Wright.  And we began making strategy changes related

18  to products merchandise.

19                So we eliminated -- we talked about on

20  TVs, we stopped selling all of those low-price points,

21  lower margin, smaller TVs.  We went through and

22  eliminated whole product categories.  We got rid of

23  small appliances.  So blenders, mixers, musical

24  instruments, iPods -- or, you know, MP3 players.  We

25  eliminated a lot of low-price point products.

1              So TVs at low-price points, washers and

2     dryers, refrigerators, mattresses, all of those things

3     resulted in eliminating a lot of cash business that we

4     used to do.  So it wasn't a result of underwriting

5     changes.  It was really we changed the merchandising

6     mix to a mix that was more likely to require financing.

7          Q.   Okay.

8          A.   Which is part of what's showing here why the

9     average score in the portfolio hasn't changed much.  It

10    wasn't that we started getting more aggressive in

11    underwriting.  That -- what drove it was the percentage

12    sales financed is the mix of products we sold and the

13    elimination of a lot of the cash business.

14         Q.   Okay.  But the line, however, would you assume

15    that the line represents the current credit portfolio

16    and doesn't include the charge-offs?

17         A.   I would have to confirm, but I -- I would

18    expect that that is -- the current portfolio balance at

19    their most current score is what I believe this is

20    representing.

21         Q.   Okay.  And if -- if you were doing a line that

22    showed credit score at origination, you would -- you

23    would see a decrease -- you would see that line going

24    down over Fiscal Year '13 and part of Fiscal Year '14,

25    right, because that was part of your store-opening

1    strategy?

2        A.    I'd have to -- the store-opening strategy did

3    not have a significant impact on the average score.

4    What had -- and I'd have to pull the data back up for

5    those periods.  What did have a bigger impact on the

6    origination score was the fact that we started using

7    Synchrony or GE at the time, for the long-term,

8    no-interest promotions.

9              So they took a lot of the high FICO score

10   business that we had been doing.  But the impact of the

11   new score -- new-store strategy would not have had a --

12   I don't believe had a significant impact on the average

13   FICO score.  Because it was just such a small piece of

14   the business.

15       Q.    Okay.  But your -- your overall credit mix

16   during that period of time was trending towards lower

17   FICO scores at origination?

18       A.    It trended -- we'd have to -- I'd have to get

19   the data, but the average FICO score dropped slightly.

20       Q.    Okay.  And the -- the -- the percentage of

21   sales that you were financing was rising significantly?

22       A.    The percentage of sales we financed did

23   increase somewhat, and it was due to change in the

24   merchandising mix.

25       Q.    Okay.  So I don't want to spend a lot of time

1              So we would reduce the total balance due

2      from the customer by the interest component, as well as

3      recoveries -- cash recoveries.

4          Q.   Okay.  And the -- the percentages are --

5      what's the ratio, the charge-off is a ratio of what to

6      what to get this percentage?  Is this the total credit

7      portfolio, or what do those percentages represent?

8          A.   The -- for the net charge-off --

9          Q.   Yes.

10         A.   -- it is the -- so similar to the provision

11     calculation.  For the quarter, it will be the quarterly

12     net charge-off dollars annualized, so times four

13     divided by the average balance for the quarter.

14         Q.   Okay.  So you can see from the chart starting

15     in the first quarter of Fiscal Year 2014 through the

16     end of this chart, which is the end of Fiscal Year

17     2014, there's a pretty pronounced upward trend in net

18     charge-offs, yes?

19         A.   There is an increase in charge-offs in the

20     fourth quarter.

21         Q.   So what -- what was the reason for that;

22     what -- what caused that?

23         A.   I'd have to go back and -- and refresh my

24     memory.  Certainly growth in the portfolio had a -- was

25     starting to drive an impact.  I'd have to go back and

1    refresh my memory on -- on that from two years ago.

2        Q.   So I understand, Mr. Poppe, why growth in the

3    portfolio would increase your aggregate absolute dollar

4    amount of charge-offs, because you have more loans in

5    the portfolio.  Why would growth in the portfolio

6    increase the percentage of net charge-offs?

