1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

CONN CREDIT I, LP,                    )
                                      )
            Plaintiff,                )
                                      )
       vs.                            )  Case No.
                                      ) 4:15-CV-03713
SHERMAN ORIGINATOR III,               )
                                      )
LLC,                                  )
                                      )
            Defendant.                )
----------------------------------)

30(b)(6) VIDEOTAPED DEPOSITION OF

GARNET CAPITAL ADVISORS, LLC, by

ROBIN ISHMAEL

New York, New York

Wednesday, July 6, 2016

Reported by:

TAMI H. TAKAHASHI, RPR, CSR

EXHIBIT
D

Ishmael, Robin                                              July 6, 2016

15

1   Q.  You're not on any sort of
2   medication that would impair your ability to
3   remember things or give your best testimony?
4   A.  I'm not.
5   Q.  You understand that you've been
6   identified as the designee for Garnet Capital
7   Advisors here today in response to a
8   subpoena --
9   A.  Yes.
10  Q.  -- do you understand that?
11      What is Garnet, just generally
12  speaking?
13  A.  They are a loan sale advisor.  We
14  are effectively the middleman for debt
15  transactions.
16  Q.  And what is your, I guess, title
17  and also kind of functionally, what's your
18  role currently at Garnet?
19  A.  I'm one of the partners, so my
20  title is managing partner.  And I -- I run
21  the firm operationally and I also do --
22  participate in some transactions to the
23  extent necessary, as I did in this subject
24  transaction.
25  Q.  How do you determine when to get

1   wait until Trax had defaulted. So, that was
2   part of the discussions with Robert all
3   through August, was when is it appropriate.
4           And then once "when it was
5   appropriate" was established, it was, you
6   know, what can we say to Sherman. And
7   because of the either actual litigation or
8   potential litigation with Trax, we were told
9   to limit what we said to the facts that we
10  knew.
11      Q.  What did Mr. Bell instruct you --
12  and we'll talk about some documents, as well,
13  and see if those bring anything else to the
14  fore.
15          But sitting here now, what did
16  Mr. Bell instruct Garnet to tell Sherman --
17  to tell Sherman?
18      A.  That Trax was having difficulty
19  funding, which was one of the facts that we
20  felt was very clear. And limit it to the
21  facts that we felt comfortable with.
22      Q.  Did Mr. Bell tell you not to say
23  anything other than that to Sherman?
24      A.  Whether he said explicitly or in so
25  many words, the discussion was about what we

1 were limiting the conversation to.
2     Q. And what -- and I understand so
3 many words.
4     What do you remember him saying?
5     A. I don't think I can quote him.
6     Q. Okay. So, we talked about one
7 thing you believed he said, but -- okay.
8 We'll talk about some more documents later.
9     Mr. DuBois, I believe, is how
10 you -- spoken in better French than I would
11 have.
12     What was David Dubois's role in
13 this transaction, as Garnet saw it?
14     A. I believe that he was, along with
15 Clint, the kind of primary business contact
16 that we had during the sale setup in terms
17 of, I think, more approvals of, like, the
18 marketing materials rather than information
19 gathering. That's my understanding.
20     Q. Okay. So, more the kind of the
21 practical, nitty-gritty level than Mr. Bell
22 or Mr. Poppe; is that fair?
23     A. I -- I believe that David DuBois
24 was more senior than Clint and that David was
25 involved to the extent of kind of more of a

Ishmael, Robin                                                July 6, 2016

75

1   remember this instance, even better.
2           Does that initial opinion of value
3   impact kind of where the tiers of
4   compensation for Garnet are set?
5       A.  We would certainly take where we
6   think a portfolio would trade into -- into
7   consideration when we are determining what
8   fee we would charge a client.
9       Q.  So "yes"?
10      A.  Yes.  Except that I don't know at
11  what point we determined a fee, whether it
12  was the first week or after a month of data,
13  so -- and if it was based on an initial
14  opinion of value or not is questionable, but
15  generally speaking, yes, that's determined in
16  that process.
17      Q.  I understand.  That's helpful.
18      A.  Okay.
19      Q.  Moving over to Phase 3, the heading
20  "Marketing Process"; do you see that, as
21  well?
22      A.  Yes.
23      Q.  Under that, for Garnet Services,
24  the second bullet says, "Manage investor due
25  diligence."

