Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

```
 1                    UNITED STATES DISTRICT COURT
                              FOR THE
 2                    SOUTHERN DISTRICT OF TEXAS

 3

 4    CONN CREDIT I, LP,

 5         Plaintiff,
                                Civil Action No. 4:15-cv-3713
 6    v.

 7    SHERMAN ORIGINATOR III,
      LLC,
 8
           Defendant.
 9

10    ****************************************************

11

12    VIDEOTAPED
      DEPOSITION OF:        TODD MOUNTS
13
      DATE TAKEN:           October 26, 2016
14
      TIME:                 9:06 a.m. - 12:18 p.m.
15
      PLACE:                111 North Orange Avenue
16                          Suite 1800
                            Orlando, Florida  32801
17
      REPORTED BY:          STACY PACE, RPR, CRR, FPR
18                          Court Reporter and Notary Public

19

20

21

22

23

24

25
```



tabbies®    EXHIBIT
             E

```
 1    level of the business.  But, yes, I -- it would be

 2    reasonable to assume that, but I don't know the

 3    specifics of it.

 4         Q    Okay.  For this document specifically, Exhibit

 5    94, the date is April 30th of 2014?

 6         A    Uh-huh.

 7         Q    And it references, if you look at Ed Storey's

 8    email, a wire transaction.

 9              Who is Ed Storey, by the way?

10         A    Ed Storey was outside counsel we utilized for

11    this transaction.

12         Q    If you look at the following page, 91- --

13    Bates stamp 9135, there's an email from an Alexandra

14    Michelini?

15         A    Yes.

16         Q    She's counsel for Trax?

17         A    Yes.  She was in-house counsel for Trax

18    Capital at that time.

19         Q    And she references an executed signature page

20    to the PSA?

21         A    Yes.

22         Q    Is this -- this document appears that the

23    transaction with Conn was closed on April 30th of 2014.

24    Is that consistent with your recollection?

25         A    Yes.  That's -- the first -- the first portion
```

```
 1   which was, I believe, the bulk --
 2        Q    Okay.
 3        A    -- or that was the title that was utilized.
 4   So that was the -- the vast majority of the transaction
 5   was closed on April 30th.
 6        Q    So this, what's reflected in Exhibit 94 is the
 7   bulk closing with Conn, correct?
 8        A    Yes, but the -- the agree- -- the PSA
 9   agreement incorporated future flows or additional
10   purchases, so -- but the closing was, you know, a
11   multi-layered transaction.  So it wasn't -- it was all
12   incorporated within the purchase and sale agreement for
13   additional purchases to come.
14        Q    Yeah.  And that is exactly where I'm headed
15   now.  Again, and the purposes of this is just to set
16   some markers.  So bulk closing on April 30th...
17             (Exhibit Number 95 marked for identification.)
18   BY MR. HEINEN:
19        Q    And you can set 94 aside.
20             I'm handing you what's been marked as Exhibit
21   95 (handing).  And take a minute to look it over.
22        A    (Reviewing document.)
23        Q    Do you recognize this document?
24        A    I do.
25        Q    And what is it?
```

1    A     This appears to be the second portion -- or

2   second closing that occurred subsequent to April 30th.

3   So this would be the closing of the flows one and two

4   identified within our purchase and sale agreement.

5    Q     And what's the date?

6    A     May 9th.

7    Q     Okay.  So the bulk closing April 30th of 2014

8   and then flows one and two on May 9th of 2014?

9    A     Correct.

10    Q     Okay.  You can set that one aside.

11          Mr. Mounts, for the bulk and flows one and

12   two, TF LoanCo paid Conn in full for those account

13   deliveries, correct?

14    A     Yes.

15    Q     And between May 9th of 2014, when flows one

16   and two were closed, and September of 2014, did anyone

17   at TF LoanCo ever tell anyone at Conn that TF LoanCo's

18   financial condition was an impediment to clo- -- future

19   closings with Conn?

20    A     No.

21    Q     Between May 9, 2014, and September 2014, did

22   anyone at TF LoanCo ever tell anyone at Conn that they

23   were unable to fund future account deliveries from Conn?

