1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

CONN CREDIT I, LP,                )
         Plaintiff,               ) Case No.
    vs.                           ) 4:15-CV-03713
SHERMAN ORIGINATOR III            )
LLC,                              )
         Defendant.               )
----------------------------------)

VIDEOTAPED DEPOSITION OF

BRYAN FALIERO

New York, New York

Wednesday, November 2, 2016

Reported by:

TAMI H. TAKAHASHI, RPR, CSR

EXHIBIT F

Faliero, Bryan                                November 2, 2016

99

1      A.   Yes.  You know, I asked -- so,
2  that's where I found out --
3           I believe that's where I found out
4  that the reason why they were coming to us is
5  I believe we were the second place bidder in
6  the first round.  So, I asked him what has
7  happened with the current bidder and he --
8  and he told me that they were unable to fund,
9  they may be unable to fund.
10          His very first call to me was not
11 definitive that they wanted to negotiate with
12 us; it was feeling me out.
13     Q.   Just to see if it would --
14     A.   If we would still be interested.
15     Q.   And what was your reaction?
16     A.   My reaction is, "Yes, we are still
17 interested."
18     Q.   Any particular reason why?
19     A.   Because we liked our bid the first
20 time.
21     Q.   You had an expectation that you
22 would meet that 10 to 15 percent NPV?
23     A.   Correct.
24     Q.   And after you got off that phone
25 call, what did you do then?

```
 1      A.   Right.
 2      Q.   -- what you remember.
 3      A.   I remember him saying that they
 4  were unable to fund.
 5      Q.   Was that meaningful to you at that
 6  time?
 7      A.   Sure, yes.
 8      Q.   Why?
 9      A.   Why somebody doesn't honor their
10  agreement matters, so the reason is
11  meaningful.
12      Q.   Who was the person -- who was the
13  entity not honoring the agreement?
14      A.   I did not know at the time.
15      Q.   Which party, the buyer or the
16  seller?
17      A.   Oh, I knew Conn's was the seller.
18  I did not know who the winning buyer was.
19      Q.   Okay, that -- I -- you answered
20  very specifically and I appreciate that.
21           All right.  So, you are saying that
22  the purchaser was not honoring the agreement
23  and that was meaningful to you.
24      A.   Yes.
25      Q.   And how did that -- how did that
```

1   impact your decision to continue with the bid
2   when you learned that it was potentially an
3   issue with their inability to fund?
4       A.   That had less of an impact on my
5   pricing than would -- you know, their reasons
6   could -- could have --
7            There could be a lot of reasons why
8   the original buyer didn't fund.  The reason
9   given that they were unable to, they didn't
10  have the cash, is probably the least harmful
11  from my perspective.
12      Q.   What do you mean on the spectrum of
13  harm?  I don't understand what would be the
14  least harmful, what would be the most
15  harmful.
16      A.   Yeah.
17           What would be most harmful is if
18  there was an actual problem with the loans
19  being sold themselves.  If that were the
20  case, I would absolutely not bid and not
21  purchase.
22           If it were that there were no
23  problems with the accounts but they didn't
24  fund because they were very unhappy with the
25  performance, then that would probably cause

1  me as a matter of caution to lower my bid.
2          And then the least harmful is hey,
3  they just didn't have the money to fund, and
4  then that leaves my original analysis fairly
5  intact.
6      Q.   Is it your experience that
7  purchasers that are unhappy with the
8  performance of the fund do try to back out of
9  continued purchase of debt portfolio?
10         MR. WRONSKI:   Form and foundation.
11     A.   We have purchased over 7,000
12 consumer portfolios, many of which have
13 performed poorly from an investment
14 standpoint.  We have never backed out of the
15 purchase contract.
16 BY MR. MONTGOMERY:
17     Q.   Of the 7,000 that you're talking
18 about, how many of them were the purchase of
19 ongoing flow, if you know?
20     A.   Many of them.  I don't know the
21 exact percentage.
22     Q.   When you say "many," like more than
23 half, an unappreciable minority?  What --
24          And I understand you don't know
25 specifics.

1   On the Conn's portfolio when we
2   saw, based on the number of consumers that we
3   actually got hold of, the percentage of them
4   that were complaining, it was, you know,
5   multiple times our historic norm both on
6   like similar assets and our portfolio as a
7   whole. We suspected something were
8   significantly wrong with the accounts.
9   We didn't know at the time that the
10  balances were actually wrong -- that we found
11  out later -- but we knew enough from the
12  types of disputes that we were getting that
13  something is materially wrong. And for us to
14  continue to call every single consumer to get
15  that list perfectly would be us willingly
16  abusing the consumer, calling a consumer on a
17  balance that they may or may not owe, which
18  would get us in regulatory hot water.
19       Q.  So, what point did you cease
20  collections for all reasons?
21       A.  We ceased -- that should be with an
22  e-mail document somewhere. I want to say
23  middle of November of 2014, but I don't know
24  the exact date. It might have been late
25  November.