7        A.   Depends on the timing of the growth.  So it

8    depends on -- I don't recall if the portfolio was still

9    growing at a rapid rate in that quarter, or if it's

10   just that I -- if it's all -- just if there were other

11   factors driving aggregate charge-offs.  I'd just have

12   to go back and refresh my memory on what drove it.  I

13   couldn't -- couldn't answer the question right now.

14       Q.   What would you need to look at to answer that

15   question?

16       A.   Have to go look at -- probably look at

17   delinquency trends and go look at -- go look at some of

18   the -- the vintage analysis what -- you know, what

19   origination periods might be contributing.

20       Q.   Okay.  Page 29 of the presentation, please,

21   which is CONNS -5251.  I just want to ask you:  Down on

22   the bottom, there's a note that says:  "Retail gross

23   margin includes product sales and repair service

24   agreement ('RSA') commissions."

25            So I know what those are.  What -- do you know

Michael J. Poppe
October 05, 2016                                    62

1          Do you see that?

2      A.    Yes.

3      Q.    And Conn responded that:  "Accounts are

4  primarily B/C/D rated at origination."

5          Do you see that?

6      A.    I do.

7      Q.    Okay.  So my question is:  Do you know what,

8  if anything, Conn did to understand what these letter

9  rankings or these -- these categories meant to make

10 sure that it understood what Garnet was asking?

11     A.    I -- I don't know what conversations Clint and

12 the team might have had with Garnet or what

13 instructions they might have gotten with Garnet.

14     Q.    Okay.  Did you have any discussions or

15 follow-up with Garnet or your team on that question?

16     A.    Not that I recall specifically.

17     Q.    Okay.  So -- but the question arises because,

18 you know, we looked at the investor presentation and

19 we've had some discussions about what subprime means,

20 and we looked at your distribution chart.  And if D is

21 subprime, most of the loans that Conn's originates are

22 subprime under that standard you give me of 6 -- below

23 630 to 650, correct?

24     A.    High percentage are -- would be subprime.

25 That's right.

1    strike that.

2         So in the -- in the PSA -- I think I have it.

3    I can show it to you.  But I think you'd agree with me

4    that Conn didn't warrant that the accounts it was

5    selling would be collectible, right?

6         A.   I believe that's correct.

7         Q.   Okay.  So excluding certain accounts is

8    because you think that there will be some external

9    impediment to collecting them, that you won't even be

10   able to try to collect them for some reason, right?

11        A.   Or at least the buyer believes that, right,

12   and believes they're not worth pursuing.

13        Q.   Kind of the difference between an account that

14   won't pay and an account that you can't ask to pay for

15   some legal reason?

16        A.   Potentially can't ask to pay.  That's right.

17        Q.   Okay.  And the -- the assumption in this

18   transaction and in sales of those accounts are that the

19   buyer should at least be able to go out and ask the

20   borrowers to pay.  There shouldn't be some legal

21   impediment that prevents them from asking -- trying to

22   collect?

23        A.   Generally, that makes sense, yeah.

24        Q.   Okay.  So to put it another way, Conn's won't

25   warrant that you'll be able to -- that this borrower --

Michael J. Poppe
October 05, 2016                                    69

1    strike that.

2           In other words, Conn's won't represent or

3    warrant that any particular accountholder will pay,

4    right; that's a risk the buyer's taking?

5        A.   Right.  They're taking the risk on the

6    ultimate ability to collect.

7        Q.   On kind of the economic part of it, right?

8        A.   Yep.

9        Q.   But Conn will rep and warrant that the buyer

10   will be able to ask the borrower -- ask the borrower to

11   pay?

12           MR. HEARTFIELD:  Objection; form.

13       A.   They will warrant that the accounts are free

14   and -- and stand behind these specific items defined in

15   the PSA.

16       Q.   (BY MR. WRONSKI)  Okay.  But generally

17   speaking, you agree that Conn is representing and

18   warranting that there's nothing that would prevent the

19   buyer from trying to collect, from asking the borrowers

20   to pay?