1      A.    Yes.
2      Q.    What does that mean in this
3  context?
4      A.    That means permissioning buyers to
5  a website where information is available,
6  answering questions about the portfolio which
7  we either do directly if we have the answers
8  or we interface with Conn's to get the
9  answers if we don't have them.
10     Q.    Perfect. And going down, my next
11 question was going to be: For seller
12 responsibility it says, "Answer investors
13 questions (coordinated by Garnet)."
14           Can you just -- you already talked
15 a bit about this just now, but what is the
16 relationship when potential investors have
17 questions about, I guess, the accounts or the
18 potential transaction; what is the
19 relationship in terms of communication lines
20 among Garnet, the seller and the potential
21 buyer?
22     A.    The buyers are interfacing with
23 Garnet and do not interface with the seller,
24 so we're in the middle of everything, Garnet
25 is. Many, many questions, we can answer

Ishmael, Robin                                         July 6, 2016

77

1   because, frankly, a lot of buyers just don't
2   read the materials that carefully. And so
3   we're able to point them to a place in the
4   offering materials or a data file that
5   answers their question. Or it may be
6   something that we know of because of the work
7   we've done with the seller at the outset that
8   we can answer the question.
9           So, we handle kind of the frontline
10  questions. And when they get to a level
11  that's something we don't have an answer to,
12  we interface with the seller to get the
13  answer.
14      Q.  To essentially find out what you
15  can share or what you should say to the
16  potential buyer?
17      A.  No. Just to get an answer.
18      Q.  Okay.
19      A.  We don't really talk to a seller
20  about what should be said or what can be
21  said, because you get an answer and you
22  communicate it or not.
23      Q.  And you relay that answer to the
24  potential buyer?
25      A.  Correct.

Ishmael, Robin                                      July 6, 2016

94

1    e-mail or a call and who was involved?
2        A.   It would have been Lou Dipalma
3    reaching out to Bryan Faliero. And it was
4    probably both phone and e-mail. I don't know
5    which specifically occurred first.
6        Q.   And that would have been in late
7    August time frame or --
8        A.   That would have been late August.
9        Q.   And what are you aware of in that
10   first conversation, the substance of that
11   conversation?
12       A.   I'm aware that Lou asked Bryan if
13   he wanted to -- if he was interested in
14   buying any of the Conn's paper. And Bryan
15   asked Lou, you know, "Why are you calling me;
16   what happened?"
17            And Lou discussed that with Bryan.
18   And he was still interested in moving
19   forward.
20       Q.   And what did Lou -- I take it,
21   for -- in your preparation for today, you
22   spoke about this particular conversation with
23   Mr. Dipalma; is that correct?
24       A.   I did.
25       Q.   And what did Mr. Dipalma tell

Ishmael, Robin                                          July 6, 2016

                                                              95

1   Mr. Faliero in response to the inquiry of why
2   this was coming back?
3       A.   It was ultimately related to Trax
4   having funding problems.
5       Q.   And what does that mean?
6       A.   That means that when a buyer is
7   having funding problems and can't close a
8   deal, that you need to find another buyer.
9       Q.   So, Mr. Dipalma told Mr. Faliero
10  that Trax, in so many words, couldn't come up
11  with the money; is that fair?
12      A.   Yes.
13      Q.   Did he tell Mr. Faliero anything
14  else in response to that inquiry?
15      A.   I do not believe so.
16      Q.   And you spoke to Mr. Dipalma and
17  asked him that question?
18      A.   I did.
19      Q.   Were there other calls or
20  communications with Sherman that you're aware
21  of based on your personal involvement or your
22  inquiry before today's deposition, in which
23  Garnet responded to inquiries of that sort
24  from Garnet -- regarding why this was coming
25  back to them?

1  at least one other line, but I remember that
2  from looking at this e-mail.  But I don't
3  remember that just from my memory.
4       Q.   Okay.  But in terms of
5  communications from Conn -- or from Garnet to
6  Sherman, you're not aware of any other
7  communications --
8       A.   No.
9       Q.   -- responding to that inquiry?
10            And how did it come -- we talked
11  about a bit of this earlier, but just to
12  retrace your steps.
13            How did it come about that
14  Mr. Dipalma told Mr. Faliero that -- that the
15  reason it was coming back to that market was
16  that Trax was having funding problems?
17       A.   Because, number one, that's what we
18  believed that was at the root of everything
19  that had happened that summer with Trax.
20  And -- well, that was one of -- we -- we
21  believed that and we believed that it was
22  that Trax was not sophisticated enough to
23  really deal with the paper.
24            We believed that it was those two
25  issues that were at the root of all of this.