24    A     Not that I'm aware of.

25    Q     Did anyone ever say to Conn that TF LoanCo was

```
 1    having trouble securing financing for future closings?
 2         A     Not to my knowledge.
 3         Q     Anyone at TF LoanCo ever say to Conn that
 4    TF LoanCo didn't have sufficient cash to fund future
 5    closings?
 6         A     Not to my knowledge.
 7         Q     You mentioned earlier Garnet Capital that you
 8    interacted with in the context of this transaction?
 9         A     Correct.
10         Q     Between May 9, 2014, and September 2014, did
11    anyone at TF LoanCo ever tell anyone at Garnet that they
12    were unable to fund future account deliveries from Conn?
13         A     Not that I'm aware of.
14         Q     All right.  So what happened next after TF
15    LoanCo took delivery of the first three purchases from
16    Conn?
17         A     We transferred all the documents necessary to
18    the collection arm, JNR, to initiate the collection
19    activity on the accounts.
20         Q     And what were the results the first month or
21    so of collection activity?  And I'm speaking generally,
22    not the specific financial results.
23         A     We just -- I mean, we encountered a fair
24    number of issues across the board with, you know, some
25    of the accounts where parties were coming up deceased in
```

1    excess of three, four, five years; a number of multiple

2    accounts where, you know, customers had said they were

3    making payments in person at the stores, come to find

4    out they had four or five different accounts.

5              Hard to tell how they were allocating the

6    funds.  I mean, I -- the issues are numerous.  But those

7    are just, you know, some -- some of the ones off the top

8    of my head, but...  You know, payments that weren't

9    being applied correctly.  I mean, just all kind of

10   things.

11        Q    And we'll review some of them in detail, but

12   sounds like, fair to say, a number of issues cropped up?

13        A    Yes.  I mean, it's -- it's not -- yes, a

14   number of issues that, you know --

15        Q    Do you recall how quickly after the closings

16   on May 9, 2014, issues started to pop up?

17        A    I don't recall specifically.  It wasn't --

18   I -- I don't recall exactly.

19        Q    Within the first month?

20        A    Yeah, that's fair -- that's a fair assumption.

21   I mean, within the first month, at least, would be a

22   reasonable estimate.

23        Q    And when TF LoanCo began to encounter these

24   issues, did it raise them with Garnet and with Conn?

25        A    Yes.

```
 1              I think you may have mention this briefly

 2    before.   Can you explain that issue?

 3         A     I mean, I was essentially just trying to

 4    determine what -- what Conn's wanted to be produced as

 5    adequate proof for the buy-back that the borrower is

 6    deceased.

 7              And Accurint is just a -- it's just a quick

 8    like one-page sort of credit pull or credit inquiry that

 9    identifies the person as being deceased.   So I think

10    that we were asking if that was sufficient evidence for

11    the buy-back.

12         Q     Was TF LoanCo encountering a number of

13    accounts that belonged to deceased individuals?

14         A     Yes.

15         Q     And should those accounts have been included

16    in the loan portfolio from Conn?

17         A     No.

18         Q     The issues that we've discussed in Exhibit 63,

19    were any of those issues at all related to TF LoanCo not

20    being able to come up with enough money to fund future

21    account deliveries from Conn?

22              MR. MONTGOMERY:   Form.

23              THE WITNESS:   We've never -- we never ever

24         mentioned that as being an issue, not having the

25         money to fund.
```

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

Page 28

```
 1   BY MR. HEINEN:

 2       Q    Did you or anyone from TF LoanCo tell Conn or

 3   Garnet at the time of this email, in June of 2014, that

 4   TF LoanCo was unable to fund future deliveries?

 5       A    No.

 6       Q    Did you tell Conn anything about funding

 7   future deliveries at this time?

 8       A    I don't re- -- I don't recall speaking with

 9   Conn's about the deliveries.  But we had a schedule in

10   the purchase and sale agreement that allowed us to

11   defer.  And so some of those communications were vetted

12   through Garnet.  But there was never a conveyance of

13   lack of funds to do any of the closings.

14       Q    You can set that one aside.

15            I'm handing you what's been marked previously

16   (handing) as Exhibit 64 to this matter.  Do you

17   recognize this document?

18       A    Yeah.  It appears familiar to me.

19       Q    What is it?

20       A    It's an email that was facilitated from

21   myself, both to Garnet and several parties over at

22   Conn's.

23       Q    And what's the date on the first email?

24       A    July 2, 2014.

25       Q    This email is dated about a month after
```

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

Page 30

1     Q     And why was it an issue for TF LoanCo that

2   there were examples that hadn't been, in your

3   estimation, adequately scrubbed?