1           So, if there was a million dollars
2   worth of accounts we purchased, bankruptcy
3   accounts carry a different value. We would
4   agree to a price and try to replace them with
5   like value.
6        Q.   Any other solution that you're
7   aware of?
8        A.   Not that I recall.
9        Q.   At what -- you testified earlier to
10  an actual problem with the balance of the
11  accounts. What were you referring to?
12       A.   There's a list of disputes we
13  received from the consumers that ran the
14  gamut of "I paid Conn's directly," "This was
15  settled prior to our acquisition," "I
16  returned the merchandise and they didn't give
17  me a credit," "They're billing me for
18  insurance that I never signed up for" or
19  "Insurance was supposed to pay the claim, not
20  me." Those are the ones that I can remember
21  off the top of my head.
22           That was enough in terms of
23  percentage of accounts that were disputing
24  that led us conclusively to believe if we
25  could continue to work these accounts, we

1  would be abusing consumers and violating the
2  law.
3           What we didn't know at the time is
4  that 60-plus percent of the balances are
5  admittedly wrong by Conn's for the lack of
6  crediting the unused premium of a warranty
7  agreement, so flat out the balances were
8  wrong.  We didn't even uncover that problem,
9  but the nature of the complaints were so
10 filled with outrage that we stopped
11 collection activity, based on the list of
12 reasons I just gave.
13      Q.  I'm sorry.  When you mention the
14 nature of the complaints were so filled with
15 outrage, are you talking about from the
16 individual debtors?
17      A.  From the consumers, yes.
18      Q.  Then how was the level of outrage
19 relatively tracked by Resurgent?
20      A.  We listened to the calls.  Every
21 call is recorded.
22      Q.  And how many calls were listened
23 to?
24      A.  I believe I sent over -- I don't
25 recall the exact number.  I believe it was

1   otherwise?
2       A.   We did.
3            MR. WRONSKI:  Object to the form.
4       A.   We did have those conversations.
5   Those conversations were relayed back through
6   Garnet to us that these types -- from Conn's,
7   and I'm going paraphrase because I don't
8   remember the exact quote, but "These types of
9   consumers make all kind of excuses, you've
10  just got to keep calling them," and we were
11  not going to do that.
12  BY MR. MONTGOMERY:
13      Q.   And the 256 examples that you sent
14  in November of 2014, why those 256?  Were
15  there more that you had within your -- that
16  you had compiled that you did not send?
17      A.   That was everything we compiled at
18  that time.
19      Q.   So, you were making these decisions
20  based on that universe of 256 accounts that
21  were transmitted to Conn's in November of
22  2014?
23      A.   That was a subset of the accounts I
24  was making a determination on that got us
25  very, very uncomfortable.

1   So, the population I was referring
2   to are the population of accounts where we
3   actually contacted the consumer. So, of the
4   consumers we contacted, 256 of them disputed
5   or complained. So, I looked at that ratio,
6   number of disputes or complaints in the
7   numerator, total number of consumers we
8   contacted in the denominator, and that
9   dispute rate was up around 7 percent.
10      And I think we covered earlier that
11  historically that dispute rate should be half
12  of 1 percent, so that's roughly 14 times the
13  normal dispute rate.
14      And if you couple that with the
15  nature of their dispute, they weren't just
16  validating, you know, why we reported it to
17  the credit bureau because we hadn't yet.
18  They weren't validating "I don't know who you
19  are." They were saying things like "I
20  returned my furniture, they never gave me
21  credit," "My product was defective," "This
22  part of the balance I never signed up for."
23  Their disputes all --
24      The majority of their disputes
25  spoke to the integrity of the balance, and

226

1   the volume of disputes made it unworkable.
2   And for us to do that, we would have been
3   setting us up for serious regulatory
4   repercussions through any type of
5   examination, in our opinion, from a state AG
6   or a federal regulator.
7           MR. MONTGOMERY: And object to the
8       nonresponsive portion.
9   BY MR. MONTGOMERY:
10      Q.  Really my question was beyond the
11  256 disputes that you transmitted in November
12  of 2014; were there any other disputes that
13  you did not transmit or were holding back for
14  any reason?
15      A.  No, we didn't cherry-pick the
16  disputes.  That was everything that disputed
17  once we stopped working them.
18          I think today we ran it again and
19  we might have been up to like 300.  So, there
20  was an incremental trailing of disputes that
21  we would be happy to share that the nature of
22  the disputes has not changed.
23          MR. WRONSKI: And I will point out
24      and say for record, because you tried to
25      squeeze a nonresponsive objection there,

1    Sherman is claiming Conn's failed to fulfill.
2           And we have the representations
3    articulated in the PSA.  Besides those
4    representations, are there any others that
5    you would refer to, any other representations
6    made by any representative of Conn's to
7    Sherman even after the contract was executed
8    that you feel it failed -- that Conn's failed
9    to fulfill?
10       A.   So, there's a couple of things.
11           On the points in media and the
12   e-mails that you already pointed out where we
13   summarize we didn't get this media or get
14   that media, I don't know if that all shook
15   out, so I don't know if they continued not to
16   kind of fulfill that.
17           During the process I asked a direct
18   question, what happened --
19           I wasn't the original winner of
20   that portfolio, so when it came back to me --
21   and we already discussed that -- my first
22   question is:  What happened to the original
23   buyer?  The answer I got -- and I got it from
24   Garnet, I don't know if it came on behalf of
25   Conn's or it was Garnet's doing, but the

1  answer was that the original buyer couldn't
2  fund, didn't have the money. There were
3  bigger problems there that weren't disclosed
4  to me.
5         So, I don't know if that falls into
6  your question in terms of what other
7  mischaracterizations do I feel were made by
8  Conn's that aren't tied to the contract. But
9  why the first buyer fell through, where
10 Conn's knew there were problems with the
11 accounts and the answer that we were told is
12 the original buyer just didn't have the
13 money, I feel like that's a misrepresentation
14 if that's what you're asking.
15     Q.   Any other representation by Conn's
16 along those lines of post-contractual
17 representations between Conn's and Sherman?
18         MR. WRONSKI:  I'm just going to
19     object.  What he just testified about
20     was pre-contractual.
21         THE WITNESS:  Yeah, that was.
22         MR. MONTGOMERY:  Oh, yeah, I'm
23     sorry.  You're right.  I apologize.
24     A.   I can't think of any but I don't --
25 I don't know what I might be missing.  I