21       A.   Conceptually, that makes sense.

22       Q.   Okay.  You can put that one aside then.

23           Okay.  Let me show you what was previously

24   marked as Exhibit 48.  You can take as much time as you

25   want to look at that, but I believe it's the offering

1   months, they're going to charge off at 210 --

2        Q.    Okay?

3        A.    -- right.

4              If we have somebody who -- just making up

5   a hypothetical.  Tax reason, they're current.  They get

6   to tax season.  They get their refund.  They make three

7   monthly payments on the account.  And they -- they give

8   us, you know, probably $100 monthly payment, they give

9   us $300, they're now two months paid ahead, okay?

10       Q.    Okay?

11       A.    So when they get to 120 days past due, they're

12  also six months, no payment.

13       Q.    I see.

14       A.    So go one more month, they charge off at 150.

15       Q.    Okay.  I understand.  Thank you.  That was

16  really helpful.

17              Okay.  So when that policy was in place,

18  then, though, prior to charge-off, those accounts would

19  be in the credit portfolio, and there would just be a

20  bad debt provision against them?

21       A.    It would be in active collections and would be

22  considered in the reserving process.

23       Q.    Okay.  All right.  So then effective July 31st

24  of 2011, you charged the charge-off policy, right?

25       A.    That's right.

1      Q.    Okay.  And so what was the new policy?

2      A.    It was based on contractual delinquency, and

3  if the account was over 209-days past due at the end of

4  the month, it charged off.

5      Q.    Okay.  And so what was the -- what was the

6  purpose for that change in policy?

7      A.    Part of it was just to put -- implement

8  something more conservative from a public-market

9  standpoint, there was always some confusion around the

10  charge-off policy.  That wasn't the -- the key driver.

11  It was also -- that was not an efficient way to manage

12  the portfolio.

13              So we -- that customer, if they made that

14  one payment, they would stay in active collections, and

15  we would continue to collect on that account for

16  another seven months, and maybe not get another payment

17  until seven months from now.  And concluded that the

18  cost of keeping that customer in collections and the

19  daily work on an active portfolio basis was more

20  expensive than the benefit we were getting of leaving

21  them in the portfolio.

22              So it was to clean up the portfolio and

23  move a lot of the longer delinquent likely nonpayers

24  out of the portfolio faster.  So our collection

25  activity was more efficient and focused on people more

1    and then they're rolling into charge-off.

2        Q.   Okay.  And is that a -- is that a stat that

3    you keep?

4        A.   We track first payment default rates --

5        Q.   Okay?

6        A.   -- which would be they never made a payment.

7        Q.   Do you have any other metric for -- that you

8    track for -- at any other -- at any other point in,

9    say, the first 12 months of the life of the account?

10       A.   Such as -- you mean --

11       Q.   Well, you say you track first payment.  Do you

12   track 6 payment, 12 payment, any other --

13       A.   To charge-off?  No, I don't think -- I can't

14   think of a report I've seen that looks at it that way.

15       Q.   Okay.  So the -- I'm sorry.  What did -- what

16   was the phrase you used, "early paid default"?

17       A.   Early paid default, first pay defaults.

18       Q.   Okay.  First pay defaults, were those higher

19   in 2013, Fiscal Year -- I'm sorry -- in Fiscal Year

20   2014 than Conn's had previously experienced?

21       A.   If you look over a long period of time, yes.

22       Q.   Okay.  And are those rates reported anywhere

23   publicly that you're aware of?

24       A.   At times, we -- we didn't report it all the

25   time.  But we did talk about -- I couldn't tell you

1       Q.   Okay.  So you have the Sherman PSA in front of

2   you, right?

3       A.   Yes.

4       Q.   So that's dated as of September 15th of 2014,

5   correct?

6       A.   Yes.

7       Q.   Okay.  So my question is:  At -- at any time

8   before that date, did anyone at TF LoanCo ever tell you

9   that TF LoanCo was unable to fund further deliveries of

10  accounts from Conn?

11      A.   They told us they were -- they -- the reas- --

12  ultimately, they told us they were unwilling to fund.