1   And because of the potential or initial
2   litigation with Conn's and Trax and the fact
3   that we were instructed by Conn's to limit
4   what we discussed with Sherman, we were
5   comfortable doing so because we believed that
6   there wasn't really a problem and that this
7   was really boiling down to funding issues and
8   the unsophistication of the buyer.
9        Q.   So, before Mr. Dipalma spoke to
10  Mr. Faliero, we already discussed this, but
11  you had a discussion personally with Mr. Bell
12  at Conn, correct?
13       A.   Correct.
14       Q.   And during that discussion --
15  sorry.
16            Was that conversation had, in part,
17  in order to figure out what Garnet should
18  relay to Sherman in response to the inquiry
19  from Mr. Faliero --
20       A.   Not in --
21       Q.   -- or the anticipated inquiry,
22  perhaps?
23       A.   That's better stated, because we
24  had the conversation before we ever spoke to
25  Bryan about what it would be appropriate to

```
 1    share.
 2        Q.    So, how did that particular call
 3    between you and Mr. Bell come about; was
 4    that, okay, we're ready to go back to Sherman
 5    or should we go back to Sherman?  Or what was
 6    the -- going into that call, what was the
 7    status?
 8        A.    I don't remember if it was the -- I
 9    don't remember if that call happened after he
10    said now is the appropriate time to go back
11    to Sherman, or if we just knew it was going
12    to be coming soon and we were preparing for
13    it.
14              But in any event, it was near the
15    end of August when we knew we were going to
16    be calling Bryan soon.  And it was to
17    establish what was appropriate today.
18        Q.    And Mr. Bell instructed that Garnet
19    should say that -- or what did Mr. Bell tell
20    Garnet it could or should say to Sherman in
21    that regard?
22        A.    I understand the importance of
23    this, and I do not know what his exact words
24    were.  I just know that at the end of the
25    call, I knew that we could share that Trax
```

Ishmael, Robin                                          July 6, 2016

100

1    was having funding issues.
2              How that -- what words were used
3    and how that came about, I do not remember
4    definitively.
5        Q.   But you understood coming out of
6    that call that Garnet had authority from Conn
7    to tell Sherman that whatever the exact words
8    were, that the reason that it was coming back
9    to market, the reason that the prior buyer
10   was out of the picture, was because that
11   prior buyer had funding issues or couldn't
12   come up with the money or something of that
13   nature; is that right?
14       A.   Correct.
15       Q.   What do you -- and you also
16   mentioned litigation or potential litigation
17   between Trax and Conn, correct?
18       A.   Correct.
19       Q.   What did Mr. Bell indicate or say
20   to you regarding that?
21       A.   The reason why we needed to limit
22   what we were saying to Bryan was either
23   because they had just filed litigation --
24   "they" meaning Conn against Trax, or it was
25   imminent.

```
 1   BY MR. KASPER:
 2       Q.   Back to Exhibit 22.  Under (C),
 3   what is the issue that's raised in that
 4   paragraph?
 5       A.   This issue is -- I mean, I can read
 6   to you what he says the issue is or I can
 7   tell you what I really think the issue is.
 8       Q.   No.  I'm interested in what Trax
 9   conveyed was their understanding of the
10   issue.
11       A.   Okay.  I don't know if I can
12   interpret that any better than you can, but
13   they are saying that the letter
14   misrepresented the gross balance of the
15   accounts that were sold, including settled
16   accounts, structured payments and various
17   other things on this list here.  So, what
18   they have said is, I believe, what they're
19   stating their issue is.
20       Q.   And I'll just read part of their --
21   I take it that's what's in all caps here is
22   something you took from the letter from Trax
23   verbatim, is that your best understanding,
24   and then answered it; is that right?
25       A.   Probably.  Probably cut and paste.
```