4     A     It's just -- it's a provocative -- sort of a

5   provocative behavior to willingly or knowingly or

6   actively try to collect on these type -- some of these

7   type of accounts.  Definitely puts yourself in harm's

8   way legally.

9     Q     What do you mean by that?

10    A     Just increases the propensity of being, you

11  know, sued for some issue.

12    Q     Sued by a consumer?

13    A     A debtor, yes.

14    Q     Was this issue related to TF LoanCo not being

15  able to come up with enough money for future account

16  deliveries?

17    A     That's, again, never been -- it was never an

18  issue, lack of funds.  The issues were more of the

19  breaches of the reps and warranties that were provided

20  in the purchase and sale agreement by Conn's.

21    Q     So did anyone from TF LoanCo tell Conn or

22  Garnet at this time that it was unable to fund future

23  deliveries?

24    A     Not that I'm aware.

25    Q     All right.  You can set that one aside.

```
 1       Q      By this time -- this email is dated July 11th

 2   of 2014 -- did you think that the accounts you received

 3   from Conn matched up with what they had represented to

 4   be in the offering memorandum and marketing materials?

 5              MR. MONTGOMERY:   Form.

 6              THE WITNESS:   I don't think that it was -- no,

 7       I don't.

 8   BY MR. HEINEN:

 9       Q      Why not?

10       A      It just -- it didn't -- didn't fit the

11   description of what was marketed.

12       Q      Would you be a little more specific?  In what

13   way?

14       A      Everything that was proposed is not being

15   included -- appeared to have been included in the sale.

16   That's, I guess, as descriptive as I can be, because

17   there's -- the issues are limitless with -- within that

18   portfolio.

19       Q      Did you or anyone from TF LoanCo tell Conn or

20   Garnet in connection with these issues that TF LoanCo

21   was unable to fund future account deliveries?

22       A      No.

23       Q      Did you tell Conn or Garnet anything at this

24   time about funding future account deliveries?

25       A      We never conveyed that there was a lack
```

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

Page 36

1       A       I -- which bullet point, I'm sorry?

2       Q       Number seven.  My question is, what did you

3   mean by uncollectible accounts?

4       A       Real- -- I mean, uncollectible and

5   unenforceable are kind of one and the same, perhaps not

6   your unanimously defined.  But that's -- that was an

7   error on my part; I should have put unenforceable.

8       Q       And can you explain a little bit about what

9   unenforceable meant to TF LoanCo?

10      A       It's --

11              MR. KAMIN:  Objection, form.

12              THE WITNESS:  I mean, it's -- you know, absent

13          giving a legal definition on that, I mean, just --

14          it wasn't -- you know, the excess of a

15          settled-in-full account, you know, if it was

16          performed by both parties, it's not -- it's not

17          what you would characterize as an unenforceable

18          account if you've already accepted less than the

19          existing balance.  So that's just one of many

20          numerous examples, but --

21  BY MR. HEINEN:

22      Q       Is that because TF LoanCo couldn't attempt to

23  collect on that account?

24      A       Again, that's another legal interpretation I'm

25  not really qualified to give.  It's just -- it's not

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016                                        Page 37

1    recommended for certain -- the legalities of it.  That's

2    why God invented attorneys.

3          Q      Unfortunately, right?

4                 I don't want to give -- I don't want to ask

5    you to make any legal interpretations.  I'm just trying

6    to get at:  When you said uncollectible accounts in this

7    agenda, what were you trying to convey to Conn?