13      Q.   Okay.  So they never told you they were unable

14  to fund?

15      A.   They never -- I don't recall specifically

16  having that conversation.

17      Q.   Okay.  Do you recall generally having that

18  conversation?

19      A.   No.

20      Q.   All right.  Do you remember any communication

21  with TF LoanCo where TF LoanCo conveyed to you that it

22  was having difficulty funding the transaction?

23      A.   No, they did not communicate, to my knowledge,

24  difficulty in funding.  Only in the fact that they

25  continued to look for ways to have us finance the

1    transaction for them.

2        Q.   Okay.  They were proposing a different

3    structure for the deal?

4        A.   Right.  They wanted -- yes, they wanted to

5    renegotiate and were trying to get financing from us.

6        Q.   Okay.  And sitting here today, you don't know

7    whether they did that because they thought that was

8    just more economically beneficial for them or whether

9    they were unable to get financing from other sources,

10   correct?

11       A.   Correct.  I don't know ultimate -- what was

12   really driving them.

13       Q.   Okay.  Same date of reference, September 15th

14   of 2014, did anyone from Garnet ever relay to you that

15   TF LoanCo was unable to fund further deliveries of

16   accounts from Conn?

17       A.   Not to me directly.  And I couldn't tell you

18   if they relayed something like that to Robert or Clint.

19       Q.   Okay.  At any point in time before Sep- -- I

20   think you just answered it, but I'm going to -- I'm

21   going to make sure that I know because you said "they,"

22   and I want to -- by "they," I think you meant Garnet,

23   but I'm going ask anyway.

24            At any point before September 14th --

25   15th of 2014, did anyone from Conn report to you that

1  they had been told by someone at TF LoanCo that

2  TF LoanCo was unable to fund future deliveries of

3  accounts from Conn?

4      A.   Not that I recall.

5      Q.   Okay.  Okay.  Do you recall that at some point

6  in time while -- I don't know what you want to call

7  them -- discussions, negotiations with TF LoanCo were

8  ongoing, Garnet made the suggestion to Conn that it go

9  back to Sherman and investigate whether there could be

10 a deal still with Sherman?

11     A.   I don't remember how or when the

12 conversation initi- -- who or when it initiated, but

13 there was a conversation about if they ultimately

14 breached their obligation, you know, what would be next

15 step?  And Sherman was -- appeared to be the -- you

16 know, the most sense -- make the most sense for the

17 next step to -- if -- if Sherman was still interested.

18     Q.   Okay.  Just for purposes of timeline, I'm

19 going to show you what's been previously marked as

20 Exhibit 65, which is some email traffic between

21 Mr. Bell, Mr. Walton, and Robin Ishmael at Garnet.  And

22 if you look near the center of the page, there's an

23 email from Ms. Ishmeal that is talking about Sherman

24 and Sherman's markup of the draft PSA and suggesting

25 possibly, you know, going back to Sherman.  Do you --

1      A.    Our -- our assessment is -- was that it was an

2   ability issue based on the conversations and the

3   proposals they kept making to change the way it was

4   financed.  They weren't coming to the table to stop the

5   sale.  They were coming to the table to find a

6   different way to finance the purchase.

7                  And when we were unwilling to sell or

8   finance the purchase, that's when they did not complete

9   the transaction.  So since the -- the core issues

10  blocking completing that were around whether we would

11  finance and how it would get -- which to us is funding

12  the transaction, that was to us the core issue.  That

13  -- that's our assessment.  Agreed, they never said

14  that.

15                 But in the path of the discussions during

16  that time frame, it was -- you know, they were -- kept

17  coming back with alternative financing structures to

18  have us fund the assets.  So that's what led us to this

19  looks like a funding issue to us.  Agreed, they never

20  said that.

21     Q.    And in addition to not saying that, they told

22  you that the reason they wanted to restructure the

23  transaction is because they wanted to put some -- they

24  thought some of the economic risk of collection should

25  have been put back on Conn because they didn't think

1    Q.   Okay.  So is it correct that prior to

2  September 15 of 2014, you personally never had any

3  direct communications with anyone at Sherman about this

4  transaction?