1    It doesn't look like my words.
2         Q.   Okay.  So (C) begins, "Seller
3    misrepresented the gross balance of the
4    accounts that were sold."  And it goes on
5    from there.
6              And they go on to say that for
7    those reasons, they felt it was that -- that
8    constituted breach of 8.6 -- Section 8.6 of
9    their agreement with Conn?
10        A.   Um-hum.
11        Q.   Do you see that?
12             Did you ever tell Sherman that the
13   previous buyer -- did you, Garnet, ever tell
14   Sherman that the previous buyer had raised
15   concerns that they believed that Conn had
16   misrepresented the gross balance of the
17   accounts that had been sold to them?
18        A.   No, because every portfolio we've
19   ever sold to Sherman has some of these same
20   issues in it.  And it's not issues.
21   Structured settlements, you sell the full
22   balance.  If there's a settlement in process,
23   that's expected and the buyers like it.
24   They're getting a large collection with no
25   work.  So no, we did not inform Sherman of

Ishmael, Robin                                               July 6, 2016

323

1  this.
2      Q.   This was one of the issues that was
3  raised by Trax --
4      A.   Yes.
5      Q.   -- in the context that led to them
6  refusing to fund and being unwilling to fund
7  further deliveries on their contract with
8  Conn, correct?
9      A.   Yes.
10     Q.   You did not tell Sherman about that
11 issue having been raised by the previous
12 buyer?
13     A.   That is correct.
14          MR. MULRY:  Objection.
15 BY MR. KASPER:
16     Q.   And under (C), just above (D) in
17 what I take to be the last line of your
18 response to (C) --
19     A.   Yes.
20     Q.   -- you write, "I don't really
21 understand the life insurance issue and have
22 no feedback on it."
23     A.   Correct.
24     Q.   Could you just help me understand,
25 I guess, the limits of your knowledge on that

Ishmael, Robin                                         July 6, 2016

331

```
 1    had resulted in litigation?
 2            MR. MULRY:  Objection.
 3        A.    I don't know if they would have or
 4    not.
 5    BY MR. KASPER:
 6        Q.    I understand you don't know this.
 7    Do you believe that they would have?
 8            MR. MULRY:  Objection.
 9        A.    I just don't know because there's a
10    lot of litigation in the collection industry.
11    So, the fact that there's litigation between
12    parties is not necessarily something that I
13    think would be something that they would say
14    "show stopper."  I don't know.
15    BY MR. KASPER:
16        Q.    Well, is one reason that Garnet
17    chose not to inform Sherman of that
18    litigation because Garnet was concerned that
19    it would make Sherman less likely to enter a
20    deal or would cause Sherman to pay less than
21    it actually did?
22        A.    No.  Our rationale in not telling
23    them was, A, we didn't believe there was a
24    problem.  And, B, that we were specifically
25    told not to tell them more than they wouldn't
```

1   fund.
2       Q.  And who specifically told you not
3   to tell Sherman more than the previous buyer
4   was unable to fund?
5       **A.  As discussed earlier, the**
6   **conversation I had with Robert Bell.**
7       Q.  Was that a phone conversation?
8       **A.  I think.**
9       Q.  I think it's a separate
10  conversation, but the top of this e-mail,
11  Exhibit 23, you write to Mr. Dipalma that,
12  "Robert Bell wants me to call him so I'll do
13  that soon and let you know if there's
14  anything to know."
15          Do you remember a call with
16  Mr. Bell around this time regarding the
17  prospect of litigation?
18      **A.  No.  The calls we've had, we've**
19  **already discussed.  And I don't know what**
20  **this specific reference is to.**
21          (Defendant's Exhibit 24, E-mail
22      dated 8/22/2014, from Robin Ishmael to
23      Sean McVity and Lou Dipalma, marked for
24      identification as of this date.)
25  BY MR. KASPER:

1  A.  With respect to the disputes
2  specifically, what I was told -- I don't
3  remember if it was call or e-mail, but
4  probably an e-mail -- that the types of
5  things that the borrowers were telling
6  Sherman were typical of the excuses that
7  borrowers give to Conn's that they routinely
8  hear and routinely deal with and that they're
9  not based in any actual issues.
10  Q.  So, this doesn't indicate that
11  Sherman was making excuses?
12  A.  No, no.  This was -- no.  This is
13  about the borrowers making excuses which led
14  to this high dispute rate.  That's what this
15  is about.
16  Q.  So, this doesn't -- did Conn
17  indicate whether the dispute rate that
18  Sherman was seeing and reporting was higher
19  than they would have expected?
20  A.  I don't know if they indicated
21  that, but they thought that the level of
22  disputes was a result of Sherman not handling
23  the assertion of disputes properly
24  because --
25  Q.  Do you --