8                 MR. MONTGOMERY:  Objection to form.

9                 THE WITNESS:  It -- there was more than one --

10         in other words, there's no -- no uniler- (sic) --

11         universally defined example of that, so -- it's

12         sort of a broad statement.  It's just accounts that

13         we did not willingly participate in collecting on

14         and wasn't what -- what we were portrayed to have

15         purchased.

16   BY MR. HEINEN:

17         Q      Number eight on the same agenda says:  Discuss

18   the various regulatory issues and potential fines,

19   slash, penalties that may be probable as a result of

20   selling the various accounts above.

21                What does that mean?

22         A      I don't recall specifically, to be honest with

23   you.

24         Q      Do you recall why TF LoanCo was raising

25   regulatory issues and potential fines, slash, penalties?

1          mean, there was probably a few in each -- each

2          bullet.

3     BY MR. HEINEN:

4          Q      All right.   Number ten on this same list says:

5     Need additional information on the various insurance

6     billing processes, slash, procedures.

7          A      Yes, I see that.

8          Q      What type of insurance was TF LoanCo asking

9     for information about?

10         A      This was the credit insurance that was

11    included in some of the accounts.   There were a claim or

12    two that had come up, and we were given the information

13    to facilitate the processing of the claim.   So on -- we

14    were just -- we were just asking for more information

15    with regard to some of those accounts.

16         Q      Okay.   Take a look at number 13 on that same

17    list.   It says:   Discuss and propose changes, slash,

18    amendments as appropriate in an effort to improve the

19    collection efforts.

20                Do you see that?

21         A      Yeah.

22         Q      Was TF LoanCo planning to continue purchasing

23    account deliveries assuming these issues could be

24    resolved?

25         A      That was the purpose of the meeting, as I

1    recall, was to try to address some items that -- that

2    weren't adequately addressed.

3        Q    And did you or anyone from TF LoanCo tell Conn

4    or Garnet, in connection with this agenda, that TF

5    LoanCo was unable to fund future account deliveries?

6        A    Not to my knowledge.

7        Q    What did you tell Conn at this time about

8    funding future account deliveries?

9        A    The only message that had been conveyed with

10   regard to that was deferring to a later date, which was

11   allowed.

12       Q    And did you tell any -- Conn anything at this

13   time about closing on future account deliveries,

14   generally?

15       A    Only deferring those closings.

16       Q    Eventually, after a number of these

17   negotiations, TF LoanCo sent Conn a formal letter from

18   its attorneys regarding some of these issues, correct?

19       A    Yes.

20       Q    I'm handing you (handing) what's been

21   previously marked as Exhibit 66, and 67 (handing), in

22   this matter.  If you could take a look at those and let

23   me know when you're ready to answer a couple of

24   questions.

25       A    (Reviewing documents.)  Okay.

```
 1    paragraph C.   It says:   Seller misrepresented the gross
 2    balance of the accounts that were sold.
 3               And it lists a number of specific types.
 4               Later in the paragraph it says:   Many of these
 5    accounts are invalid and unenforceable constituting a
 6    breach of section 8.6 of the agreement.
 7               In TF LoanCo's opinion, why were these
 8    accounts invalid and unenforceable?
 9          MR. KAMIN:   I'm going to object to you
10       testifying on behalf of what TF LoanCo's opinion
11       is.   If you're here in your individual capacity,
12       you can testify.   But you're not to testify what TF
13       LoanCo was thinking.
14          MR. HEINEN:   Let me rephrase.
15    BY MR. HEINEN:
16       Q    Mr. Mounts, do you recall why -- or did you
17    consider some of the accounts purchased from Conn to be
18    unenforceable?
19       A    In my professional experience, I considered
20    them to be unenforceable, yes.
21       Q    Why was that?
22       A    If you've taken in a life insurance payment on
23    a deceased debtor, whatever those proceeds were,
24    that's -- you know, the excess balance of that is not
25    a -- an enforceable debt.   The debtor is deceased.
```

1          So that was, again, one of many issues raised

2   in bullet point C.  But that's my professional

3   experience, that's not a enforceable valid debt that

4   would be sold or collected upon.  It's a practice that's

5   shunned.