5    A.   Prior to September the 15th?  I'd have to go

6  back and look at my calendar to confirm that, and see

7  if I can -- but I -- I don't recall having a

8  conversation, but I'm not going to say for certainty

9  that there wasn't.

10    Q.   Okay.  But sitting here today, you can't

11  recall ever talking to someone at Sherman about this

12  transaction before the deal closed?

13    A.   I don't -- I remember conversations post.

14  Right now I don't remember conversations prior to.

15    Q.   Okay.  Prior to September 15th of 2014, did

16  you ever disclose to Sherman the name of the prior

17  purchaser of the accounts?

18    A.   Me personally?

19    Q.   Yeah, you personally.

20    A.   I don't recall even having a conversation with

21  them prior to the 15th, so based on that, I would say

22  probably not.

23    Q.   Okay.  Do you know whether anyone else at Conn

24  disclosed the name of TF LoanCo as the prior purchaser

25  before the Sherman transaction closed?

1      A.   I'm not aware of anybody at Conn's or at

2  Garnet would have communicated that.

3      Q.   Okay.  Prior to September 15th of 2014, did

4  you personally disclose to Sherman that Conn had filed

5  suit against TF LoanCo in connection with the accounts?

6      A.   I -- based on prior comment, I -- I don't

7  recall having any conversations directly with Sherman.

8      Q.   Okay.  And do you know whether anyone else at

9  Conn disclosed the existence of the TF LoanCo

10  litigation before the Sherman transaction closed?

11      A.   No, I don't know.

12      Q.   Okay.  Prior to September 15th of 2014, did

13  you personally disclose to Sherman any of the issues

14  that TF LoanCo had raised during its discussions with

15  Conn about the accounts?

16      A.   Again, I don't recall having a direct

17  discussion with anybody at Sherman.

18      Q.   Okay.  And do you know whether anyone else at

19  Conn disclosed the issues that TF LoanCo had raised

20  with Conn about the accounts during your negotiations

21  with TF LoanCo?

22      A.   I do not.

23      Q.   Okay.  Let's talk then about the disputes or

24  negotiations post close with Sherman.

25                Okay.  So you've got that in front of

1    We'd like to understand what issues or problems you're

2    seeing because this is a surprise to us."

3        Q.    Okay.  And so what -- was that being reported

4    to you at the outset, or were you involved from the

5    outset?

6        A.    Initially reported, and then I had the call

7    with somebody.  I had a call with somebody at Sherman.

8        Q.    Okay.  All right.  So did you understand that

9    Sherman had raised some complaints about incomplete

10   media in connection with the sale?

11       A.    I -- I generally recall there was a topic

12   about getting -- getting -- making sure we got the

13   completed media, and understand ultimately that the

14   completed media was delivered.

15       Q.    Okay.  Did you understand, though, that it

16   wasn't complete at the outset --

17       A.    Initial- --

18       Q.    -- and it wasn't delivered when it was

19   supposed to be?

20       A.    That's generally my understanding, yes.

21       Q.    Okay?

22       A.    I don't have all the specifics.

23       Q.    Okay.  And do you recall that Sherman was

24   raising concerns about the validity of the account

25   balances?

1    the time frame that there was work being done on

2    strategic alternatives review and was working with

3    somebody to help them map how the cash flows from

4    credit insurance and RSA refunds, just how they flowed

5    through the process.

6         Q.   And are -- does that refer specifically to the

7    refunds that happen upon the charge-off of an account

8    or when they're canceled or --

9         A.   Anytime.  Just anytime.

10        Q.   Okay.  All right.  You can put that aside.

11             So we've discussed generally what you

12   recall.  I think about one or more, possibly more,

13   conversations that you had with Sherman about these

14   disputes.  Is there anything else that you recall

15   specifically about conversations with Sherman or

16   conversations with Garnet about Sherman in relation to

17   those disputes, other than what you've already

18   testified to?

19        A.   Not that I recall at this time.

20        Q.   Do you have any notes or anything else that

21   might improve or refresh your recollection?