6       Q    Okay.  If you take a look at Exhibit 67.  I'll

7   direct you to paragraph D, which is on the second page,

8   Bates stamped CONNS 12164.

9          If you take a look at the -- it's actually the

10  second paragraph under point D.

11      A    (Reviewing document.)  Okay.

12      Q    My question is:  It appears in that paragraph

13  that Conn is agreeing -- or at least is not disputing

14  that there were some deceased and bankrupt accounts

15  included in the accounts sold to TF LoanCo.

16          Is that consistent with your understanding?

17      A    As -- as I understand it, yes.

18      Q    Okay.

19          MR. MONTGOMERY:  I'm sorry, could you repeat

20      that question -- would the court reporter reread

21      that question?  I missed it, I apologize.

22          (Requested portion of the record was read back

23      by the court reporter.)

24          MR. MONTGOMERY:  Sorry about that.

25

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

Page 52

1       Q     Many of the issues on the list are ones that

2   have come up on -- on previous emails.

3             By August 19th of 2014, from your perspective,

4   had these issues still not been resolved by Conn?

5       A     I don't believe so.

6       Q     But was TF LoanCo still trying to work with

7   Conn to resolve those issues?

8       A     Yes.

9       Q     And had the issues been resolved, could TF

10  LoanCo had funded future account deliveries, financially

11  speaking?

12            MR. MONTGOMERY:   Form.

13            MR. KAMIN:   Form.

14            THE WITNESS:   Yeah, I don't think the

15       financial issue was the issue.   It was more along

16       the lines of the breaches that we were trying to

17       address.

18  BY MR. HEINEN:

19       Q     In your opinion had these issues been

20  resolved, would TF LoanCo have closed on future

21  account deliveries?

22            MR. KAMIN:   Objection to form.

23            MR. MONTGOMERY:   Objection, form.

24            THE WITNESS:   I can't answer that, to be

25       honest.

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

Page 53

```
 1    BY MR. HEINEN:

 2         Q     At this time in August of 2014, did anyone

 3    from TF LoanCo tell Conn or Garnet that they did not --

 4    that it did not have sufficient funds to accept another

 5    loan delivery?

 6         A     Not that I'm aware of.

 7         Q     Did anyone from TF LoanCo tell Conn or Garnet

 8    they were unable to fund future account deliveries?

 9         A     Not that I'm aware of.

10         Q     TF LoanCo eventually refused to close on any

11    additional account deliveries from Conn; is that right?

12              MR. KAMIN:  Objection, form.

13              THE WITNESS:  I don't -- can you repeat that

14         one more -- I -- I don't recall that being the

15         case, but --

16    BY MR. HEINEN:

17         Q     Let me ask it this way:  After the May 9, 2014

18    closing of flows one and two that we discussed

19    previously, did TF LoanCo ever close on another delivery

20    of accounts from Conn?

21         A     No, we did not.

22         Q     Did that have anything to do with any

23    financing issues?

24              MR. MONTGOMERY:  Form.

25              THE WITNESS:  Not to my knowledge.
```

Conn Credit I, LP vs Sherman Originator III, LLC
TODD MOUNTS on 10/26/2016

Page 54

```
 1    BY MR. HEINEN:

 2         Q     Why did TF LoanCo not close on another account

 3    delivery from Conn?

 4                MR. MONTGOMERY:   Form.

 5                THE WITNESS:   Because of the breaches under

 6         the purchase and sale agreement, specifically the

 7         reps and warranties.

 8    BY MR. HEINEN:

 9         Q     Then in August of 2014 Conn sued TF LoanCo; is

10    that correct?

11         A     Yes.

12         Q     You can set that one aside.

13                All right, Mr. Mounts, I think I have just one

14    more issue I want to talk to you about.

15                A number of the accounts TF LoanCo purchased

16    from Conn had repair service agreements and other

17    warranty products included with them.   Is that your

18    understanding?

19         A     Yes.

20         Q     And are you familiar at all with Conn's

21    policies regarding repair service agreements?

22         A     Not -- I mean, not specifically.   I mean...

23         Q     And I'll be more specific:   Do you know at

24    Conn's, at the time that TF LoanCo purchased accounts,

25    what happens to a repair service agreement when an
```