22        A.   Not -- I don't think so.

23        Q.   All right.  I want to talk then about the

24   subject we just touched on a second ago, the refund of

25   unearned RSA balances upon charge-off, okay?

Michael J. Poppe
October 05, 2016                                    236

1      A.    Yes.

2      Q.    So I understand that in the relatively recent

3   past, there's been a change in Conn's practice and

4   policy on that.  So could you describe for me the old

5   policy, when the change was made and what the new

6   policy is?

7      A.    I don't remember exactly when the change was

8   made.  I would have -- I'd have to go get that date.

9   But the old policy and practice had been when a repair

10  or service agreement was cancelled upon charge-off, the

11  unearned premium was collected by the -- by the company

12  and retained by the company and not credited to the

13  customer's balance.  And then subsequent to the change,

14  the new practice is to credit the unearned portion of

15  the premium to the customer's charge-off balance.

16     Q.    Okay.  And my understanding is that that

17  change was made in early 2015; does that sound right?

18     A.    Sounds like it's in the ballpark.

19     Q.    In the ballpark?  Okay.

20           Why was that change in policy made?

21     A.    As a matter of course over time similar to --

22  we looked at a change in the accounting for

23  charge-offs, too.  We continue to review practices,

24  procedures, and policies.  And as we identify areas

25  that we think would be better suited to change, we'll

1    -- we'll make those changes if we think it's

2    appropriate.

3         Q.    Sure.  Okay.  I understand that.

4         A.    Just natural evolution.

5         Q.    So why was it appropriate?  I understand that

6    you periodically look at your policies and change them

7    when it's appropriate.  That doesn't tell me why you

8    changed this particular policy.

9         A.    You know, I'm trying -- trying to recall what

10   raised the question specifically that made us go back

11   and decide to -- to change that -- that policy on the

12   accounts.  Could have been triggered just by some of

13   the discussions.  You know, talked about the credit

14   insurance RSA refund flow.  It may have been triggered

15   by some of the discussions we were having during the

16   strategic alternative's review.  There's a number of

17   different things that would bring that topic up that

18   may have triggered the discussion.

19        Q.    Do you recall that it's an issue that

20   TF LoanCo raised in connection with your discussions

21   and some questions about the accuracy or validity of

22   the account balances that it had been given?

23        A.    They -- they did raise that question sometime

24   after they stopped purchasing, yes.

25        Q.    Okay.  Did they raise that question before the

1   accounts were sold to Sherman?

2       A.   No.  I do not believe so.  I believe it was

3   several months later.

4       Q.   Okay.  Had you been evaluating or aware of

5   that issue before TF LoanCo raised it?

6       A.   As far as that issue, what do you mean by

7   "that issue," TF LoanCo's issue or --

8       Q.   The RSA credit issue.

9       A.   I mean, what do you -- what do you mean by

10  "that issue," that -- that TF LoanCo was going to have

11  an issue with it?  No, I was not aware they were going

12  to have an issue.

13      Q.   No, the fact that you were not accounting for

14  that or handling that apparently in -- at a minimum

15  best practice.

16      A.   No, from the best practice standpoint, no,

17  that wasn't something that we had -- when we -- I --

18  we -- if we had identified it previously as something

19  that we felt would have been a better best practice, we

20  would have done it sooner when it did come up.  No, we

21  reviewed the process.  We did -- when we ultimately

22  decided to make the change.

23      Q.   But you don't remember how it came up?

24      A.   Specific, no.  I mean, it -- there were so

25  many things around that topic.  We spent a lot of time

1    walking -- when we were doing the strategic

2    alternatives review, we spent a bunch of time walking

3    the bankers and potential investors through how all the

4    cash flows moved and had questions from them on why you

5    do this, why you do that.  Why is insurance different

6    than RSA, et cetera.

7        Q.    Okay.  And so why did you change the policy?

8        A.    Because we felt as we reviewed and talked

9    about it internally that it would be a better practice.

10       Q.    Why?

11       A.    More consistent with the way we treat other --

12   we treat credit insurance, for one.

13       Q.    Okay.  Did you determine that in fact Texas

14   law required you to do it and you hadn't been in

15   compliance with Texas law?

16       A.    We became aware of that in the process, too.

17       Q.    Okay.  So when -- when did you start the

18   strategic alternative discussion?  I'm trying to put

19   some parameters around when you may have started

20   looking at this issue.

21       A.    I'm trying -- that was October -- Octoberish

22   of '14, I think, is when that began.  It was late

23   Calendar '14, and then rolled into the better half --

24   you know, the first part of Calendar 15 before we

25   ultimately completed the big ABS transaction in

1    September, which was kind of the culmination of the

2    whole strategic alternatives review process.

3        Q.   Okay.  When did you discover that at least as

4    to accounts that had been originated in Texas that you

5    were not in compliance with Texas law in connection

6    with the treatment of unearned RSA?

7        A.   I don't remember the specific date.  We'd have

8    to go back and...

9        Q.   Was it in 2014?

10       A.   Really, I don't recall.

11       Q.   No idea at all?

12       A.   No.

13       Q.   Did it come up in the context of the

14   TF LoanCo; is that how you learned about it, TF LoanCo

15   litigation?

16       A.   Possibly, but I'm -- I don't recall

17   specifically.

18       Q.   So when you were having your discussions with

19   Sherman in late 2014 and early 2015, no one from Conn

20   told Sherman that the account balances were inaccurate

21   or overstated because they included unearned RSA?

22       A.   I do not know if anyone had a conversation

23   with Sherman about whether that -- about the change in

24   the RSA process.

25       Q.   You didn't tell them that personally?

1          A.    I didn't personally.  I don't know if anybody

2     else did or not.

3          Q.    All right.

4                     (Exhibit Nos. 90 and 91 were marked.)

5          Q.    (BY MR. WRONSKI)  Okay.  I want to show you

6     what's been marked as Exhibits 90 and 91.

7                     MR. WRONSKI:  In that order, Thad.

8          Q.    (BY MR. WRONSKI)  So Exhibit 90 is Conn's

9     disclosure of expert witnesses in this case.  Okay.

10    Sorry.  Exhibit 90 is the -- the report in the form of

11    a declaration of Mr. Bruce Blacker, who is the damages

12    expert that's been retained by Conn in this case.

13                    And Exhibit 91 is one of the spreadsheets

14    that were in his working papers that were produced with

15    that report.  So my first question is:  Have you ever

16    seen either of these documents before?

17         A.    I do not believe so.

18         Q.    Okay.  Have you ever spoken with Mr. Blacker,

19    and I'll say in connection with the preparation of this

20    report or his retention by Conn in this litigation?

21         A.    I do not believe I've ever spoken with

22    Mr. Blacker.

23         Q.    Okay.  And I take it from your responses that

24    you did not review or comment on any drafts of this

25    report before it was filed in this case on

1      Q.   Okay.  So if that number -- well, No. 1, do

2   you agree with that methodology; do you agree that

3   Sherman should been titled to a credit for the unearned

4   RSA on these accounts?

5      A.   Based on the discussion we had about the Texas

6   Occupation Code, I think it's a reasonable request to

7   say that the purchaser price would be adjusted by

8   the -- the unearned RSA balance.

9      Q.   Okay.  Now, are you aware of anything in the

10   PSA that allows Conn to simply credit Sherman for a

11   portion of the balance if the account balance is

12   inaccurate and a portion of it is not collectible?

13      A.   I'd have to go through the agreement and get

14   legal counsel's review on what the -- what the

15   allowable cure provisions are in the document.  I

16   couldn't tell you off the top of my head.

17      Q.   Okay.  All right.  I'd like you to look at

18   Exhibit 91, then.

19           So Exhibit 91 was prepared by

20   Mr. Blacker, and it's a summary of the accounts that

21   Sherman did take delivery of, okay, the bulk and then

22   the first two flows; do you see that?

23      A.   I do.

24      Q.   Okay.  And he's -- he's basically going across

25   and tabulating a number of things.  But it includes in